1

2

3

4

5

6

7

8               IN THE UNITED STATES DISTRICT COURT

9             FOR THE EASTERN DISTRICT OF CALIFORNIA

10   KEITH HUGH JENSEN,

11             Petitioner,              No. CIV S-09-0512 DAD P

12       vs.

13   ROBERT J. HERNANDEZ,

14             Respondent.             <u>ORDER</u>

15   _____/

16            Petitioner is a state prisoner proceeding pro se with a petition for a writ of habeas

17   corpus pursuant to 28 U.S.C. § 2254.  The parties have consented to proceed before a United

18   States Magistrate Judge pursuant to 28 U.S.C. § 636(c).  Petitioner challenges a judgment of

19   conviction entered against him on December 17, 2003 in the Sacramento County Superior Court

20   on charges of spousal rape with force, false imprisonment, misdemeanor spousal battery, and

21   making terrorist threats.  Petitioner raises nineteen separate claims for federal habeas relief.

22   Upon careful consideration of the record and the applicable law, and for the reasons set forth

23   below, the undersigned will conditionally grant petitioner's application for a writ of habeas

24   corpus on his claims of <u>Faretta</u> error and that his appellate counsel rendered ineffective assistance

25   in failing to raise the <u>Faretta</u> error on appeal, and will deny the application in all other respects.

26   /////

1

BACKGROUND

I. Factual Background

In its unpublished memorandum and opinion affirming petitioner's judgment of conviction on appeal[1], the California Court of Appeal for the Third Appellate District provided the following factual summary:

> Defendant Keith Hugh Jensen was convicted by jury of spousal rape, false imprisonment, misdemeanor spousal battery, and terrorists threats. The jury also found true the allegation defendant served four prior prison terms. The trial court sentenced defendant to 15 years in state prison.
>
> On appeal, defendant contends: (1) the trial court improperly refused his request for advisory counsel, (2) the trial court improperly admitted battered women's syndrome evidence, (3) admission, pursuant to Evidence Code section 1109, of defendant's prior infliction of domestic abuse violated his due process and equal protection rights, and (4) a jury instruction pursuant to CALJIC No. 2.50.01 violated his due process rights. We affirm.
>
> **FACTS**
>
> On May 4, 2002, in the early morning hours, defendant called his estranged wife, Terri, to get a ride, but she refused. Defendant called a second time and told Terri his young nephew was with him at a known drug house. Terri picked up a friend, Jill Johnson, to go with her and attempted to retrieve the nephew. When she arrived, defendant got into the car instead of the nephew and refused to get out. He demanded Terri give him a ride to his father's house. During the drive, defendant pulled Terri's hair and called her names. He threatened to kill those close to Terri to bring her "world to an end."
>
> Upon arrival at the father's house, defendant refused to get out of the car because Terri would not go with him. She decided to drive to a friend's house on Withington Avenue for help dealing with defendant. Her friends were not home, but others were in the house. Defendant exited the car on Terri's side and pulled her out of the car by her shirt sleeve. He warned her that it would be "the easy way or the hard way."
>
> Defendant pulled Terri into the house by the front of her shirt. Once inside, defendant again grabbed Terri by the shirt, pulled her

---

[1] Doc. No. 18-1 (hereinafter Opinion). Page references to all filed documents refer to the pagination created by this court's CM/ECF system.

towards the bedroom, and threatened, "the easy way or the hard way."  He said he wanted to talk to her.  Terri entered the bedroom, fearing she would be beaten if she did not comply.  Defendant kept Johnson from entering the bedroom.  He closed and locked the door.

In the bedroom, defendant and Terri argued about their relationship, Terri's illness (she thought she had cancer), and her attitude.  Nothing Terri said satisfied defendant, and he hit her twice on the head.  She tried to protect her head with her hands, but this made him angry.  He hit her again when she put her hands down.  At one point, he threatened to "take [her] world down even though it mean[t] spending the rest of [his] life on death row," which she understood as a threat to kill her or her son.  At some other point, defendant bit Terri on her arm.

Johnson knocked on the door to check on Terri because she had heard Terri tell defendant to stop.  Defendant opened the door, told Johnson to go away, and assured her that Terri was fine.  Terri said she was "okay," but Johnson could not see her.  Later, Johnson asked again if everything was okay, and defendant responded that everything was fine, but the door remained closed.

Defendant ordered Terri to remove her clothes.  She did not want to, but feared what he would do if she refused.  She complied, removing all but her underwear.  Defendant removed the underwear and had intercourse with her for approximately 30 minutes.  She did not resist because she did not want him to strike her.  Defendant commented she could not fulfill him, and she responded with a sarcastic remark.  He attempted to hit her, and she shouted at him not to.

Johnson knocked on the door a third time, and defendant opened it.  He asked Johnson about Terri's phone and purse.  Johnson saw Terri was putting on her blouse, had a red and swollen face, and looked horrified.  Terri managed to get out of the house and ran into the middle of the street shouting for Johnson to get into the car and start it.  Defendant reached the car first, attempted to start it with an old key, and smashed in the windshield when his key failed to work.  He walked away, carrying Terri's cell phone.

Terri and Johnson fled in the car to go call the police.  They stopped at a bar, and Johnson dialed 911.  Terri kept a lookout for defendant.  The police arrived and interviewed Terri, but did not ask her for details of what happened in the room.  In the meantime, defendant went to Terri's sister's house.  He admitted hitting Terri, smashing the windshield of her car, and having a fight.

Terri did not report the rape until later when she was questioned by an investigator from the district attorney's office.  Terri is very guarded about her personal life.

3

At trial, Terri testified to two prior incidents of sex and violence with defendant.  The first occurred when defendant strapped her, naked, to the bed in a camper after she attempted to leave when he wanted to have sex.  She escaped the bonds while defendant was outside the camper, but was unable to dress before he returned.  She consented to sex with him because she did not want to be strapped down again.  The second time defendant broke Terri's nose when she refused to have sex with him.

Defendant testified he started calling Terri for a ride at 4:00 a .m. on May 4, 2002, and it was light out when she picked him up.  He claimed he did not ask to go to the house on Withington Avenue and did not force Terri to enter the house.  He testified they argued about Terri's cancer.  He denied having intercourse with Terri and stated she was mistaken about having disrobed.  Finally, defendant claimed his threatening statements had been taken out of context because he was referring to what would happen if Terri kept doing and selling drugs.

(Doc. No. 18-1 at 2-3.)

II.  Procedural Background

On February 15, 2007, after the California Court of Appeal affirmed petitioner's judgment of conviction, petitioner filed a petition for writ of error coram nobis in the Sacramento County Superior Court.  (Resp't's Lod. Doc. 3.)  That petition was subsequently dismissed pursuant to petitioner's notice of rescission.  (Id.)

On February 16, 2007, petitioner filed a petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District.  (Resp't's Lod. Doc. 4.)  Therein, he claimed that his appellate counsel had rendered ineffective assistance in failing to return petitioner's trial record in a timely manner and in failing to raise meritorious issues on appeal.  (Id.)  That petition was summarily denied by order dated February 22, 2007.  (Id.)

On March 28, 2007, petitioner filed another petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District.  (Resp't's Lod. Doc. 5.)  Therein, he claimed that: (1) his appellate counsel rendered ineffective assistance; (2) his rights pursuant to Faretta v. California, 422 U.S. 806, 821 (1975) were violated when the prosecution charged him with additional enhancements after he waived his right to counsel; (3) the trial court violated

4

1   his constitutional rights in denying his repeated requests for "advisory/co-counsel;" (4) the

2   prosecution violated <u>Brady v. Maryland</u>, 373 U.S. 83, 87 (1963) when it failed to disclose

3   exculpatory material to the defense; (5) the prosecutor violated his right to due process by

4   presenting knowingly false testimony at trial; (6) his sentence violated the ruling in <u>Cunningham</u>

5   <u>v. California</u>, 549 U.S. 270 (2007); (7) his sentence violated state sentencing law; (8) the

6   "superior court clerk and/or department of corrections" violated his Constitutional rights by

7   "adding to [his] sentence;" (9) California Penal Code § 3000 is vague and unconstitutional; (10)

8   California Penal Code § 3000.07 is unconstitutional; and (11) California Penal Code § 3004(B) is

9   unconstitutional.  (<u>Id.</u>)  The state appellate court denied relief in an order dated May 10, 2007

10  with the following reasoning:

11          The petition for writ of habeas corpus is denied for failure to state a
            prima facie case as to any claim other than the contention that the
12          trial court imposed the upper term in violation of <u>Blakely v.</u>
            <u>Washington</u> (2004) 159 L. Ed.2d 403 and <u>Cunningham v.</u>
13          <u>California</u> (2007) 166 L. Ed.2d 856, and, as to the
            <u>Blakely/Cunningham</u> issue, the petition is denied for failure to
14          specifically demonstrate that the claim has been presented to the
            trial court in the first instance (<u>In re Steele</u> (2004) 32 Cal.4th 682,
15          692; <u>In re Hillery</u> (1962) 202 Cal. App.2d 293.)

16  (<u>Id.</u>)

17          On June 25, 2007, petitioner filed a petition for writ of habeas corpus in the

18  Sacramento County Superior Court, in which he raised the following claims: (1) his appellate

19  counsel rendered ineffective assistance; (2) the trial court violated his <u>Faretta</u> rights; (3) the trial

20  court violated his constitutional rights by discussing petitioner's request to represent himself at

21  an ex parte meeting held outside of his presence; (4) he was "denied advisory/co-counsel after

22  trial court made up its mind 'in camera;'" (5) the prosecution "suppressed exculpatory evidence

23  and allowed it to be destroyed;" (6) the prosecutor knowingly introduced perjured testimony at

24  trial; (7) the trial court improperly denied petitioner compulsory process for obtaining trial

25  witnesses; (8) the trial court improperly admitted evidence of Battered Woman Syndrome; (9)

26  California Evidence Code § 1109 is unconstitutional; (10) the trial court violated his right to due

5

process by instructing the jury with CALJIC No. 2.50.01; (11) the trial court violated his right to due process by refusing to give jury instructions on his theory of the defense; (12) he was improperly sentenced to three upper terms without a jury finding of aggravated facts; (13) the trial court abused its discretion when it sentenced him to consecutive terms pursuant to California Penal Code § 667.6 (C); (14) he was "not sentenced to parole nor to registration per penal code section § 290;" (15) California Penal Code § 3000 (A) (4) is unconstitutional; (16) California Penal Code § 3000.07(A) is unconstitutional; and (17) California Penal Code § 3004(B) is unconstitutional.  (Resp't's Lod. Doc. 6.)  Petitioner also alleged a "supplemental" claim as part of this petition (claim 18), arguing that "new evidence" indicating that prosecution witness Jill Johnson had recanted her trial testimony demonstrated that he was innocent of the crimes for which he was convicted.  (Id.)

In a written decision issued on October 1, 2007, Sacramento County Superior Court Judge Michael W. Sweet denied that petition.  (Resp't's Lod. Doc. 6.)  Citing the decision in In re Waltreus, 62 Cal.2d 218, 225 (1965), the Superior Court denied relief as to petitioner's claims 3, 4, 8, 9, and 10 because they were raised and rejected on appeal.  (Id.)  Citing the decision in In re Dixon, 41 Cal.2d 756, 759 (1953), the Superior Court denied relief as to petitioner's claims 2, 5, 6, 7, and 11 because they were apparent from the record and therefore should have been raised on appeal.  (Id.)  Petitioner's claim of ineffective assistance of appellate counsel, his sentencing claims (claims 12 through 17) and his supplemental claim of actual innocence based on newly discovered evidence (claim 18), were rejected by the Superior Court on the merits.  (Id.)

On October 29, 2007, petitioner filed another petition for writ of habeas corpus in the California Court of Appeal for the Third Appellate District.  (Resp't's Lod. Doc. 7.)  A court docket entry reflects that petition being dismissed by order dated March 13, 2008, as "duplicative

/////

/////

1  of the writ petition filed on October 31, 2008."[2]  (Id.)

2         On October 31, 2007, petitioner filed a petition for writ of habeas corpus in the

3  California Court of Appeal, in which he raised the same claims that he raised in his June 25,

4  2007 petition filed in the Sacramento County Superior Court, as well as one additional claim that

5  "the lower court ruled contrary to, and unreasonably in light of the California and United States

6  Supreme Court law and the facts in evidence as set forth by petitioner."  (Resp't's Lod. Doc. 8.)

7  On March 14, 2008, the California Court of Appeal issued an order to show cause (OSC),

8  returnable before the Sacramento County Superior Court and ordered the matter to be heard when

9  placed on the calendar by the Superior Court.  (Id.)

10        On November 8, 2007, before the California Court of Appeal issued its OSC and

11  before the Sacramento County Superior Court could place the OSC on calendar for hearing,

12  petitioner filed a petition for writ of habeas corpus in the California Supreme Court, raising all of

13  the claims raised in his October 31, 2007 petition filed with the California Court of Appeal.

14  (Resp't's Lod. Doc. 9.)  The California Supreme Court summarily denied that petition on June

15  11, 2008.  (Id.)

16        On June 13, 2008, petitioner filed another habeas petition in the California Court

17  of Appeal.  (Resp't's Lod. Doc. 10.)  That petition has not been lodged with this court and

18  neither party has described the claims contained therein.  However, the petition was summarily

19  denied by order dated June 19, 2008.  (Id.)

20        Meanwhile, on May 7, 2008, the Sacramento County Superior Court issued an

21  order directing the district attorney to file a formal response to petitioner's October 31, 2007

22  habeas petition.  (Resp't's Lod. Doc. 11.)  On May 13, 2008, the Superior Court issued a further

23  order clarifying that the OSC previously issued from the California Court of Appeal covered only

24

25  ────────────

26  [2]  This docket entry in the state appellate court's records  appears to contain a typographical error because petitioner's "writ petition" was actually filed with that court on October 31, 2007.  (See Resp't's Lod. Doc. 8.)

1    petitioner's claim (18) that prosecution witness Johnson's recantation of her trial testimony

2    demonstrated that petitioner was innocent.  (Resp't's Lod. Doc. 12).  However, notwithstanding

3    this clarification, the Superior Court also ordered respondent to file a response to petitioner's

4    claims 4, 7, 8, 9, 10, 11, and 18.  (Id.)  Respondent filed responsive documents on June 13, 2008,

5    and June 19, 2008.  (Resp't's Lod. Docs. 13, 14.)

6          On October 30, 2008, the Superior Court ordered an evidentiary hearing on

7    petitioner's claim regarding Johnson's recantation of her trial testimony (claim 18), and denied

8    relief with respect to petitioner's claims 4, 7, 8, 9, 10, and 11 on procedural grounds.  (Resp't's

9    Lod. Doc. 15.)  The Superior Court held the evidentiary hearing on petitioner's claim 18 on

10    December 12, 16, and 17, 2008.  (Resp't's Lod. Docs. 16-18.)  On March 18, 2009, the court

11    issued an order denying petitioner relief as to that claim on the grounds that he had "failed to

12    make any convincing showing that Jill Johnson had committed perjury at trial."  (Resp't's Lod.

13    Doc. 19.)

14          Petitioner filed his federal petition for writ of habeas corpus in this court on

15    February 23, 2009.

16                                        ANALYSIS

17    I.  Standards of Review Applicable to Habeas Corpus Claims

18          An application for a writ of habeas corpus by a person in custody under a

19    judgment of a state court can be granted only for violations of the Constitution or laws of the

20    United States.  28 U.S.C. § 2254(a).  A federal writ is not available for alleged error in the

21    interpretation or application of state law.  See Wilson v. Corcoran, 562 U.S.___, ___, 131 S. Ct.

22    13, 16 (2010); Estelle v. McGuire, 502 U.S. 62, 67-68 (1991); Park v. California, 202 F.3d 1146,

23    1149 (9th Cir. 2000).

24          Title 28 U.S.C. § 2254(d) sets forth the following standards for granting federal

25    habeas corpus relief:

26    /////

                                            8

> An application for a writ of habeas corpus on behalf of a person in custody pursuant to the judgment of a State court shall not be granted with respect to any claim that was adjudicated on the merits in State court proceedings unless the adjudication of the claim -
>
> (1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or
>
> (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding.

For purposes of applying § 2254(d)(1), "clearly established federal law" consists of holdings of the United States Supreme Court at the time of the state court decision. Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (citing Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). Nonetheless, "circuit court precedent may be persuasive in determining what law is clearly established and whether a state court applied that law unreasonably." Stanley, 633 F.3d at 859 (quoting Maxwell v. Roe, 606 F.3d 561, 567 (9th Cir. 2010).

A state court decision is "contrary to" clearly established federal law if it applies a rule contradicting a holding of the Supreme Court or reaches a result different from Supreme Court precedent on "materially indistinguishable" facts. Price v. Vincent, 538 U.S. 634, 640 (2003). Under the "unreasonable application" clause of § 2254(d)(1), a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from the Supreme Court's decisions, but unreasonably applies that principle to the facts of the prisoner's case.[3] Lockyer v. Andrade, 538 U.S. 63, 75 (2003); Williams, 529 U.S. at 413; Chia v. Cambra, 360 F.3d 997, 1002 (9th Cir. 2004). In this regard, a federal habeas court "may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that

---

[3] Under § 2254(d)(2), a state court decision based on a factual determination is not to be overturned on factual grounds unless it is "objectively unreasonable in light of the evidence presented in the state court proceeding." Stanley v. Cullen, 633 F.3d 852, 859 (9th Cir. 2011) (quoting Davis v. Woodford, 384 F.3d 628, 638 (9th Cir. 2004)).

1    application must also be unreasonable." <u>Williams</u>, 529 U.S. at 412.  <u>See also</u> <u>Schriro v.</u>

2    <u>Landrigan</u>, 550 U.S. 465, 473 (2007); <u>Lockyer</u>, 538 U.S. at 75 (it is "not enough that a federal

3    habeas court, in its independent review of the legal question, is left with a 'firm conviction' that

4    the state court was 'erroneous.'").  "A state court's determination that a claim lacks merit

5    precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of

6    the state court's decision." <u>Harrington v. Richter</u>, 562 U.S.___, ___,131 S. Ct. 770, 786 (2011)

7    (quoting <u>Yarborough v. Alvarado</u>, 541 U.S. 652, 664 (2004)).  Accordingly, "[a]s a condition for

8    obtaining habeas corpus from a federal court, a state prisoner must show that the state court's

9    ruling on the claim being presented in federal court was so lacking in justification that there was

10   an error well understood and comprehended in existing law beyond any possibility for fairminded

11   disagreement." <u>Harrington</u>,131 S. Ct. at 786-87.

12          If the state court's decision does not meet the criteria set forth in § 2254(d), a

13   reviewing court must conduct a de novo review of a habeas petitioner's claims.  <u>Delgadillo v.</u>

14   <u>Woodford</u>, 527 F.3d 919, 925 (9th Cir. 2008); <u>see also</u> <u>Frantz v. Hazey</u>, 533 F.3d 724, 735 (9th

15   Cir. 2008) (en banc) ("[I]t is now clear both that we may not grant habeas relief simply because

16   of § 2254(d)(1) error and that, if there is such error, we must decide the habeas petition by

17   considering de novo the constitutional issues raised.").

18          The court looks to the last reasoned state court decision as the basis for the state

19   court judgment.  <u>Stanley</u>, 633 F.3d at 859; <u>Robinson v. Ignacio</u>, 360 F.3d 1044, 1055 (9th Cir.

20   2004).  If the last reasoned state court decision adopts or substantially incorporates the reasoning

21   from a previous state court decision, this court may consider both decisions to ascertain the

22   reasoning of the last decision.  <u>Edwards v. Lamarque</u>, 475 F.3d 1121, 1126 (9th Cir. 2007) (en

23   banc).  "When a federal claim has been presented to a state court and the state court has denied

24   relief, it may be presumed that the state court adjudicated the claim on the merits in the absence

25   of any indication or state-law procedural principles to the contrary." <u>Harrington</u>, 131 S. Ct. at

26   784-85.  This presumption may be overcome by a showing "there is reason to think some other

10

explanation for the state court's decision is more likely." Id. at 785 (citing Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)).  Where the state court reaches a decision on the merits but provides no reasoning to support its conclusion, a federal habeas court independently reviews the record to determine whether habeas corpus relief is available under § 2254(d).  Stanley, 633 F.3d at 860; Himes v. Thompson, 336 F.3d 848, 853 (9th Cir. 2003).  "Independent review of the record is not de novo review of the constitutional issue, but rather, the only method by which we can determine whether a silent state court decision is objectively unreasonable."  Himes, 336 F.3d at 853.  Where no reasoned decision is available, the habeas petitioner still has the burden of "showing there was no reasonable basis for the state court to deny relief."  Harrington, 131 S. Ct. at 784.

When it is clear, however, that a state court has not reached the merits of a petitioner's claim, the deferential standard set forth in 28 U.S.C. § 2254(d) does not apply and a federal habeas court must review the claim de novo.  Stanley, 633 F.3d at 860; Reynoso v. Giurbino, 462 F.3d 1099, 1109 (9th Cir. 2006); Nulph v. Cook, 333 F.3d 1052, 1056 (9th Cir. 2003).[4]

II.  Petitioner's Claims

Petitioner's nineteen claims for relief are described and considered below.  For purposes of clarity and coherence, the court will address petitioner's claim one - that his appellate counsel rendered ineffective assistance - last.  All other claims will be discussed in the order in which they were presented in the petition filed with this court.

Claim Two – Breach of Agreement/Faretta Waiver

Petitioner was initially represented by counsel in the trial court, first by court appointed counsel and later by retained counsel.  (Resp't's Lod. Doc. 1 (hereinafter CT) at 1-4.)

---

[4]  The United States Supreme Court has recently granted certiorari in a case apparently to consider this issue.  See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted in part, ___U.S.___, 132 S. Ct. 1088 (2012).

However, on the day originally set for his preliminary examination, petitioner waived his Sixth Amendment right to counsel and, at his request, was granted permission to represent himself.[5] (CT at 4; Pet'r's Lod. Doc. 14.)  Petitioner claims that in waiving his right to counsel, he and the Superior Court Judge who accepted that waiver signed what petitioner characterizes as a written "contract" that petitioner would receive a sentence of no more than eleven years in state prison. (Pet. at 25-27.)  Petitioner claims that this contract was breached "by the People and the court" when the prosecutor later amended the charging Information to add four prior conviction enhancement allegations and the trial court ultimately sentenced him to fifteen years in state prison.  (Id. at 25).  Petitioner also complains that he was not provided with new counsel, nor asked whether he wished to renew his waiver of his right to counsel, when the Information was amended to significantly increase the maximum penalty.  Petitioner contends that, therefore, "the four prior prison convictions . . . must be reversed, set aside, and barred from further prosecution."  (Id. at 27.)

The background with respect to this claim is as follows.  On February 25, 2003, prior to petitioner's preliminary hearing, the court granted his request to represent himself.  (CT at 103.)  On that same date, petitioner signed a document which advised him of the risks of proceeding without counsel (the so-called "Faretta warnings").  (Id. at 104.)  Among other things, petitioner was advised that the maximum penalty with respect to the charges brought against him in the then-pending Complaint was eleven years in state prison and a $10,000 fine.  (Id.) Sacramento County Superior Court Judge Gerald Bakarich acknowledged by his signature on the Record of Faretta Warnings form that petitioner had "knowingly, intelligently and voluntarily decided to represent himself with full knowledge of the risks and dangers of doing so."  (Id.)  In open court, Judge Bakarich also verbally informed petitioner that the  "maximum possible penalty" he faced on the charges against him was "about ten years, eleven years, in prison;

---

[5]  See Faretta v. California, 422 U.S. 806, 821 (1975).

12

1   $10,000 fine." (Pet'r's Lod. Doc. 14, at 2.)

2         Petitioner's preliminary hearing was subsequently held on April 17, 2003 and

3   April 22, 2003 before Sacramento County Superior Court Judge Shelleyanne W.L. Chang. (CT

4   at 223.) Petitioner represented himself at the preliminary hearing. (Id.) At the conclusion

5   thereof, petitioner was held to answer on the charges as amended to conform to the

6   evidence presented, the Complaint was deemed to be an Information, petitioner entered pleas of

7   not guilty to all charges and confirmed that he wished to continue to represent himself. (CT at

8   329-31.)

9         Thereafter, on May 16, 2003, the prosecutor filed a motion to amend the

10   Information, seeking to add the four prior conviction enhancement allegations. (Id. at 221-22.)

11   That motion was granted after a hearing on May 16, 2003, by Sacramento County Superior Court

12   Judge Ronald Tochterman. (Resp't's Lod. Doc. 21 (RT of May 16, 2003 Proceedings); see also

13   CT at 52-55 (original information); 335-37 (amended information)). The entire colloquy with

14   respect to the prosecution's motion to amend seeking to add the four prior prison term

15   enhancement allegations was as follows:

16               MR. PHILLIPS: (the prosecutor): Judge, I have – I have a twofold
                 motion, to amend the Complaint to allege four prison priors, and I
17               believe that Mr. Jensen has notice of the motion.

18               THE COURT: Is this a complaint or information?

19               MR. PHILLIPS: Information. Excuse me.

20               THE COURT: Do you oppose the motion, Mr. Jensen?

21               THE DEFENDANT: Which one?

22               MR. PHILLIPS: This is the motion to include the prison priors
                 from your prior convictions and subsequent sentences to state
23               prison. I believe you have notice, and I think you have got a copy.

24               THE COURT: The question is, Mr. Jensen, do you oppose the
                 motion?
25

26               THE DEFENDANT: Yeah.
/////

1    THE COURT:  On what grounds?

2    THE DEFENDANT:  It's my understanding everything is suppose
    to be filed by the preliminary hearing.

3

4    THE COURT:  I grant the motion.  I order that the Amended
    Information be filed.

5    Do we have a copy of it, Mr. Jensen?

6    THE DEFENDANT:  I have a copy of the motion.

7    THE COURT:  Do you have a copy of the Amended Information,
    too?

8

9    THE DEFENDANT:  Yes.

    THE COURT:  Do you agree I don't have to read it to you now,
10   you can read it for yourself?

11   THE DEFENDANT:  Yeah, I have read it.

12   THE COURT:  That's fine.

13   What is your next motion?

14 (Resp't's Lod. Doc. 21 at 1-2.)  Unfortunately, petitioner was not arraigned on the Amended

15 Information filed on May 16, 2003[6], nor was he advised that the maximum sentence he faced had

16 been increased as a result of the amendment.  Petitioner did not request the appointment of

17 counsel or attempt to revoke his previous waiver of his right to counsel at that time, nor was he

18 asked whether he wished to do so.

19   On July 17, 2003, and August 1, 2003, petitioner requested that advisory counsel

20 and/or standby counsel be appointed for him.  (CT at 541, 687, 691, 699-706.)  On July 17, 2003,

21 Assigned Superior Court Judge Joseph A. Orr denied petitioner's request without prejudice (CT

22

23    [6]  The Clerk's Minute Order of that date bears a stamp stating in part, "formal arrgn.
24 waived - copy delivered not guilty plea ent."  (CT at 9.)  However, a review of the transcript of
those proceedings establishes that no waiver of formal arraignment on the Amended Information
25 was sought or obtained and no pleas or denials were taken from petitioner by the court.  Most
importantly for purposes of the pending petition, petitioner was not advised that as a result of the
26 filing of the Amended Information he now faced a maximum prison term of fifteen, as opposed
to eleven, years in state prison.  (Resp't's Lod. Doc. 21 at 1-5.)

1    at 541, 691) and on August 1, 2003, denied petitioner's renewed request, informing him that he

2    could "either represent yourself or you have somebody represent you, but you can't have it both

3    ways." (Id. at 700.)  Petitioner did not seek to withdraw his waiver of his right to counsel at that

4    time.

5              On the first day of petitioner's trial, the parties discussed a possible resolution of

6    the case in the presence of the assigned trial judge, Sacramento County Superior Court Judge

7    James I. Morris.  (Reporter's Transcript on Appeal (RT) at 2-39.)  During that discussion,

8    petitioner was erroneously advised that his maximum potential prison sentence on the charges

9    against him, including the prior conviction enhancement allegations that had been added by

10   amendment, was thirteen years and four months in state prison.  (RT at 7- 9.)[7]  Specifically, the

11   trial judge erroneously informed petitioner that "the maximum penalty could be as much as 12 or

12   13 years four months depending on how I rule on motions and whether you're even convicted of

13   anything." (Id. at 9.)  Once again, following discussion of the maximum possible penalty faced,

14   petitioner did not request the appointment of counsel or attempt to revoke his previously entered

15   waiver of his right to counsel, nor was he asked whether he wished to do so.

16             At a jury instruction conference as the trial neared its conclusion, but prior to jury

17   deliberations, petitioner asked the trial judge whether it was proper that additional enhancement

18   allegations had been brought against him after he signed the Faretta waiver.  (Id. at 2159-60.)

19   The trial judge advised petitioner that "there is nothing that I'm aware of that says once a

20   defendant decides to go – to represent himself that prevents any additional charges from being

21   added." (Id.)  The judge also explained that "prison priors and prior conviction allegations"

22   could be added to the information "even up to and during trial." (Id.)  Finally, the trial judge

23   noted that petitioner was "made perfectly aware of what your sentence exposure was . . . with the

24   _____

25       [7]  Petitioner apparently did not contest this assessment of his possible maximum sentence,
     although he argued that the amendment to add the "prison priors" was invalid because it was
26   filed after his preliminary hearing had taken place.  (RT at 8.)

1   prison priors when we started the trial." (Id.)

2          Following his conviction petitioner was sentenced on March 26, 2004 to an

3   aggregate state prison term of fifteen years. (Id. at 2560, et seq.) At the beginning of the

4   sentencing hearing, petitioner stated to Judge Morris:

5                    As far as my pro per contract, I was guaranteed no more
         than 11 years state prison time. Now probation is trying to give me
6                    15.

7                    You yourself stated prior to trial that I would receive no
         more than 13 years, four months . . . , that I would not be subject
8                    possibly to no more than 12 years.

9   (Id. at 2561.) Petitioner also argued at the sentencing hearing that the amendment of the

10  Information after his preliminary hearing to add the four prior prison term enhancement

11  allegations violated California law. (Id.) Petitioner objected to being sentenced on the

12  enhancements, and asked that the court impose a sentence of eight years in state prison. (Id. at

13  2562.) The trial judge denied petitioner's request and sentenced him to the aggregate term of

14  fifteen years in state prison. (Id. at 2565.) The trial judge later recalled petitioner's sentence due

15  to concern regarding some of the consecutive sentences originally imposed on certain counts of

16  conviction and re-sentenced petitioner on April 22, 2004. (Id. at 2569-2603.) However, the

17  adjustment in petitioner's sentence again resulted in the imposition a total aggregate prison term

18  of fifteen years. (Id. at 2601.)

19          The parties agree that the last reasoned decision on petitioner's claim two is the

20  October 1, 2007 written decision of the Sacramento County Superior Court denying petitioner's

21  June 11, 2007 petition for writ of habeas corpus. After a review of the complicated procedural

22  history of petitioner's state court challenges to his judgment of conviction and sentence, set forth

23  /////

24  /////

25  /////

26  /////

above, this court agrees with the parties' conclusion in this regard.[8]  As discussed above, the

Sacramento County Superior Court rejected petitioner's claim for relief based on alleged Faretta

error on the grounds that such a claim was barred by the holding of In re Dixon, 41 Cal.2d 756,

759 (1953) ("claims that could have been, but were not, raised on appeal are not grounds for

relief.").  (Resp't's Lod. Doc. 6 at consecutive pp. 1-2.)

Petitioner's Faretta claim before this court raises several distinct issues.  First,

petitioner argues that the Faretta waiver form he signed constituted a contractual agreement with

the trial court and the prosecution, the terms of which were that he would not face any additional

charges or allegations and that his maximum possible sentence would be eleven years in state

prison.[9]  Petitioner is mistaken in this regard.  The Faretta waiver form utilized by the

Sacramento County Superior Court is clearly designed solely to warn a criminal defendant of the

dangers of self -representation and to provide a written assessment and record that the

defendant's waiver of the constitutional right to counsel was knowing and intelligent at the time

---

[8]  The California Supreme Court summarily denied relief with respect to petitioner's
Faretta claim on June 11, 2008.  Under these circumstances, this court must "look through" the
Supreme Court's unexplained ruling to the decision of the Sacramento County Superior Court to
find the last reasoned decision on that claim.  See Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991)
("Where there has been one reasoned state judgment rejecting a federal claim, later unexplained
orders upholding that judgment or rejecting the same claim rest upon the same grounds.")

[9]  Respondent argues that the Sacramento County Superior Court's citation to the decision
in In re Dixon in denying relief as to petitioner's breach of contract claim constitutes a procedural
bar which precludes this court from considering that claim on the merits.  The United States
Supreme Court has held that, when a procedural default prevents the state court from reaching
the merits of a federal claim, considerations of comity and concerns for the orderly
administration of justice require a federal court to forego the exercise of its habeas corpus power
unless the habeas petitioner can demonstrate both cause for failing to meet the state procedural
requirement and actual prejudice.  See Francis v. Henderson, 425 U.S. 536, 539-42 (1976);
Wainwright v. Sikes, 433 U.S. 72, 87 (1977); Nunnemaker, 501 U.S. at 800-01.  However, a
reviewing court need not invariably resolve the question of procedural default prior to ruling on
the merits of a claim.  Lambrix v. Singletary, 520 U.S. 518, 524-25 (1997); Franklin v. Johnson,
290 F.3d 1223, 1232 (9th Cir. 2002) ("Procedural bar issues are not infrequently more complex
than the merits issues presented by the appeal, so it may well make sense in some instances to
proceed to the merits if the result will be the same.").  Under the circumstances presented here,
the court finds that petitioner's breach of contract claim can be resolved more easily by
addressing it on the merits and will therefore assume that this aspect of the claim is not subject to
a procedural default.

it was entered.  It is not a "contract" in the legal sense.  Similarly, the <u>Faretta</u> colloquy in open court did not constitute a promise by either the trial court or the prosecutor that petitioner would not be subject to additional penalties in the event the charges were amended.  The cases cited by petitioner in support of his argument in this regard, which all involve the contractual nature of a plea bargain agreement, are not on point.   There was no plea agreement in this case.  Petitioner's breach of contract claim lacks both a factual and a legal basis and it will therefore be rejected.[10]

Petitioner also argues that the trial court violated his federal constitutional rights when it failed to obtain another waiver of counsel from him at the time the Information was amended to add the prior prison term enhancement allegations.  (Doc. No. 1 at 25.)  Petitioner claims that he was "forced" to represent himself on the new enhancement allegations added by way of amendment.  (<u>Id.</u>)  Petitioner is essentially arguing that the change in circumstances, the increased maximum term of imprisonment caused by the amendment to the Information, required the trial court to obtain anew his <u>Faretta</u> waiver.  Respondent did not address this aspect of petitioner's claim in the answer filed in this action.  Accordingly, by order dated December 2, 2010, the court directed respondent to file a response addressing petitioner's claim in this regard.  (Doc. No. 33.)  Respondent was also asked to address whether petitioner was accurately advised by the trial court of his maximum possible sentence, in light of the record reflecting that he was originally advised by the court that he faced a maximum of eleven years in state prison, was told just prior to trial that he faced a maximum of possibly up to thirteen years and four months imprisonment, but in fact was eventually sentenced to fifteen years in state prison.  (<u>Id.</u> at 4.)

---

[10]  Any claim by petitioner that state law requirements were violated when the charging Information was amended is not cognizable in this federal habeas corpus proceeding.  <u>See</u> <u>Waddington v. Sarausad</u>, 555 U.S. 179, 192 n.5 (2009) ("we have repeatedly held that 'it is not the province of a federal habeas court to reexamine state-court determinations on state-law questions'"); <u>Bradshaw v. Richey</u>, 546 U.S. 74, 76 (2005) ("a state court's interpretation of state law . . . binds a federal court sitting in federal habeas").  In any event, petitioner has cited no authority for the proposition that a prosecutor is precluded from amending an Information to add additional charges or enhancement allegations after a defendant elects to represent himself and waives his right to counsel by executing a <u>Faretta</u> waiver.

On February 3, 2011, respondent filed a brief in response to this court's December 2, 2010 order.  Therein, respondent argues that petitioner's Faretta claim is procedurally barred based on the Sacramento County Superior Court's reliance on In re Dixon in rejecting that claim.  (Doc. No. 39 at 6.)  Respondent also argues that the claim is barred by the decision in Teague v. Lane, 489 U.S. 288 (1989).  (Id. at 8.)  However, respondent's position as stated in the supplemental briefing is that in the event petitioner's Faretta claim is found to be neither subject to a procedural bar nor barred by Teague, it is meritorious and this court should grant relief.  (Id. at 15.)

The court turns first to respondent's argument that petitioner's Faretta claim is subject to a procedural bar as a result of the Sacramento County Superior Court's reliance on In re Dixon in denying relief when petitioner presented that claim to it in his June 11, 2007 habeas application.  As a general rule, "[a] federal habeas court will not review a claim rejected by a state court 'if the decision of [the state] court rests on a state law ground that is independent of the federal question and adequate to support the judgment."  Walker v. Martin, 562 U.S.___, ___, 131 S. Ct. 1120, 1127 (2011) (quoting Beard v. Kindler, 558 U.S. ___, ___, 130 S. Ct. 612, 615 (2009).  See also Maples v. Thomas, ___U.S.___, ___, 132 S. Ct. 912, 922 (2012); Greenway v. Schriro, 653 F.3d 790, 797 (9th Cir. 2011); Calderon v. United States District Court (Bean), 96 F.3d 1126, 1129 (9th Cir. 1996) (quoting Coleman v. Thompson, 501 U.S. 722, 729 (1991)).  In order for a state procedural rule to be found independent, the state law basis for the decision must not be interwoven with federal law.  Cooper v. Neven, 641 F.3d 322, 332 (9th Cir. 2011); Bennett v. Mueller, 322 F.3d 573, 581 (9th Cir. 2003); LaCrosse v. Kernan, 244 F.3d 702, 704 (9th Cir. 2001).  To be deemed adequate, the rule must be well established and consistently applied.  Walker, 131 S. Ct. at 1128; James v. Schriro, 659 F.3d 855, 878 (9th Cir. 2011); Greenway, 653 F.3d at 797-98; Poland v. Stewart, 169 F.3d 575, 577 (9th Cir. 1999).  Even if the state rule is independent and adequate, the claims may be reviewed by the federal court if the petitioner can show:  (1) cause for the default and actual prejudice as a result of the alleged

1  violation of federal law; or (2) that failure to consider the claims will result in a fundamental

2  miscarriage of justice.  Edwards v. Carpenter, 529 U.S. 446, 451 (2000); Coleman, 501 U.S. at

3  749-50; see also Maples, 132 S. Ct. at 922.

4         Respondent argues, and petitioner agrees, that the procedural rule set forth in In re

5  Dixon is independent of the federal question and adequate to support the judgment.  (Doc. No. 18

6  at 28-29; Doc. No. 41 at 4.)[11]  Petitioner contends, however, that the erroneous failure of his

7  appellate counsel to raise this Faretta error issue on direct appeal constitutes cause for his default

8  with respect to that claim.  (Doc. No. 41 at 4.)  In other words, petitioner argues that his

9  procedural default was caused by the ineffective assistance of his appellate counsel in failing to

10  raise the Faretta error issue on appeal.

11         Ineffective assistance of counsel will establish cause to excuse a procedural

12  default if it was "so ineffective as to violate the Federal Constitution."  Edwards, 529 U.S. at 451

13  (citing Murray v. Carrier, 477 U.S. 478, 486–88 (1986)).  See also Cook v. Schriro, 538 F.3d

14  1000, 1027 (9th Cir. 2008).  Moreover, the ineffective assistance claim must be presented to the

15  state courts as an independent claim before it may be used to establish cause for a procedural

16  default.  Edwards, 529 U.S. at 451 (citing Carrier, 477 U.S. at 489.)  Here, as noted above,

17  petitioner presented his ineffective assistance of appellate counsel claim to the state courts.

18  Further, for the reasons described below, the court concludes that petitioner's Faretta claim is,

19  and was at the time of his direct appeal, meritorious.  The failure of petitioner's appellate counsel

20  to raise a clearly meritorious argument on appeal constitutes ineffective assistance of appellate

21  counsel and establishes cause to excuse petitioner's procedural default on his Faretta claim in this

22  case.  Edwards, 529 U.S. at 451; Cook, 538 F.3d at 1027.  See also Martinez v. Ryan, ___ U.S.

23  ___, 2012 WL 912950, at *7 (U.S. Mar. 20, 2012) ("[A]n attorney's errors during an appeal on

24

25       [11]  In conceding this point, petitioner does not seek to meet his burden of establishing
otherwise.  See Bennett v. Mueller, 322 F.3d 573, 583 (9th Cir. 2003) (once the state has

26  adequately pled the existence of an independent and adequate state procedural ground as an
affirmative defense, the burden to place that defense in issue shifts to the petitioner).

direct review may provide cause to excuse procedural default; for if the attorney appointed by the State to pursue the direct appeal is ineffective, the prisoner has been denied fair process and the opportunity to comply with the State's procedures and obtain an adjudication on the merits of his claims.") (citing Coleman v. Thompson, 501 U.S. 722, 754 (1991)).

As noted, respondent also contends that the granting of federal habeas relief as to petitioner's Faretta claim is barred by the decision of the Supreme Court in Teague v. Lane, 489 U.S. 288 (1989). The non-retroactivity principle announced in Teague "prevents a federal court from granting habeas corpus relief to a state prisoner based on a rule announced after his conviction and sentence became final." Caspari v. Bohlen, 510 U.S. 383, 389 (1994).

> "[A] case announces a new rule if the result was not dictated by precedent existing at the time the defendant's conviction became final." Teague v. Lane, supra, 489 U.S., at 301, 109 S. Ct., at 1070. In determining whether a state prisoner is entitled to habeas relief, a federal court should apply Teague by proceeding in three steps. First, the court must ascertain the date on which the defendant's conviction and sentence became final for Teague purposes. Second, the court must "[s]urve[y] the legal landscape as it then existed," Graham v. Collins, supra, 506 U.S., at 468, 113 S. Ct., at 898, and "determine whether a state court considering [the defendant's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution," Saffle v. Parks, 494 U.S. 484, 488, 110 S. Ct. 1257, 1260, 108 L. Ed.2d 415 (1990). Finally, even if the court determines that the defendant seeks the benefit of a new rule, the court must decide whether that rule falls within one of the two narrow exceptions to the nonretroactivity principle. See Gilmore v. Taylor, 508 U.S. 333, 345, 113 S. Ct. 2112, 2113, 124 L. Ed.2d 306 (1993).

Id. at 390. See also United States v. Netherland, 521 U.S. 151, 157 (1997); Dyer v. Calderon, 151 F.3d 970, 989 (9th Cir. 1998).[12]

/////

---

[12] "A state conviction and sentence become final for purposes of retroactivity analysis when the availability of direct appeal to the state courts has been exhausted and the time for filing a petition for a writ of certiorari has elapsed or a timely filed petition has been finally denied." Caspari v. Bohlen, 510 U.S. 383, 390 (1994). Here, petitioner's conviction became final on May 29, 2006, ninety days after the California Court of Appeal affirmed his judgment of conviction. (Doc. 39 at 11.)

It is well established that Courts are to "indulge in every reasonable presumption against waiver" of the constitutional right to counsel. Brewer v. Williams, 430 U.S. 387, 404 (1977). See also Patterson v. Illinois, 487 U.S. 285, 307 (1988) (noting the "strong presumption against" waiver of the right to counsel); United States v. Forrester, 512 F.3d 500, 507 (9th Cir. 2007). It is also true that a valid waiver of counsel generally carries forward through all stages of the proceedings. See e.g. Arnold v. United States, 414 F.2d 1056, 1059 (9th Cir. 1969) ("A competent election by the defendant to represent himself and to decline the assistance of counsel once made before the court carries forward through all further proceedings in that case unless appointment of counsel for subsequent proceedings is expressly requested by the defendant or there are circumstances which suggest that the waiver was limited to a particular stage of the proceedings"); see also United States v. Unger, 915 F.2d 759, 762 (1st Cir. 1990) (holding that the district court was free to find that the defendant's earlier Faretta waiver was still in force at the sentencing hearing "in the absence of an intervening event").

However, by May 29, 2006, many courts had made clear that if after the waiver of counsel the circumstances faced by the defendant significantly changed, a new Faretta inquiry is required because under such circumstances the defendant could no longer be said to have knowingly and intelligently waived his constitutional right to counsel. See United States v. Erskine, 355 F.3d 1161, 1165 (9th Cir. 2004) (Reversing a conviction because the court failed to advise the defendant "of the correct maximum penalty" or ask him "whether in light of the new and different information as to the penalty he faced, he desired to withdraw his Faretta waiver."); United v. Fazzini, 871 F.2d 635, 643 (7th Cir. 1989) ("Once the defendant has knowingly and intelligently waived his right to counsel, only a substantial change in circumstances will require the district court to inquire whether the defendant wishes to revoke his earlier waiver[.]"); Schell v. United States, 423 F.2d 101, 103 (7th Cir. 1970) (conviction set aside where in waiving his right to counsel the defendant was advised that the maximum penalty he faced was five years but, because of changed circumstances, the court imposed a six year term of imprisonment at the time

22

of sentencing without a new <u>Faretta</u> inquiry); <u>see also</u> <u>Davis v. United States</u>, 226 F.2d 834, 840

(8th Cir.1955) (petitioner's waiver of the right to counsel was still valid at the time of sentencing

four days later, where "nothing happened in the meantime, such as an unreasonable lapse of time,

newly discovered evidence which might require or justify advice of counsel, <u>new charges</u>

<u>brought</u>, a request from the defendant, or similar circumstances.") (emphasis added.)[13]

Moreover, a valid <u>Faretta</u> waiver has long been recognized as requiring that at the

time of the waiver the defendant has an accurate understanding of the maximum possible penalty

faced. <u>United States v. Robinson</u>, 913 F.2d 712, 714-15 (9th Cir. 1990) ("The second

requirement under this circuit's reading of <u>Faretta</u> is that the defendant's waiver of the right to

counsel must be made knowingly and intelligently; 'that is, a criminal defendant must be aware

of the nature of the charges against him, the possible penalties, and the dangers and

disadvantages of self representation.'") (quoting <u>United States v. Balough</u>, 820 F.2d 1485, 1487

(9th Cir. 1987)); <u>Harding v. Lewis</u>, 834 F.2d 853, 857 (9th Cir. 1987) (same); <u>United States v.</u>

<u>Aponte</u>, 591 F.2d 1247, 1249-50 (9th Cir. 1978) (same).

/////

---

[13]   The pertinent inquiry is "specifically what the defendant understood *at the particular stage of the proceedings at which he purportedly waived his right to counsel.*" <u>United States v. Erskine</u>, 355 F.3d 1161, 1169 (9th Cir. 2004) (emphasis in original).  What the defendant earlier or later understood is relevant only to the extent it sheds light on his understanding at the time of his <u>Faretta</u> waiver. (<u>Id.</u> at 1170.)  It is well-established that because <u>Faretta</u> error is not subject to the harmless error analysis. <u>McKaskle v. Wiggins</u>, 465 U.S. 168, 177 n.8 (1984) ("Since the right of self-representation is a right that when exercised usually increases the likelihood of a trial outcome unfavorable to the defendant, its denial is not amenable to the 'harmless error' analysis."); <u>Erskine</u>, 355 F.3d at 1170.  Therefore, it is irrelevant that a defendant received a sentence less than the erroneous maximum of which he was advised, just as it is irrelevant whether he was advised of a maximum sentence greater than that which he actually faced. <u>Erskine</u>, 355 F.3d at 1170, n.12.)  This is so since "[i]t is the court's failure to inform the defendant of the correct maximum penalty that affects [the decision to represent oneself] which, in turn, gives rise to the harm and to the per se prejudice." (<u>Id.</u> at 1170, n.12) (citing <u>United States v. Arlt</u>, 41 F.3d 516, 524 (9th Cir. 1994)).  <u>See also</u> <u>United States v. Forrester</u>, 512 F.3d 500, 508 (9th Cir. 2007) ( "It is thus irrelevant whether the district court over-stated or understated Forrester's potential penalty.  By materially misstating the applicable sentence, the court failed to fulfill its obligation to 'insure that [the defendant] understands . . . the possible penalties," and Forrester's waiver was therefore not knowing and intelligent.")

1     Finally, the Ninth Circuit has relied on several decisions rendered prior to

2 petitioner's trial for the proposition that "a properly conducted <u>Faretta</u> colloquy need not be

3 renewed in subsequent proceedings <u>unless intervening events substantially change the</u>

4 <u>circumstances existing at the time of the initial colloquy.</u>"  <u>United States v. Hantzis</u>, 625 F.3d

5 575, 580-81 (9th Cir. 2010) (emphasis added) (citing <u>United States v. Springer</u>, 51 F.3d 861,

6 864-65 (9th Cir. 1995), <u>Arnold</u>, 414 F. 2d at 1059 and <u>White v. United States</u>, 354 F.2d 22, 23

7 (9th Cir. 1965)).

8     Respondent argues that the instant case does not present "significant changed

9 circumstances" and that most of the court decisions addressing the "changed circumstances"

10 issue, concluded that no additional <u>Faretta</u> waiver was required under the circumstances

11 presented in those cases.  However, that argument is only pertinent to whether petitioner's <u>Faretta</u>

12 claim is meritorious, not to whether the "changed circumstances" rule existed at the time

13 petitioner's conviction became final on May 29, 2006.  Surveying the legal landscape as of May

14 29, 2006, the court notes the numerous decisions addressed above dating back to 1970, including

15 the Ninth Circuit's 2004 decision in <u>Erskine</u>.  These decisions, in turn, were all based on

16 Supreme Court decisions regarding the Sixth Amendment right to counsel.  Many of the cases

17 cited above required that the defendant be aware of the actual maximum penalty at the time of his

18 <u>Faretta</u> waiver.  Under these circumstances, this court concludes that the principle that a change

19 in the maximum penalty faced by a defendant required a re-affirmation of a <u>Faretta</u> waiver was

20 not a "new rule" for purposes of <u>Teague</u>'s non-retroactivity doctrine.  Put another way, the rule

21 that "changed circumstances" require a new <u>Faretta</u> waiver was dictated by precedent existing at

22 the time petitioner's conviction became final.  <u>Teague</u>, 489 U.S. at 301; <u>see also</u> <u>Fields v. Brown</u>,

23 431 F.3d 1186, 1195-96 (9th Cir. 2005) (finding petitioner's claim of implied or presumed juror

24 bias was not <u>Teague</u> barred even though the Supreme Court had considered, but not resolved the

25 issue); <u>Gonzalez v. Pliler</u>, 341 F.3d 897, 904 (9th Cir. 2003) (the holding that use of a stun belt

26 on a defendant at jury trial failed to meet minimum constitutional standards with respect to the

use of physical restraints in the courtroom was not a new rule under <u>Teague</u> because the specific

form of physical restraint used "is irrelevant to the application of the constitutional standards"

that were well-established)

Accordingly, <u>Teague</u> does not bar petitioner's <u>Faretta</u> claim in these federal

habeas proceedings and this court must decide that claim on its merits.  Because the Sacramento

County Superior Court denied petitioner's <u>Faretta</u> claim on procedural grounds, this court must

therefore review the claim de novo.  <u>Stanley</u>, 633 F.3d at 860; <u>Reynoso</u>, 462 F.3d at 1109; <u>Nulph</u>,

333 F.3d at 1056-57.[14]

The court will now turn to the merits of petitioner's claim of Faretta error.[15]  As

noted above, a defendant wishing to waive the right to counsel must be made aware of the nature

of the charges against him, the possible penalties he faces, and the dangers and disadvantages of

representation.  <u>McCormick v. Adams</u>, 621 F.3d 970, 977 (9th Cir. 2010);  <u>Robinson</u>, 913 F.2d at

714-15; <u>Harding</u>, 834 F.2d at 857; <u>Balough</u>, 820 F.2d at 1487; <u>Aponte</u>, 591 F.2d at 1249-50.  A

waiver of counsel is not valid "in the absence of some knowledge of [defendant's] understanding

of the seriousness of the charges . . . ."  <u>Evans v. Raines</u>, 705 F.2d 1479, 1480 (9th Cir. 1983).

<u>See</u> <u>also</u> <u>United States Forrester</u>, 512 F.3d 500, 506 (9th Cir. 2008) (the waiver of the right to

counsel was not knowing and voluntary where the trial court did not advise the defendant he

faced a conspiracy count and erroneously informed him that his maximum possible penalty was

10 years to life in prison, when he actually faced only zero to 20 years in prison).  A court's

failure to secure a valid <u>Faretta</u> waiver, which includes an accurate advisement as to maximum

penalties, constitutes per se prejudicial error.  <u>Erskine</u>, 355 F.3d at 1167, 1170 n.12 ("It is the

court's failure to inform the defendant of the correct maximum penalty that affect [the decision to

---

[14]  Respondent agrees that petitioner's <u>Faretta</u> claim is subject to de novo review by this court.  (Doc. No. 39 at 8.)

[15]  However, respondent has conceded that if this claim is not procedurally barred due to the Sacramento County Superior Court's reliance on <u>In re Dixon</u> in denying relief and is also not <u>Teague</u> barred, it is meritorious and relief must be granted.

represent oneself] which, in turn, gives rise to the harm and to the per se prejudice."); Balough, 820 F.2d at 1489-90.  Here, petitioner's waiver of his right to counsel was valid at the time it was initially made because he was appropriately advised of all the relevant factors including the correct maximum possible penalty he faced at that time before the prior prison term/felony conviction enhancements were alleged.  Petitioner does not argue to the contrary.

As noted, generally a Faretta waiver remains in effect throughout the criminal proceedings, unless the circumstances change in a significant way or the waiver was limited. Hantzis, 625 F.3d at 580-81 (the trial court was not required to conduct a new Faretta colloquy at subsequent hearings where, among other things, "there is nothing in the record to suggest that any changes occurred . . . that would have affected [the defendant's] understanding of the charges or penalties against him").  Therefore, "[a] properly conducted Faretta colloquy need not be renewed in subsequent proceedings unless intervening events substantially change the circumstances existing at the time of the initial colloquy."  Id.  See also Fazzini, 871 F.2d at 643; Becker v. Martel, 789 F. Supp.2d 1235, 1243-1247 (S.D. Cal. 2011) (granting federal habeas relief because the bringing of additional charges carrying an increased penalty was a substantial change that required the trial court to readvise petitioner of his right to counsel at subsequent arraignment and the failure to do so constituted per se prejudicial error); Spence v. Runnels, No. CIVS030376GEB KJM P, 2006 WL 224442, at *12-13  (E.D. Cal. Jan. 27, 2006) (granting federal habeas relief where petitioner's waiver of right to counsel was vitiated by later amendment of the Information adding prior conviction and Three Strikes allegations which increased his maximum possible penalty).  "The essential inquiry is whether circumstances have sufficiently changed since the date of the Faretta inquiry that the defendant can no longer be considered to have knowingly and intelligently waived the right to counsel."  Hantzis, 625 F.3d at 581.

The question in this case is whether the amendment of the charging Information to add the four prior prison term allegations constituted such a significant change in circumstances

26

that it left petitioner without a clear understanding of the maximum penalties he faced and therefore rendered his previous waiver of counsel unintelligent and unknowing.  Respondent concedes that "the amended information, adding four prior prison term allegations  (§ 667.5(b)), is a sufficient change in circumstances triggering an obligation on the trial court to seek a renewed Faretta waiver."  (Doc. No. 39 at 15.)  This court agrees.

Petitioner was not advised at the hearing on the motion to amend that the maximum punishment he could suffer had been increased by four years as a result of the addition of the prior prison term enhancement allegations.  The amendment increased petitioner's potential sentence by more than one third.  It is true that the record reflects that petitioner is an experienced criminal defendant and it is certainly possible that he understood the new potential penalties at the time the Information was amended.  However, there is no evidence in the record that he did.  See United States v. Mohawk, 20 F.3d 1480, 1485 (9th Cir. 1994) ("We think Mohawk's decision to waive his right to counsel may well have been knowing and intelligent – but we are not free from doubt . . . .  We therefore hold that the government has failed to carry its burden . . . .").  This court cannot assume that petitioner would have wished to continue representing himself had he been advised that his possible penalty would be increased by four years.  Indeed, petitioner consistently argued later that he had been promised an eleven year sentence at the time he entered his Faretta waiver.  (See e.g., RT at 2561.)  There is no evidence in the record that petitioner was aware at any time before or during his trial that he faced a fifteen year prison sentence.  It is undisputed that the record establishes that he was not advised of that maximum penalty at the time of the hearing on the prosecution's motion to amend the Information.

Under very similar circumstances another district court recently concluded as follows:

> The Court looks at what Petitioner understood and was told at the time he waived counsel.  See Erskine, 355 F.3d at 1164–65; Balough, 820 F.2d at 1489.  On October 21, 2004, Petitioner was

arraigned on a forty-one count complaint and was informed that he was facing a maximum of fifty-eight years in prison. On December 21, 2004, the district attorney amended the complaint and added twelve more counts. Therefore, the maximum penalty necessarily would have increased to more than fifty-eight years. FN6 However, the trial court did not advise Petitioner about the added counts or the revised maximum penalty he would face and whether it would have affected his decision to represent himself.

> FN6. In the corrected penalties provided by Respondent, the original maximum penalty should have been 33 years and 8 months at the initial arraignment on October 21, 2004. On December 21, 2004, the maximum penalty Petitioner should have been facing was 41 years and 8 months. The maximum penalty increased by eight years from the 41–count complaint to the 53–count complaint.

Respondent argues that since it is clear Petitioner wanted to represent himself even when he believed he was facing 58 years, he did not need to be readvised of his right to counsel in subsequent proceedings. However, in Erskine, the Ninth Circuit pointed out the government's erroneous argument that a petitioner's Faretta waiver was valid because he was subsequently sentenced to less than what he erroneously thought was the maximum. Erskine, 355 F.3d at 1171 n. 12. The court explained that "the prejudice a defendant suffers is not the term of his sentence but rather in the decision to forgo counsel and, instead, to represent himself. The choice of self-representation, in turn, increases the likelihood of a conviction and likely length of any sentence." Id. (emphasis in original).

Here, the [state] court of appeal erroneously applied the harmless error analysis to Petitioner's federal claim that he was not readvised of his Faretta waiver at his subsequent arraignments. Therefore, even though Petitioner understood that his maximum penalty at the initial arraignment was fifty-eight years, the maximum penalty necessarily increased when twelve additional counts were added in the amended complaint. The addition of twelve counts and increased penalty was a substantial change that required the trial court to readvise Petitioner of his right to counsel. See Fazzini, 871 F.2d at 643. Therefore, the trial court's failure to readvise Petitioner about his right to counsel on December 21, 2004 was a violation of Petitioner's Sixth Amendment right to counsel. As a result of the initial failure to readvise Petitioner of his right to counsel on December 21, 2004, the two subsequent arraignments on the information on March 9, 2005 and July 27, 2006 were necessarily compromised and violated his Sixth Amendment right.

/////

1    Respondent argues that even if there were a constitutional error,
2    the harmless error standard should apply.  However, the failure to
     meet the requirements for a valid <u>Faretta</u> waiver invoking the Sixth
3    Amendment right to self-representation constitutes per se
     prejudicial error, and the harmless error standard is inapplicable.
4    <u>Frantz v. Hazey</u>, 533 F.3d 724 (9th Cir. 2008); <u>United States v.</u>
     <u>Erskine</u>, 355 F.3d 1161 (9th Cir.2004); <u>United States v. Balough</u>,
5    820 F.2d 1485, 1489–90 (1987) (citing <u>Rose v. Clark</u>, 478 U.S.
     570, 577–78, 106 S. Ct. 3101, 92 L. Ed.2d 460 (1986)); <u>U.S. v.</u>
6    <u>Arlt</u>, 41 F.3d 516, 524 (9th Cir.1994) (stating that a denial of the
     right to self-representation is 'per se prejudicial error').  Therefore,
7    in this case, because the trial court failed to readvise Petitioner of
     the <u>Faretta</u> waiver, harmless error does not apply.

8    Accordingly, the state court's denial of this claim was contrary to
     and involved an unreasonable application of clearly established
9    federal law as determined by the United States Supreme Court, <u>see</u>
     28 U.S.C. § 2254(d), and the Court GRANTS the petition for writ
10   of habeas corpus as to the claim that Petitioner was not readvised
     of his right to counsel at the subsequent arraignments after the
11   initial arraignment.  The Court's determination that a <u>Faretta</u> error
     occurred here requires us to reverse the conviction.

12

13   <u>Becker</u>, 789 F. Supp.2d at 1246-47.

14        In much the same way, the record here establishes that a significant change in the

15   circumstances faced by petitioner occurred after the February 25, 2003 <u>Faretta</u> inquiry such that

16   he could no longer be considered to have knowingly and intelligently waived the right to counsel

17   after the Information was amended to add the additional enhancement allegations.  The trial court

18   violated petitioner's right to counsel by failing to undertake a new <u>Faretta</u> advisement at the time

19   of the amendment or thereafter.  Accordingly, the writ must issue.

20        Respondent's position is that if petitioner's <u>Faretta</u> claim is not procedurally

21   barred, not <u>Teague</u> barred and the court is required to grant relief as to that claim, "the

22   conditional writ should direct the People to decide whether to retry Petitioner for the four prior

23   prison term allegations, and if the People decide not to do so, the four, one-year enhancements

24   should be struck."  (Doc. No. 39 at 15.)  Petitioner appears to contend that his petition should be

25   granted "<u>without</u> condition with a full reversal" because his trial was tainted by inclusion of the

26   four enhancement allegations. (Doc. No. 41 at 6.)

1    The court is mindful of the Ninth Circuit's admonition that a habeas court "'has

2  the power to release' a prisoner, but 'has no other power.'"  Douglas v. Jacquez, 626 F.3d 501,

3  504 (9th Cir. 2010) (quoting Fay v. Noia, 372 U.S. 391, 431, overruled on other grounds by

4  Wainwright v. Sykes, 433 U.S. 72, 87 (1977)) (holding that the district court exceeded its habeas

5  jurisdiction in directing the state court to revise its judgment to reflect conviction on a lesser

6  charge instead of granting a conditional writ).  Thus, the habeas court "cannot revise the state

7  court judgment; it can act only on the body of the petitioner."  Id. (quoting Noia, 372 U.S. at

8  431.)  However, it is also the case that in such instances habeas remedies "should be tailored to

9  the injury suffered from the constitutional violation and should not unnecessarily infringe on

10  competing interests."  United States v. Morrison, 449 U.S. 361, 364 (1981).  See also Chioino v.

11  Kernan, 581 F.3d 1182, 1186 (9th Cir. 2009) (the district court should have remanded to for

12  resentencing instead of ordering the state court to reduce the sentence, since habeas remedies

13  should not unnecessarily infringe on a state's interest in the administration of justice).

14    Applying these principles here, the appropriate remedy with respect to the Faretta

15  error in this case is to conditionally grant the writ and order that petitioner's judgment of

16  conviction be vacated only if respondent fails to either dismiss the enhancement allegations

17  which were added by amendment after the Faretta advisement and resentence petitioner

18  accordingly, or initiates proceedings to retry petitioner within a reasonable time.  See Douglas,

19  626 F.3d at 505 ("[T]he district court should have granted a conditional writ of habeas corpus

20  and ordered that Douglas's conviction . . . be vacated only if the state court did not resentence

21  him within a reasonable time[.]  The state court would thus have an opportunity to correct its

22  own constitutional error."); Becker, 789 F. Supp. 2d at 1247-48 ("The Court **GRANTS** the claim

23  that Petitioner did not knowingly and voluntarily waive his right to counsel under the Sixth

24  Amendment at his subsequent arraignments after the arraignment . . . and resentence Petitioner,

25  /////

26  /////

30

1  or initiate proceedings to retry Petitioner.")[16]

2              Claims Three and Four – Denial of Advisory Counsel

3          A.  Claim Three

4              In his third claim for relief presented to this court, petitioner alleges that the trial

5  judge violated his federal constitutional rights when he denied petitioner's requests for advisory

6  counsel after conducting an "in camera hearing" out of petitioner's presence.  (Pet. at 28.)

7  Specifically, petitioner claims that:

8              [the] trial court abused its discretion violating [petitioner's]
               constitutional due process and equal protection rights when trial
9              judge, district attorney, head of conflict criminal defenders office,
               and [petitioner's] investigator committed governmental misconduct
10             with bias and prejudice when they held a in camera meeting in the
               judges chambers and conspired to deny [petitioner's] motion for
11             appointment of advisory/co-counsel, after trial judge previously
               declared he would not object to [petitioner's] motion.

12

13  Id.

14             The last reasoned state court decision addressing this claim is the opinion of the

15  California Court of Appeal on petitioner's direct appeal.  That court rejected petitioner's

16  argument on the grounds that his allegations lacked a factual basis and did not demonstrate an

17  abuse of discretion by the trial court in any event.  The state appellate court reasoned as follows:

18             Defendant contends the decision to deny his motion to appoint
               advisory counsel was an abuse of discretion because it took place
19             during an ex parte in camera hearing.  To the contrary, the trial
               court did not decide the motion ex parte.  The judge met with the
20             director of the office of the Sacramento County Conflict Criminal
               Defenders.  Also present were defendant's investigator and the
21             prosecutor.  The court asked the director about the differences
               between advisory counsel and cocounsel.  The court also discussed
22             scheduling for the case.  Defendant attempted to disqualify the trial

23  ─────────────────

24        [16]  The court rejects petitioner's apparent contention that he is entitled to a "full reversal."
There was no error, constitutional or otherwise, in the prosecution's amendment adding the four
25  prior prison term enhancement allegations.  The only constitutional error was in failing to
conduct another Faretta inquiry after those enhancement allegations were added and the
26  maximum possible penalty petitioner faced had changed significantly.  The state court will have
the opportunity to correct its own constitutional error in either way it chooses.

31

1          judge as a result of the meeting, but his request was denied by
           another judge.  Thereafter, the court considered defendant's motion
2          in open court, with defendant present, and, stating its reasons,
           denied the motion to appoint advisory counsel.  The court's inquiry
3          concerning the difference between advisory counsel and cocounsel,
           without defendant's presence, did not render the denial of the
4          motion to appoint advisory counsel an abuse of discretion.

5   (Opinion at 4.)

6          The state court record supports the factual background described by the California

7   Court of Appeal in its Opinion with respect to this claim.  (See Pet., Exs. B, C, D, E, & CT at

8   762-66.)  The record also contains additional relevant facts.  For instance, in his "Answer" to

9   petitioner's request for his disqualification, Assigned Superior Court Judge Joseph A. Orr

10  explained that at a hearing that took place on July 17, 2003, he denied petitioner's request for

11  advisory counsel without prejudice, but also advised petitioner that he could make such a request

12  to attorney Fern Laethem, Program Director for Sacramento County's Conflict Criminal

13  Defender (CCD).  (CT at 764.)  On August 1, 2003, a hearing was scheduled to address

14  petitioner's request for advisory counsel, among other things.  (Id. at 765.)  Judge Orr at that time

15  explained:

16         Prior to commencing the hearing and before [petitioner] was
           brought into court for the morning calendar, Deputy District
17         Attorney Noah Phillips, Mr. Wilcox (petitioner's investigator), and
           Ms. Laethem met with me in chambers.  The length and extent of
18         any conversation was limited to Ms. Laethem's understanding of
           the distinction between co-counsel and advisory counsel.
19

20  (Id. at 765.)  Judge Orr denied that he had "any discussion regarding the merits of [petitioner's]

21  case or [petitioner's] request for the appointment of advisory counsel or co-counsel."  (Id. at

22  766.)

23         On August 5, 2003, another hearing was held on petitioner's request for advisory

24  counsel, at which petitioner was given the opportunity to be heard.  (Id. at 724.)  Assigned

25  Superior Court Judge Orr denied petitioner's request but informed him that he could hire any

26  attorney he wished to help him with the trial.  (Id. at 727.)

                                          32

1    The precise contention petitioner seeks to raise by way of his allegations in claim

2  three of his pending petition are not entirely clear.  Respondent construes petitioner's allegations

3  as a claim that he was denied the right to attend a critical stage of the trial when Judge Orr held

4  the in-chambers meeting and discussed petitioner's request for the appointment of advisory

5  counsel outside of petitioner's presence.  (Answer, at 32-34.)  Petitioner also appears to be

6  alleging that Judge Orr's decision to hold the hearing outside of his presence was unfair and/or

7  indicated judicial bias, in violation of petitioner's right to due process.  This court will construe

8  petitioner's allegations as raising two federal constitutional claims: (1) whether he was denied the

9  right to be present at a critical stage of the proceedings when the then-assigned judge held an in-

10  camera meeting; and (2) whether his right to due process and to an unbiased decision was

11  violated by his exclusion from that in-chambers hearing.[17]

12    The California Court of Appeal addressed only one issue presented by petitioner's

13  argument in this regard:  whether the in-chambers hearing constituted an abuse of discretion

14  under state law.  The state appellate court did not address petitioner's federal constitutional

15  claims.  Under these circumstances, the court must review these federal claims de novo.  Nulph,

16  /////

17  /////

18

19    [17]  Petitioner alleges, without elaboration, that he was denied the right to "equal
protection."  See e.g., Pet. at 28.  However, petitioner does not explain how the circumstances

20  surrounding his request for advisory counsel could possibly violate the Equal Protection Clause.
Petitioner's equal protection claim is vague and conclusory and will be rejected.  See Jones v.

21  Gomez, 66 F.3d 199, 204 (9th Cir. 1995) ("'[c]onclusory allegations which are not supported by
a statement of specific facts do not warrant habeas relief'") (quoting James v. Borg, 24 F.3d 20,

22  26 (9th Cir. 1994)).  Further, petitioner's allegations that Judge Orr should have been disqualified
under state law are not cognizable in this federal habeas petition, as they involve only state law

23  issues.  Federal recusal statutes and canons of judicial ethics are also inapplicable because they
do not govern state court judges.  In any event, as indicated above, Sacramento County Superior

24  Court Judge James I. Morris, and not Judge Orr, presided over petitioner's trial.  Finally,
petitioner may be claiming that the in-chambers hearing conducted by Judge Orr was an abuse of

25  discretion under state law.  Any such claim is also not cognizable in this federal habeas corpus
proceeding.  Lewis v. Jeffers, 497 U.S. 764, 780 (1990) ("[F]ederal habeas corpus relief does not

26  lie for errors of state law.")  All of petitioner's "claims" alleging violations of state law will be
rejected.

333 F.3d at 1056-57.[18]  However, for the reasons set forth below, petitioner is not entitled to federal habeas relief even under a de novo standard of review.

### 1. Right to be Present

A criminal defendant has a right to be present at any stage of the criminal proceeding that is critical to its outcome if his presence would contribute to the fairness or reliability of the procedure.  Kentucky v. Stincer, 482 U.S. 730, 745 (1987); United States v. Gagnon, 470 U.S. 522, 527 (1985).  A defendant must therefore be allowed to be present "to the extent that a fair and just hearing would be thwarted by his absence."  Stincer, 482 U.S. at 745 (quoting Snyder v. Massachusetts, 291 U.S. 97, 108 (1934)).  The constitutional right to be present at every critical stage of the trial is based on the Fifth Amendment Due Process Clause and the Sixth Amendment Confrontation Clause.  United States v. Marks, 530 F.3d 799, 812 (9th Cir. 2008).  The right to be present during all critical stages of the proceedings is subject to harmless error analysis.  Rushen v. Spain, 464 U.S. 114, 117 (1983); Campbell v. Rice, 408 F.3d 1166,  1172 (9th Cir. 2005).

Even if Judge Orr erred in excluding petitioner from the initial in-chambers meeting at which the subject of petitioner's request for appointment of advisory counsel was discussed, any such error was harmless.  An in-court hearing was later held on petitioner's request, at which time petitioner was allowed to make any arguments he could have made in support thereof at the earlier in-chambers meeting.  At the hearing in open court, petitioner presented his arguments, countered the arguments of the prosecutor, responded to the judge's

---

[18]  As noted above, the United States Supreme Court has recently granted certiorari to consider the question of whether, when a state court addresses and rejects only a petitioner's state law claim and leaves completely unaddressed a constitutional claim, the habeas court must subject the federal constitutional claim to de novo review or should instead still apply the AEDPA deferential standard of review.  See Williams v. Cavazos, 646 F.3d 626, 639-41 (9th Cir. 2011), cert. granted in part, ___U.S.___, 132 S. Ct. 1088 (2012).  Binding Ninth Circuit authority currently requires de novo review of this claim.  More importantly, even under the de novo standard or review, the court concludes that petitioner is not entitled to federal habeas relief with respect to this claim.

concerns, and put on the record his objection to the meeting that was held in chambers.  (CT at 720-40.)  According to the record before this court, nothing of significance was raised at the in-chambers meeting that was not also discussed at the in-court hearing.  In this regard, Sacramento County Superior Court Judge Stanley Young's order denying petitioner's request to disqualify Judge Orr accurately stated that "the only evidence of the matters discussed in ex parte communications were limited to scheduling, administrative matters or emergencies that do not deal with substantive matters."  (Id. at 956.)  In short, petitioner's absence from the in-chambers meeting did not impair the fairness of these proceedings.

Further, contrary to petitioner's allegations, there is no indication in the record that the in-chambers hearing exposed a "conspiracy" to deny petitioner advisory counsel.  Rather, Judge Orr's decision on petitioner's request was based on his conclusions that petitioner had already "gone through four attorneys;" it was "too late in the ball game" to appoint advisory counsel; that it was "not a death penalty case;" that the court did not want to grant a continuance to allow time for advisory counsel to familiarize themselves with the case; and that he didn't "feel comfortable at this juncture in appointing someone."  (CT at 724-27.)  This court also notes that there is no evidence in the record that petitioner was unable to present his case at trial without the assistance of advisory attorney.  Indeed, it appears that petitioner's efforts on his own behalf were competent and thorough.

For all of these reasons, petitioner is not entitled to federal habeas relief with respect to this claim.

2. Due Process

Petitioner also claims that the Judge Orr's decision to hold an in-chambers hearing on the issue of advisory counsel outside of petitioner's presence was unfair and evidenced bias on the part of the judge.  (Pet. at 28-35.)

"A fair trial in a fair tribunal is a basic requirement of due process."  In re Murchison, 349 U.S. 133, 136 (1955).  A judge "may not adopt procedures that impair a

defendant's right to due process or his other rights guaranteed by the constitution." United States v. Thompson, 827 F.2d 1254, 1258 (9th Cir. 1987) (district judge violated defendant's right to due process in conducting in-camera, ex-parte examination of the prosecutor's motives for excluding blacks from jury).  Similarly, a court "may not adopt procedures that tend to significantly favor one party over the other."  Id.  "The right of a criminal defendant to an adversary proceeding is fundamental to our system of justice."  Id.

A criminal defendant is also guaranteed the right to an impartial judge. "A judge's conduct justifies a new trial if the record shows actual bias or leaves an abiding impression that the jury perceived an appearance of advocacy or partiality.  Marks, 530 F.3d at 806.  To sustain a claim of judicial bias on habeas corpus, however, the issue is "whether the state trial judge's behavior rendered the trial so fundamentally unfair as to violate federal due process under the United States Constitution."  Duckett v. Godinez, 67 F.3d 734, 740 (9th Cir. 1995).  The Ninth Circuit has recognized that there are three general circumstances in which an appearance of bias violates due process: (1) a judge who "has a direct, personal, substantial pecuniary interest in reaching a conclusion against one of the litigants;" (2) a judge who "becomes embroiled in a running, bitter controversy with one of the litigants;" and (3) a judge who "acts as part of the accusatory process."  Crater v. Galaza, 491 F.3d 1119, 1130 (9th Cir. 2007) (citing cases).  In order to prevail on a claim of judicial bias, a petitioner must overcome a "strong presumption that a judge is not biased or prejudiced."  Sivak v. Hardison, 658 F.3d 898, 924 (9th Cir. 2011) (quoting Rhoades v. Henry, 598 F.3d 511, 519 (9th Cir. 2010)).

The circumstances surrounding the denial of petitioner's request for advisory counsel clearly do not evidence a due process violation, nor do they demonstrate bias on the part of Judge Orr.  As discussed above, although Judge Orr held an in-chambers meeting outside of petitioner's presence, an in-court hearing subsequently took place with respect to his request for advisory counsel at which petitioner was allowed to present his arguments and respond to the arguments of the prosecutor.  Thus, petitioner was not unfairly prejudiced by the prior conference

1  and the procedures utilized by Judge Orr did not significantly favor either party.

2          In addition, there is no evidence of actual or implied bias on the part of Judge Orr.

3  He obviously had no pecuniary interest in the outcome of petitioner's trial, did not become

4  "personally embroiled" in a controversy with petitioner, and he did not perform "incompatible

5  accusatory and judicial roles."  Moreover, Judge Young's order denying petitioner's request to

6  disqualify Judge Orr concluded that "no person aware of all the facts would reasonably entertain

7  a doubt that Judge Orr would be able to be impartial in this case."  (CT at 956.)  Finally, as noted

8  above, it was Sacramento County Superior Court Judge James Morris and not Judge Orr who

9  ultimately presided over petitioner's trial and imposed sentence following petitioner's conviction.

10         For all of these reasons, petitioner is not entitled to federal habeas relief on his

11  claim construed as one alleging judicial bias or fundamental unfairness.

12         B.  Claim Four

13         In his fourth ground for relief, petitioner claims that the his constitutional rights

14  were violated by the repeated denial of his requests for "advisory counsel/co-counsel."  (Pet. at

15  36-39.)  Petitioner argues that the state trial court "was required to appoint advisory counsel or

16  co-counsel (in the sense of an attorney who would sit by [petitioner's] side at counsel table and

17  consult with him) once [petitioner] had been granted permission to represent himself."  (Id. at

18  36.)  Petitioner concedes that there is no federal constitutional right to advisory or co-counsel, but

19  he argues, nonetheless,  that Judge Orr abused his discretion in this case by denying his requests

20  for advisory legal assistance.  (Id. at 37-39.)  Petitioner also complains that the decision to deny

21  his request was made after the "ex parte" in-chambers meeting described above.

22         The last reasoned state court decision on these claims is the opinion of the

23  California Court of Appeal rejecting petitioner's arguments on direct appeal.  The appellate court

24  reasoned as follows:

25  /////

26  /////

Refusal of Advisory Counsel

Defendant went through four attorneys before he decided to represent himself. The court denied his request for advisory counsel. Defendant argues the trial court should have appointed advisory counsel on defendant's request after he was allowed to represent himself. We disagree.

The California Supreme Court has "specifically held that cocounsel status, advisory counsel and other forms of 'hybrid' representation are not constitutionally guaranteed. [Citation.]" (People v. Clark (1992) 3 Cal.4th 41, 111.) The trial court has the discretion to appoint advisory counsel if the defendant makes a proper showing. (People v. Crandell (1988) 46 Cal.3d 833, 862.)

In a capital case, the denial of a motion to appoint advisory counsel is reversible if the lower court abused its discretion. (People v. Bigelow (1984) 37 Cal.3d 731, 743-746.) "Thus, as with other matters requiring the exercise of discretion, 'as long as there exists a reasonable or even fairly debatable justification, under the law, for the action taken, such action will not be here set aside . . . . [Citations.]' [Citation.]" (People v. Clark, supra, 3 Cal.4th at p. 111.)

Thus, the California Supreme Court has reviewed, under the abuse of discretion standard, the denial of a motion to appoint advisory counsel in a death penalty case. A defendant in a noncapital case, however, cannot make this argument. The trial court, to promote the orderly and efficient disposition of the case, may have the power to appoint advisory counsel. The defendant in a noncapital case, however, cannot assert on appeal that denial of a motion to appoint advisory counsel was error because this would "allow a defendant to complain that because of the poor quality of his self-representation, he was improperly denied effective assistance of counsel in the form of a hybrid representation." (People v. Garcia (2000) 78 Cal. App.4th 1422, 1430-1431 [refusing to extend Bigelow to a noncapital case absent a directive from the California Supreme Court].) Defendant's argument, therefore, has no merit.

Even if defendant could complain of error in the denial of a motion to appoint advisory counsel, we would conclude the trial court did not abuse its discretion here. The trial court stated it was denying advisory counsel because defendant had discharged four attorneys prior to his decision to represent himself. The court was unwilling to delay the case further so that a new attorney could come up to speed. Additionally, the court was concerned about the possibility that defendant would attempt to discharge his advisory counsel, disrupting the trial. The court stated defendant had access to help from the office of the Sacramento County Conflict Criminal Defenders if he needed general advice. Finally, it noted defendant

1    had filed several briefs on his own behalf and he appeared
     articulate and aware of how to conduct legal research.  The trial
2    court acted reasonably when it denied defendant's request.

3    (Opinion at 3-4.)

4           There are several types of hybrid trial counsel.  "Advisory counsel is generally

5    used to describe the situation when a pro se defendant is given technical assistance by an attorney

6    in the courtroom, but the attorney does not participate in the actual conduct of the trial."  Locks

7    v. Sumner, 703 F.2d 403, 407 (9th Cir. 1983).  "'Standby' counsel refers to the situation where a

8    pro se defendant is given the assistance of advisory counsel who may take over the defense if for

9    some reason the defendant becomes unable to continue."  Id. at 407 n.3.  Standby counsel is "a

10   type of advisory counsel."  Id.  Co-counsel "may participate directly in the trial proceedings with

11   the defendant (examining witnesses, objecting to evidence, etc.)."  Id.  There is no federal

12   constitutional right to any such type of assistance.  Id. (no absolute right to advisory or standby

13   counsel); United States v. Halbert, 640 F.2d 1000, 1009 (9th Cir. 1981) (no absolute right to co-

14   counsel).  "The decision to allow a defendant to proceed with either form of hybrid

15   representation is best left to the sound discretion of the trial judge."  Locks, 703 F.2d at 408.  See

16   also United States v. Salemo, 81 F.3d 1453, 1460 (9th Cir. 1996) (no federal constitutional right

17   to advisory counsel); United States v. Kienenberger, 13 F.3d 1354, 1356 (9th Cir. 1994) (same).

18          Petitioner has not cited this court to a United States Supreme Court decision, nor

19   any federal law for that matter, establishing the right of a pro se defendant in a non-capital case to

20   advisory counsel.  Accordingly, he has failed to establish that the state court's rejection of his

21   argument in this regard is contrary to, or an unreasonable application of clearly established

22   federal law, as required for the granting of habeas relief under AEDPA.  See Moses v. Payne, 555

23   F.3d 742, 754 (9th Cir. 2009); Brewer v. Hall, 378 F.3d 952, 955 (9th Cir. 2004) ("If no Supreme

24   Court precedent creates clearly established federal law relating to the legal issue the habeas

25   petitioner raised in state court, the state court's decision cannot be contrary to or an unreasonable

26   application of clearly established federal law").

1         In any event, the state appellate court's conclusion that the lower court properly

2   denied petitioner's request for advisory legal assistance is not unreasonable.  As described above,

3   petitioner displayed competence in representing himself, and there is no evidence he was unable

4   to proceed without the assistance of advisory counsel.  Indeed, after petitioner's initial request for

5   advisory counsel was denied by Judge Orr, the trial judge, Judge Morris, also declined to appoint

6   advisory counsel in large part because petitioner had demonstrated that he was able to represent

7   himself competently.  (RT at 621-25.)  Petitioner has failed to show that his federal constitutional

8   rights were violated by the state trial court's failure to appoint advisory or standby counsel for

9   him.  Accordingly, his request for federal habeas corpus relief as to this claim will be denied.

10         Claim Five – Suppression and Destruction of Evidence

11         In his next claim, petitioner alleges that he was "denied due process and equal

12   protection rights when the prosecutor and investigating agencies suppressed discoverable

13   exculpatory evidence and allowed it to be destroyed."  (Pet. at 40.)

14         The last reasoned state court decision addressing this claim is the October 1, 2007

15   order of the Sacramento County Superior Court denying petitioner's application for a writ of

16   habeas corpus.  As was the case with respect to petitioner's claim two, the Superior Court denied

17   relief as to this claim with a citation to In re Dixon, 41 Cal.2d 756, 759 (1953).  (Resp't's Lod.

18   Doc. 6 at consecutive p. 1.)  Respondent argues that the Superior Court's citation to In re Dixon

19   constitutes a procedural bar precluding this court from considering the merits of this claim.

20   Under the circumstances presented here, this court finds that this claim can be resolved more

21   easily by addressing it on the merits and will therefore assume that the claim is not subject to a

22   procedural default.  Because the Superior Court rejected this claim on procedural grounds, this

23   court will review it de novo.  Stanley, 633 F.3d at 860; Reynoso, 462 F.3d at 1109; Nulph, 333

24   F.3d at 1056-57.

25         Due process requires that the prosecution disclose exculpatory evidence within its

26   possession.  Brady v. Maryland, 373 U.S. 83, 87 (1963); Cooper v. Brown, 510 F.3d 870, 924

(9th Cir. 2007).  There are three components of a <u>Brady</u> violation: "[t]he evidence at issue must

be favorable to the accused, either because it is exculpatory, or because it is impeaching; the

evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice

must have ensued."  <u>Strickler v. Greene</u>, 527 U.S. 263, 281-82 (1999).  <u>See also</u> <u>Banks v. Dretke</u>,

540 U.S. 668, 691 (2004); <u>Silva v. Brown</u>, 416 F.3d 980, 985 (9th Cir. 2005).  A failure to

preserve evidence violates a defendant's right to due process if the unavailable evidence

possessed "exculpatory value that was apparent before the evidence was destroyed, and [is] of

such a nature that the defendant would be unable to obtain comparable evidence by other

reasonably available means."  <u>California v. Trombetta</u>, 467 U.S. 479, 489 (1984).  A defendant

must also demonstrate that the police acted in bad faith in failing to preserve the potentially

useful evidence.  <u>Arizona v. Youngblood</u>, 488 U.S. 51, 58 (1988); <u>Phillips v. Woodford</u>, 267

F.3d 966, 986-87 (9th Cir. 2001).  The presence or absence of bad faith turns on the

government's knowledge of the apparent exculpatory value of the evidence at the time it was lost

or destroyed.  <u>Youngblood</u>, 488 U.S. at 56-57 n.*; <u>see also</u> <u>Grisby v. Blodgett</u>, 130 F.3d 365, 371

(9th Cir. 1997); <u>United States v. Barton</u>, 995 F.2d 931, 934 (9th Cir. 1993); <u>United States v.</u>

<u>Cooper</u>, 983 F.2d 928, 931 (9th Cir. 1993).  "The mere failure to preserve evidence which could

have been subjected to tests which might have exonerated the defendant does not constitute a due

process violation."  <u>Phillips</u>, 267 F.3d at 987 (quoting <u>United States v. Hernandez</u>, 109 F.3d

1450, 1455 (9th Cir. 1997).  <u>See also</u> <u>Youngblood</u>, 488 U.S. at 57.

   Petitioner's <u>Brady</u> claim is directed to three specific forms of evidence.  First, he

contends that the State acted in bad faith in destroying audio recordings of S.W.A.T. team

members and helicopter officers who were allegedly dispatched to the property of petitioner's

father on the date of the crimes.  (Pet. at 40-51.)  Petitioner contends that these recordings were

destroyed after he had requested them in discovery.  (<u>Id.</u> at 40-51.)  Petitioner's theory is that the

recordings may have revealed that the victim told the S.W.A.T. officers she had been raped,

which would have prompted a rape test, which would in turn have confirmed that no rape had

occurred.  In this regard, petitioner explains, "the outcome would have been different because petitioner would have had a rape kit that would have shown that petitioner and [the victim] did not have sex that morning and that the tapes would have shown that the alleged rape was in fact alleged in the onset of the case which would have had to have had a rape kit done which would have proven petitioner's innocence."  (Traverse at 21.)

At a hearing on petitioner's discovery motions, the state court found that the prosecution had failed to comply with petitioner's discovery request for the recordings and had apparently destroyed them when they should have been retained.  (RT at 354-55, 415, 420.)  The court, however, declined to dismiss the case or to recuse the district attorney for this reason.  (Id. at 420.)  However, the trial judge did later inform the jury that petitioner had requested these recordings in discovery but that the responsive material had been destroyed by the Sheriff's Department.  (Id. at 2055-2057.)  The jury was further informed that they could "consider" this information and that the parties could "argue whatever they feel it pertains to."  (Id. at 2053-54.) The trial court also instructed the jury at petitioner's trial as follows:

> The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial.
>
> Concealment of evidence or delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence.
>
> Disclosures of evidence are required to be made at least 30 days in advance of trial.  Any new evidence discovered within 30 days of trial must be disclosed immediately.
>
> In this case the People failed to timely disclose the following evidence:  Sheriff's dispatch tapes and related evidence.
>
> The weight and significance, if any, of this failure to disclose are matters for your consideration.
>
> However, you should consider whether this evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence.

42

1   (Id. at 2179-80.)

2          Assuming arguendo that the prosecution or law enforcement improperly destroyed

3   the dispatch recordings in violation of a discovery order, petitioner has made no showing in this

4   court that the recordings would have provided evidence favorable to the defense or that the

5   exculpatory value of the tapes was apparent prior to their destruction.  His claim that the

6   recordings could have exonerated him is based on pure speculation. As noted above, "[t]he mere

7   failure to preserve evidence which could have been subjected to tests which might have

8   exonerated the defendant does not constitute a due process violation." Phillips, 267 F.3d at 987

9   (quoting Hernandez, 109 F.3d at 1455).  See also Grisby, 130 F.3d at 371.  Accordingly,

10  petitioner is not entitled to relief with respect to his claim regarding the prosecution's failure to

11  produce the requested audio recordings in discovery.

12          Petitioner also complains that he did not receive "the medical report for the

13  incident of May 4, 2002, which is the present case at hand, even though he requested said reports

14  numerous times." (Pet. at 51.)  Petitioner notes that on May 4, 2002, the victim signed an

15  "authorization for the release of medical information."  (Id.)  It appears petitioner is arguing that

16  the victim's signature on this form indicates that there must have been medical records pertaining

17  to a rape evaluation conducted on May 4, 2002, which would have proven that he did not rape

18  the victim.

19          At petitioner's trial, a sheriff's deputy testified that the victim did not mention the

20  rape when she was first interviewed by police on May 4, 2002.  (RT at 899, 906-07.)  On cross-

21  examination by petitioner, the victim testified that in signing the authorization form she "thought

22  [she] was signing something that I didn't need medical attention." (Id. at 1028.)  Deputy Garcia

23  testified that he had the victim sign the authorization form because it was "standard with all

24  reports where allegations of abuse or battery have occurred."  (Id. at 1553-54.)  Respondent

25  asserts that, contrary to petitioner's allegations here, "there apparently were no medical records

26  for May 4, 2002, and [the victim's] signature on the release form was obtained as part of a

1  routine sheriff's procedure that was unnecessary in this case."  (Answer at 27.)

2          Petitioner has failed to demonstrate that any medical records were actually

3  generated on May 4, 2002, that any such records were destroyed by the police, or that if any

4  medical records from that date existed they would have been helpful to the defense.  On the

5  contrary, the record before this court reflects that the victim was asked to sign the authorization

6  form only because this was standard police procedure in domestic violence cases, but that no

7  medical tests were performed.  Petitioner's allegations to the contrary are based on speculation

8  alone.  For this reason, he is not entitled to federal habeas relief on this aspect of his claim.

9          Finally, petitioner contends he was informed by the prosecutor that he was "going

10  to provide leniency, offer of deal, and/or monies" to an unidentified  witness in exchange for his

11  or her testimony against petitioner, but that petitioner was never informed who that witness was.

12  (Pet. at 54.)  After several hearings before the trial court, it was determined that petitioner was

13  mistaken in this regard and that the prosecutor was actually speaking about a warrant for another

14  witness.  (RT at 290-91, 467-68, 470, 472, 476-77, 714.)  As to this aspect of his Brady claim,

15  petitioner has failed to demonstrate that the prosecution failed to turn over any exculpatory

16  material, that any evidence was suppressed by the state, or that he suffered prejudice resulting

17  from this alleged discovery violation.  Accordingly, he is not entitled to federal habeas relief.

18          Claim Six – Knowing Use of Perjured Testimony

19          In his next ground for relief, petitioner claims that the prosecutor committed

20  misconduct when she presented false evidence at trial, in violation of the holding in Napue v.

21  Illinois, 360 U.S. 264 (1959).  (Pet. at 58.)  Petitioner alleges that the prosecutor knew that the

22  victim and Deputy Garcia were giving perjured testimony at petitioner's trial, but "allowed [it] to

23  stand without trying to correct it, then tried to block [petitioner] from eliciting the truth of the

24  perjured testimony."  (Id.)

25          Petitioner first claims that the victim testified falsely about the exact timing of

26  petitioner's telephone calls to her on the day of the crime.  (Id. at 58-64.)  The victim had

testified that petitioner called her twice between 1:45 and 3:00 a.m. on the morning in question. (RT at 830-35.) She stated that she knew what time it was because she had a habit of checking her watch. (Id. at 846, 932.) Apparently, telephone records did not match the victim's testimony as to the timing of those calls. (Id. at 972-74.) According to petitioner, "there was no calls incoming or going out between 1:45 and 4:00 a.m." (Pet. at 60.) Rather, it appeared that petitioner spoke with the victim closer to 6:00 a.m. On cross-examination at trial, the victim conceded she "could have been wrong about the time." (RT at 976.) Petitioner alleges that the victim "lied about checking her watch to make things look worse and the D.A. was condoning the lies and tried to cover for them." (Pet. at 64-65.) In his traverse, petitioner explains that the prosecutor knew the victim "was lying when she testified to the time frame of the phone calls which showed that petitioner was not even with [the victim] during the time frame as was testified to." (Traverse at 22.) Petitioner also notes that the prosecutor was in possession of relevant phone records at the time the victim testified in this way. (Id.)

Petitioner next challenges the veracity of the victim's testimony about what she told the responding deputies. At trial, the victim testified she told Deputy Garcia that she "just had some lumps on my head" and did not need medical attention. (RT at 1026-27.) She testified she did not tell Garcia that she had been raped. (Id.) On cross-examination, petitioner asked why, if she had not been injured and did not request medical attention, she had signed a medical release form. (Id. at 1028.) The victim responded that she didn't know why she signed it. (Id.) As noted above, the victim then testified, "I thought I was signing something that I didn't need medical attention." (Id.) Petitioner now appears to be claiming that this testimony was false and reflects that the victim was lying about whether she was raped, or about whether she received a medical evaluation for rape. Petitioner alleges that the prosecutor also knew this testimony was false but attempted to hide information about the medical release form "and other areas that could be provided." (Pet. at 65.)

/////

1          Finally, petitioner argues that Deputy Garcia lied when he testified at trial that he

2    did not understand certain notations on the police report regarding the events in question.  (Id. at

3    65-68.)  Petitioner argues that Deputy Garcia entered the information on the computer that was

4    later reflected in the report, so he should have known what the notations meant.  (Id.)  Petitioner

5    contends that the prosecutor knew Deputy Garcia's testimony was false in this regard because

6    "she had 'Larissa Hansen' go over the dispatch log with her."  (Id. at 68.)  Petitioner also asserts

7    that Deputy Garcia testified falsely that there was no S.W.A.T. team or helicopter at the house of

8    petitioner's father, thus demonstrating that the victim must have claimed she had been raped or a

9    helicopter would not have been dispatched.  (Traverse at 23.)  Petitioner argues that "these lies

10   prejudiced petitioner because it helped to cover up the none [sic] existing doctors report that

11   should have been available, and the rape kit that should have been done to show petitioner did

12   not have sex with [the victim] on the morning of May 4, 2002."  (Id.)

13         Respondent informs that court that the last reasoned decision addressing these

14   claims is the October 1, 2007 decision of the Superior Court denying petitioner's application for

15   a writ of habeas corpus. (Answer at 28; Resp't's Lod. Doc. 6.)  Although it is difficult to identify

16   the last reasoned decision addressing this claim from the record before this court, the undersigned

17   will assume respondent's representation is accurate.  The Superior Court rejected petitioner's

18   prosecutorial misconduct claims with a citation to In re Dixon.  (Resp't's Lod. Doc. 6. at 2.)

19   Respondent argues that the Superior Court's citation to In re Dixon constitutes a procedural bar

20   precluding this court from considering the merits of these claims.  For the same reasons set forth

21   above with respect to other claims addressed on the merits, the court will assume the claims are

22   not procedurally barred and will address them on the merits, conducting a de novo review.

23         On habeas review of a prosecutorial misconduct claim, the court may grant relief

24   only if the misconduct rises to the level of a due process violation.  See Sechrest v. Ignacio, 549

25   F.3d 789, 807 (9th Cir. 2008).  A violation of a defendant's constitutional rights occurs if the

26   government knowingly uses false evidence in obtaining a conviction.  Giglio v. United States,

46

405 U.S. 150, 153-54 (1971); Napue, 360 U.S. at 269; see also United States v. Agurs, 427 U.S.

97, 103 (1976) (""[T]he Court has consistently held that a conviction obtained by the knowing

use of perjured testimony is fundamentally unfair."); Morales v. Woodford, 388 F.3d 1159, 1179

(9th Cir. 2004) ("The due process requirement voids a conviction where the false evidence is

'known to be such by representatives of the State.'") (quoting Napue, 360 U.S. at 269)  It is

clearly established that "a conviction obtained by the knowing use of perjured testimony must be

set aside if there is any reasonable likelihood that the false testimony could have affected the

jury's verdict."  United States v. Bagley, 473 U.S. 667,  680 n.9 (1985).  See also Maxwell v.

Rose, 628 F.3d 486, 506 (9th Cir. 2010); Killian v. Poole, 282 F.3d 1204, 1209-10 (9th Cir.

2002) (habeas relief was to be granted where "there is a reasonable probability that, without all

the perjury, the result of the proceeding would have been different.")  Due process is violated in

such circumstances regardless of whether the false testimony was obtained through the active

conduct of the prosecutor, Hysler v. Florida, 315 U.S. 411 (1942); Mooney v. Holohan, 294 U.S.

1033 (1935), or was unsolicited.  Napue, 360 U.S. at 269 ("[t]he same result obtains when the

State, although not soliciting false evidence, allows it to go uncorrected when it appears").  This

rule applies even where the false testimony goes only to the credibility of the witness.  Napue,

360 U.S. at 269; Mancuso v Olivarez, 292 F. 3d 939, 957 (9th Cir. 2002).

There are several components to establishing a claim for relief based on the

prosecutor's introduction of perjured testimony at trial.  First, the petitioner must establish that

the testimony was false.  United States v. Polizzi, 801 F.2d 1543, 1549-50 (9th Cir. 1986).

Second, the petitioner must demonstrate that the prosecution knowingly used the perjured

testimony.  Id.  Finally, the petitioner must show that the false testimony was material.  United

States v. Juno-Arce, 339 F.3d 886, 889 (9th Cir. 2003).  False evidence is material "if there is

any reasonable likelihood that the false [evidence] could have affected the judgment of the jury."

Hein v. Sullivan, 601 F.3d 897, 908 (9th Cir. 2010) (quoting Bagley, 473 U.S. at 678).  Mere

speculation regarding these factors is insufficient to meet petitioner's burden.  United States v.

47

1   <u>Aichele</u>, 941 F.2d 761, 766 (9th Cir. 1991).

2          Petitioner has failed to demonstrate that the prosecutor committed misconduct by

3   knowingly introducing false testimony at his trial.  Regardless of when petitioner called the

4   victim and asked her to give him a ride, there was no dispute that he and the victim were present

5   together at the scene of the assault.  The victim's inability to remember the exact timing of the

6   calls was not "false," nor was it material to any issue at petitioner's trial.  At most, the victim

7   may have been mistaken about the timing of her conversations with petitioner.  The same is true

8   with respect to the victim's testimony regarding the signing of the medical release form.  She

9   explained in her trial testimony that she believed she was declining medical attention by signing

10  the form.  There is no evidence before this court that any medical information was generated.  All

11  of this is consistent with the victim's testimony that she informed Deputy Garcia she did not need

12  medical attention and had only suffered lumps on her head.  With respect to the testimony of

13  Deputy Garcia, petitioner has failed to demonstrate that the Deputy's inability to decipher a

14  notation on the dispatch report was "false testimony" or that the testimony "could have affected

15  the judgment of the jury."  Finally, petitioner himself cross-examined these witnesses and argued

16  to the jury that they were not credible.

17          In short, petitioner has failed to show that any of the challenged trial testimony

18  was false, that the prosecutor knew that any of that trial testimony was false, or that the allegedly

19  false testimony was material.  Petitioner's claim in this regard is also vague and conclusory and

20  are based on speculation and innuendo.  For all of these reasons, petitioner is not entitled to relief

21  with respect to his perjured testimony claim.

22      <u>Claim Seven – Denial of Compulsory Process to Obtain Witnesses</u>

23          In his next ground for relief, petitioner claims that the trial court violated his

24  rights pursuant to state law and the "5th, 6th, and 14th Amendments of the United States

25  Constitution" when it refused him "the right to compulsory process for obtaining and confronting

26  witnesses (law enforcement) to defend against the states accusations."  (Pet. at 69.)  Petitioner

1   alleges that, even though "a minimum of four deputies" arrived at the scene after Johnson called

2   911, he was only allowed to call Deputy Garcia as a witness at trial because Garcia was the

3   officer who wrote the incident report.  (Id.)  Petitioner states that he was "denied to call as

4   witnesses the other three deputies to the stand for a lack of them not producing a report." (Id.)

5   Petitioner also complains that his defense investigator was not allowed to get a statement from

6   the other deputies prior to trial "due to Penal Code Section 1054.5(A)."[19]  (Id.)

7           Petitioner has attached to his petition before this court a copy of a partial

8   transcript of a July 17, 2003 hearing held on various motions he had filed prior to his preliminary

9   examination.  (Pet., Ex. J.)  At that hearing petitioner was allowed to question Deputy Garcia and

10  the three other deputies who responded to the scene of the crime (Officers Templeton, Koontz

11  and Elliott).  (Id.)[20]  Deputy Garcia testified that he authored the police report of the incident, but

12  that he did not possess his underlying notes.  (Id.)  The other deputies testified that they did not

13  write a report of the incident and that they had no independent recollection of the events.  (Id.)

14  Although Detective Koontz testified that he did not write the "official police report," petitioner

15  infers from that testimony that Koontz wrote his own report of the incident.  (Pet. at 70.)

16  Petitioner complains that he was not provided with a copy of Detective Koontz's report.  (Id.)

17

18  [19]  California Penal Code § 1054.5 provides:

19
20              (a) No order requiring discovery shall be made in criminal cases
                except as provided in this chapter.  This chapter shall be the only
21              means by which the defendant may compel the disclosure or
                production of information from prosecuting attorneys, law
22              enforcement agencies which investigated or prepared the case
                against the defendant, or any other persons or agencies which the
23              prosecuting attorney or investigating agency may have employed to
                assist them in performing their duties.

24  [20]  According to the Clerk's Transcript on Appeal the hearing was held in connection with
25  petitioner's motions for an evidentiary hearing of pre-preliminary facts and probable cause, to
    dismiss for vindictive prosecution and for advisory counsel and the prosecution's motion to
26  quash subpoenas issued by defendant in connection with the preliminary examination.  (CT at
    19.)

1   Petitioner explains that he

> had to give an offer of proof for any law enforcement personnel in
> order to call them to the stand, and because [petitioner] could not
> provide a written report authored by the deputy or an investigation
> report done by [petitioner's] investigators (Penal Code section
> 1054.5(A) does not permit such.)  [Petitioner] was denied any of
> the deputies that participated in the initial responding call, and
> were present during each phase on the morning of May 4, 2002.
> This was denied by the court with each law enforcement personnel.

(Id. at 74.)  Petitioner further argues:

> The court was fully aware that the district attorney's office
> continually made false representations to the court on at least six
> explicit discovery request's and orders for all communications,
> tapes, telephone, and computer printouts before they were all
> destroyed showing bad faith, then the court again let the district
> attorney's office repeat the same bad faith when it would not
> continue to pursue the declaration for the tapes it ordered the D.A.
> to get.  The court was fully aware that per Penal Code section
> 1054.5, [petitioner's] investigator's could not get any reports from
> law enforcement personnel and that they allegedly did not write
> any reports even though they were on the seen [sic] and the court
> still denied [petitioner's] constitutional rights for obtaining and
> confronting witnesses that would be able to state the truth
> especially when the people's main witness and law enforcement
> personnel were caught in perjury and the people did nothing to set
> the record right with the truth.  Deputy District Attorney Lani
> Biafore admitted that Larissa Hansen went over the computer
> printed dispatch, and therefore she would know that Deputy
> Garcia's testimony was false.  Even knowing all of this, the court
> still denied [petitioner] his constitutional rights.

(Id. at 75.)

In his traverse, petitioner explains that he wanted to "put the responding deputies

on the stand to be able to contradict what Deputy Garcia testified to falsely concerning the

S.W.A.T. team, or the computer aided dispatch computer printout that listed the 940.15 on El

Verano Avenue."  (Traverse at 24.)  Petitioner again states that these three officers

> could have testified that [the victim] alleged the spousal rape in the
> onset of the case which would have been required to have a rape
> kit done, medical reports available, and photo's of [the victim]
> which [the victim] alleged that petitioner was beating and raping
> her for (4) four hours, yet there was no evidence of such.  No
> bruises, no cuts, no injuries whatsoever as she and Deputy Garcia
> testified to."

50

1   (Id.)

2          The last reasoned decision addressing this claim is once again the October 1, 2007

3   order of the Sacramento County Superior Court denying petitioner's application for a writ of

4   habeas corpus.  (Resp't's Lod. Doc. 6.)  The Superior Court rejected the claim citing In re Dixon.

5   (Id.)  Respondent argues that the Superior Court's citation to In re Dixon constitutes a

6   procedural bar precluding this court from considering the merits of the claim.  (Answer, at 43.)

7   For the same reasons as the claims addressed above, the court will assume this claim is not

8   procedurally barred and will address it on the merits applying a de novo standard of review.

9          The Sixth Amendment guarantees a criminal defendant the right "to have

10  compulsory process for obtaining witnesses in his favor."  U.S. Const., Amend. VI.  See also

11  Washington v. Texas, 388 U.S. 14, 23 (1967).  However, "more than the mere absence of

12  testimony is necessary to establish a violation of the right [to compulsory process]."  United

13  States v. Valenzuela-Bernal, 458 U.S. 858, 867 (1982).  A petitioner must also "at least make

14  some plausible showing of how [the witness] testimony would have been both material and

15  favorable to his defense."  Id.  See also Williams v. Stewart, 441 F.3d 1030, 1044 (9th Cir.

16  2006).

17         The state court record reflects that petitioner requested permission to call as trial

18  witnesses all four of the deputies who were present at the crime scene.  (RT at 1421.)  The trial

19  judge agreed that petitioner could call Deputy Garcia, who had written the police incident report.

20  (Id.)  The trial judge explained to petitioner that he would not allow him to call deputies

21  Templeton, Koontz and Elliott as witnesses unless he could demonstrate the relevance of their

22  proposed testimony.  (Id.)  The trial judge stated that unless the other three deputies were going

23  to testify to something "different than Garcia," he would not allow petitioner to "just put [them]

24  on the stand and find out what [they'll] say."  (Id. at 1422.)  The trial judge also suggested that

25  petitioner "take a statement" from his proposed witnesses.  (Id.)  Petitioner responded that his

26  investigator had been trying to "get investigation reports on all these people."  (Id.)  The trial

judge noted that petitioner hadn't "even established a reasonable belief that they will say anything that helps you." (Id.)  The trial judge reiterated that petitioner had to "tell me what it is [the witness] has to say that has any relevancy to the case beyond what anybody else has already said or will say." (Id. at 1423.)  On the following Monday, Deputy Templeton arrived at court pursuant to a trial subpoena. (Id. at 1464-65.)  The trial judge suggested to petitioner's investigator that he interview Deputy Templeton to "see whether or not there's any basis to need him to remain." (Id.)[21]  Deputies Elliot, Templeton and Koontz did not testify at petitioner's trial.

In light of the events described above, petitioner has failed to demonstrate that his right to compulsory process was violated by the trial court's refusal to allow him to call Deputies Elliot, Templeton and Koontz as witnesses at his trial.  Petitioner was informed that he would be permitted to call these witnesses if he could proffer that they could give relevant, material, and non-cumulative testimony.  He was unable to do so, even though he was given the opportunity to question all of these witnesses at a hearing held prior to his preliminary examination and was able to interview Deputy Templeton at the courthouse during his trial.  Petitioner's assertion that these other deputies might have contradicted Deputy Garcia's trial testimony, or that their testimony might have provided relevant evidence on the issue of whether the victim was assaulted or raped, is based on pure speculation and does not constitute a "plausible showing of how [the witness] testimony would have been both material and favorable to his defense." Valenzuela-Bernal, 458 U.S. at 867.

In short, there is no evidence in the record before this court that the victim told the responding officers she had been raped; that she was medically evaluated to determine whether she had been raped; or that Deputy Garcia testified falsely about the presence of a S.W.A.T. team, medical records, or anything else.  Petitioner's attempts to manufacture such evidence from

---

[21]  The subject of petitioner attempting to call the other three deputies as witnesses at his trial does not appear in the state court record again after this exchange.

insinuation and innuendo do not establish a constitutional violation.  Accordingly, he is not entitled to federal habeas relief on this claim.

Claims Eight, Nine and Ten

In claims eight, nine, and ten, petitioner challenges the admission into evidence of his prior acts of domestic violence as well as the giving of an instruction related to the jury's consideration of that evidence.  Below, the court will provide the background to these claims.

The prosecution filed a pretrial motion in limine seeking permission to introduce evidence of petitioner's commission of other domestic violence offenses pursuant to California Evidence Code § 1109.  (CT at 1111-16; RT at 122, et seq.)[22]  At trial, the victim testified about previous acts of domestic violence committed by petitioner.  (RT at 890, 1248.)  Dr. Linda Barnard, a licensed marriage family therapist, also testified on the subject of Battered Woman's Syndrome.  (Id. at 1136-79.)  Dr. Barnard explained the common behavior characteristics demonstrated by battered women, such as a reluctance to testify against the batterer in court.  (Id. at 1136-79.)  At the conclusion of petitioner's trial the court gave several jury instructions designed to inform the jury how to consider the testimony with respect to petitioner's prior acts of domestic violence.  In particular, the jury was instructed with CALJIC No. 2.50.01, as follows:

> Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense other than that charged in the case.

---

[22]  California Evidence Code § 1109 provides, in pertinent part:

> (a)(1)  Except as provided in subdivision (e) or (f), in a criminal action in which the defendant is accused of an offense involving domestic violence, evidence of the defendant's commission of other domestic violence is not made inadmissible by Section 1101 if the evidence is not inadmissible pursuant to Section 352.

This provision changed the general rule that character evidence is inadmissible to prove a defendant's conduct on a specified occasion.  See Cal. Code Evid. § 1101; People v. Falsetta, 21 Cal.4th 903, 911 (1999).  It is tempered, however, by application of California Evidence Code § 353 which allows the court, in the exercise of its discretion, to exclude evidence if its probative value is substantially outweighed by the undue consumption of time or substantial danger of undue prejudice, confusion of the issues or the risk of misleading the jury posed by its admission.

* * *

> If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit the same or similar type sexual offenses. If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crimes of which he is accused.
>
> However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes. If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime. You must not consider this evidence for any other purpose.

(CT at 1377.)

A.  Claim Eight – Evidence of Battered Women's Syndrome

In his eighth claim for relief petitioner argues that the introduction into evidence of Dr. Barnard's testimony on Battered Woman's Syndrome rendered his trial fundamentally unfair, in violation of his right to due process. (Pet. at 76.) He argues that the trial court "wrongly allowed the prosecutor to introduce prejudicial evidence of Battered Woman Syndrome to bolster the credibility of the prosecutor's main witness," even though that evidence was "irrelevant to any legitimate issues involved in the guilt determination." (Id.) Petitioner further argues that the admission of this evidence "allowed the prosecutor to poison the jury against [petitioner] by side-stepping the prohibition of character evidence and by using a pseudo-scientific proxy to vouch for the credibility of his star witness." (Doc. 1-1, at 2.)

On appeal, the California Court of Appeal rejected these arguments, reasoning as follows:

Battered Women's Syndrome Evidence

Defendant contends the trial court improperly admitted evidence about battered women's syndrome because such evidence did not explain anything relevant to the case. He argues the prejudice from

54

such testimony outweighed any probative value because Terri did not recant or refuse to testify.  Finally, defendant asserts that admission of battered women's syndrome evidence is reversible error because there is a reasonable probability the verdict would have been different without it.  We conclude battered women's syndrome evidence was admissible.

Expert testimony on "intimate partner battering and its effects, including the nature and effect of physical, emotional, or mental abuse on the beliefs, perceptions, or behavior of victims of domestic violence, except when offered against a criminal defendant to prove the occurrence of the act or acts of abuse which form the basis of the criminal charge" is expressively authorized by statute.  (Evid. Code, § 1107, subd. (a).)

Battered women's syndrome evidence is permissible to aid the jury, whose lack of experience with such abuse and its effects may cause it to misinterpret the counterintuitive behavior of the victim.  (People v. McAlpin (1991) 53 Cal.3d 1289, 1302; People v. Morgan (1997) 58 Cal. App.4th 1210, 1214-1216.)  Such evidence is "relevant to the victim's credibility, because it would assist the jury 'by dispelling many of the commonly held misconceptions about battered women.' [Citations.]"  (People v. Brown (2004) 33 Cal.4th 892, 903.)  It can also be used to explain apparent inconsistencies in the victim's conduct or testimony.  (People v. Morgan, supra, at p. 1215.)

"A trial court's ruling permitting expert testimony is reviewed on appeal under the deferential abuse of discretion standard. [Citations.]"  (People v. Mayfield (1997) 14 Cal.4th 668, 766.)  Likewise, a trial court's balancing of probative value and prejudicial effect under Evidence Code section 352 will be reversed only if an abuse of discretion is found.  (People v. Stewart (1985) 171 Cal. App.3d 59, 65.)

"When the question on appeal is whether the trial court has abused its discretion, the showing is insufficient if it presents facts which merely afford an opportunity for a difference of opinion.  An appellate tribunal is not authorized to substitute its judgment for that of the trial judge.  [Citation.]  A trial court's exercise of discretion will not be disturbed unless it appears that the resulting injury is sufficiently grave to manifest a miscarriage of justice.  [Citation.]  In other words, discretion is abused only if the court exceeds the bounds of reason, all of the circumstances being considered.  [Citation.]"  (People v. Stewart, supra, 171 Cal. App.3d at p. 65.)

Here, the record reflects a lengthy relationship with instances in which defendant violently abused Terri after she refused to have sexual relations with defendant.  When testifying about these incidents, Terri minimized defendant's behavior until the

1   prosecutor read her prior statements and asked her if they were
    true.  She admitted the prior, more damning statements were true.
2   Despite the abuse, Terri married defendant and reunited with him
    whenever he was released from prison or jail.  This continued even
3   though their relationship ended poorly after each reunion.

4   Although Terri was held in the bedroom against her will, she told
    her friend Johnson that she was okay.  When the prosecutor asked
5   if she was indeed okay, Terri stated, "Well, I wasn't – I wasn't
    maimed ."  The morning of the incident Terri did not report the
6   rape to the police, but she later told an investigator about it.  She
    testified she did not believe what happened to her was rape.
7   However, she also testified she did not want to have sexual
    relations with defendant the morning of the incident and consented
8   because she did not want him to beat her for refusing.

9   Expert testimony to explain the apparent inconsistencies and
    possible misconceptions flowing from these facts was relevant and
10  did not exceed the bounds of reason.  Furthermore, the probative
    value outweighed any prejudicial effect.  The prior acts of abuse
11  were not admitted through the expert testimony; instead, this
    contention includes only the testimony concerning the battered
12  women's syndrome and its relation to the facts.

13  (Opinion at 3-4.)

14          As noted above, absent some federal constitutional violation, a violation of state

15  law does not provide a basis for habeas relief.  Wilson, 131 S. Ct. at 16; Estelle, 502 U.S. at

16  67-68.  Accordingly, a state court's evidentiary ruling, even if erroneous, is grounds for federal

17  habeas relief only if it renders the state proceedings so fundamentally unfair as to violate due

18  process.  Drayden v. White, 232 F.3d 704, 710 (9th Cir. 2000).  A writ of habeas corpus will be

19  granted for an erroneous admission of evidence "only where the 'testimony is almost entirely

20  unreliable and . . . the factfinder and the adversary system will not be competent to uncover,

21  recognize, and take due account of its shortcomings.'"  Mancuso, 292 F.3d at 956 (quoting

22  Barefoot v. Estelle, 463 U.S. 880, 899 (1983)).  Evidence violates due process only if "there are

23  no permissible inferences the jury may draw from the evidence."  Jammal v. Van de Kamp, 926

24  F. 2d 918, 920 (9th Cir. 1991).  Even then, evidence must "be of such quality as necessarily

25  prevents a fair trial."  Id. (quoting Kealohapauole v. Shimoda, 800 F.2d 1463 (9th Cir. 1986)).

26  /////

1    Petitioner's trial was not rendered fundamentally unfair by the admission into

2    evidence of the expert testimony regarding Battered Woman's Syndrome.  As noted by the state

3    appellate court, that testimony was relevant to explain certain aspects of the victim's testimony,

4    her reluctance to testify against petitioner, inconsistencies between her testimony at trial and her

5    testimony at the preliminary hearing, and her willingness to maintain a personal relationship with

6    petitioner in spite of continuing physical abuse.  The possibility that these matters could be

7    explained as the typical behavior of a battered woman is a rational and permissible inference the

8    jury could draw from the expert's testimony.  In addition, testimony regarding Battered Woman's

9    Syndrome was relevant to assist the jury in evaluating the victim's credibility, which was crucial

10   in the case against petitioner.  Moreover, Dr. Barnard's testimony was not unduly prejudicial.

11   She did not testify about any acts of domestic violence, but simply explained certain aspects of

12   the victim's testimony and behavior.  Under these circumstances, petitioner has failed to

13   demonstrate that the admission of expert testimony on Battered Woman's Syndrome had "a

14   substantial and injurious effect" on the verdict or prevented a fair trial.  See Brecht v.

15   Abrahamson, 507 U.S. 619, 623 (1993).

16   Petitioner has also failed to demonstrate that the California courts' rejection of his

17   federal due process claim is contrary to or an unreasonable application of federal law.  See 28

18   U.S.C. § 2254(d)(1); see also Ageel v. Tilton, No. 06cv1454 DMS (PCL), 2007 WL 3026407, at

19   * 11 (S.D. Cal. Oct. 16, 2007) (rejecting near identical claim on habeas); Chavarria v. Hamlet,

20   No. C01-2242 SI (PR), 2003 WL 1563992, at *11 (N.D. Cal. Mar. 25, 2003) (same).  The United

21   States Supreme Court "has not yet made a clear ruling that admission of irrelevant or overtly

22   prejudicial evidence constitutes a due process violation sufficient to warrant issuance of the

23   writ."  Holley v. Yarborough, 568 F.3d 1091, 1101 (9th Cir. 2009).[23]  Accordingly, under

24

25   ────────────

26       [23] The Supreme Court has also left open the question whether "the Constitution is
     violated by the admission of expert testimony concerning an ultimate issue to be resolved by the
     trier of fact."  Moses, 555 F.3d at 761.

1    AEDPA, petitioner is not entitled to federal habeas relief on this claim.

2        B.  Claim Nine – California Evidence Code § 1109

3            As noted, pursuant to California Evidence Code § 1109 the victim in this case was

4    allowed to testify at trial regarding petitioner's prior acts of domestic violence.  Petitioner argues

5    that § 1109 violates his right to due process on its face and as applied to him "because it permits

6    evidence of other acts of domestic violence to be used as propensity evidence."  (Doc. 1-1 at 3.)

7    Petitioner also argues that § 1109 violates his right to equal protection because it applies only to

8    defendants accused of domestic violence and not to all criminal defendants.  (Id.)

9            The California Court of Appeal rejected these arguments in its decision affirming

10   petitioner's conviction on direct appeal.  The state appellate court reasoned as follows:

11       A. Due Process

12       Defendant argues Evidence Code section 1109[24] is unconstitutional
         on its face and as applied to him because it violates due process
13       rights by allowing propensity evidence.  We disagree.

14       While the Supreme Court has yet to speak to the constitutionality
         of section 1109, numerous courts have compared section 1109 to
15       section 1108, which the Supreme Court found constitutional in
         People v. Falsetta (1999) 21 Cal.4th 903.  (See, e.g., People v.
16       Johnson (2000) 77 Cal. App.4th 410; People v. Hoover (2000) 77
         Cal. App.4th 1020; People v. Brown (2000) 77 Cal. App.4th 1324.)
17       We agree with those courts that section 1109 does not violate due
         process.
18
         The legislative history of section 1109 recognizes the utility of
19       propensity evidence because of unique problems associated with
         domestic violence.  (People v. Johnson, supra, 77 Cal. App.4th at
20       p. 419.)  Specifically, the ongoing and escalating nature of typical
         domestic violence make this manner of proof particularly
21       probative.  Without propensity evidence, the abuse cycle may be
         masked.  (Ibid.)  Additionally, the nature of these crimes often
22       produces uncooperative witnesses and victims because they fear
         retaliation from the abuser.  (People v. Brown, supra, 77 Cal.
23       App.4th at p. 1333.)  Therefore, "the California Legislature has
         determined the policy considerations favoring the exclusion of
24       evidence of uncharged domestic violence offenses are outweighed
         in criminal domestic violence cases by the policy considerations
25

26   _____
         [24]  All further section references will be to the Evidence Code unless otherwise stated.

                                              58

favoring the admission of such evidence."  (<u>People v. Johnson</u>, <u>supra</u>, at p. 420.)

Moreover, section 1109 requires pretrial notice to allow the defense to prepare to rebut or otherwise explain the evidence. (<u>People v. Brown</u>, <u>supra</u>, 77 Cal. App.4th at p. 1334.)  It permits evidence of prior domestic violence only to show propensity for domestic violence and not for other purposes.  (<u>People v. Johnson</u>, <u>supra</u>, 77 Cal. App.4th at p. 420.)  Such an exception does not offend historical principles of exclusion of propensity evidence because "section 1101 has long been subject to far-ranging exceptions . . . ."  (<u>Id.</u> at p. 418.)

Because prior acts of domestic violence, as are any other prior acts under section 1101, are subject to balancing under section 352, "'the Legislature has ensured that such evidence cannot be used in cases where its probative value is substantially outweighed by the possibility that it will consume an undue amount of time or create a substantial danger of undue prejudice, confusion of issues, or misleading the jury.  (§ 352.)  This determination is entrusted to the sound discretion of the trial judge who is in the best position to evaluate the evidence.  [Citation.]' [Citation.]"  (<u>People v. Hoover</u>, <u>supra</u>, 77 Cal. App.4th at pp. 1028-1029.)

Defendant's assertion that section 352 balancing fails constitutional muster precisely because the judge makes the decision in the absence of the jury is nonsensical.  The purpose of the section 352 balancing is to shield the jury from issues later determined by the court to be inadmissible.

Finally, "section 1109 does not lessen the prosecution's burden of proof, because a properly instructed jury will be told the defendant is presumed innocent and the prosecution must prove him guilty beyond a reasonable doubt in order for the jury to convict." (<u>People v. Johnson</u>, <u>supra</u>, 77 Cal. App.4th at p. 420.) Accordingly, we find section 1109 does not violate due process.

Defendant also asserts section 1109 is unconstitutional as applied to him, but fails to cite authority supporting that assertion.  When a party makes a legal assertion and fails to support the assertion with authority, we may deem the argument abandoned.  (<u>Mansell v. Board of Administration</u> (1994) 30 Cal. App.4th 539, 545-546.) Even if proper authority were cited, defendant's claim would fail. The trial court did not abuse its discretion in admitting the evidence of prior abuse after section 352 balancing.  This evidence was highly probative and relevant to the issues in this case. (<u>People v. Harris</u> (1998) 60 Cal. App.4th 727, 737-740.)

/////

/////

B. <u>Equal Protection</u>

Defendant contends that section 1109 violates the equal protection provisions of the California and United States constitutions. This argument was considered and rejected by the First Appellate District in <u>People v. Jennings</u> (2000) 81 Cal. App .4th 1301, 1310-1313. We find <u>Jennings</u> persuasive.

Section 1109 is facially neutral, treating "all defendants charged with domestic violence equally;" it only distinguishes between domestic violence defendants and defendants accused of other crimes. (<u>People v. Jennings</u>, <u>supra</u>, 81 Cal. App.4th at p. 1311.) "Neither the federal nor the state constitution bars a legislature from distinguishing among criminal offenses in establishing rules for the admission of evidence; nor does equal protection require that acts or things which are different in fact be treated in law as if they were the same. The equal protection clause simply requires that, 'in defining a class subject to legislation, the distinctions that are drawn have "some relevance to the purpose for which the classification is made."' [Citation.] Absolute equity is not required; the Constitution permits lines to be drawn. [Citation.] The distinction drawn by section 1109 between domestic violence offenses and all other offenses is clearly relevant to the evidentiary purposes for which this distinction is made." (<u>Id.</u> at p. 1311.)

Defendant provides no authority that domestic violence defendants are similarly situated to all other criminal defendants. Such a showing is a prerequisite to an equal protection claim. (<u>People v. Jennings</u>, <u>supra</u>, 81 Cal. App.4th at p. 1311.) Even if such a showing were made, we reject defendant's contention that strict scrutiny should be applied. Section 1109 does not violate defendant's right to "due process, a fair trial, or conviction by proof beyond a reasonable doubt." (<u>People v. Jennings</u>, <u>supra</u>, at p. 1312.) Nor does it unconstitutionally infringe on defendant's liberty interest. (<u>Ibid.</u>) "Although statutes allowing additional evidence to be admitted at trial against particular kinds of criminal defendants may make prosecution easier in such cases, this fact does not render such statutes [unlawful] direct restraints on the defendants' personal liberty. To require strict scrutiny analysis in this case would as a practical matter deny the Legislature the power to admit propensity evidence in any case unless it was admissible in all cases." (<u>Ibid.</u>, italics in original.)

Applying the rational basis test to the present facts, section 1109 is constitutional. The secretive nature of domestic abuse, combined with the special relationship between victim and abuser, sufficiently distinguishes these cases from general criminal conduct. (<u>People v. Jennings</u>, <u>supra</u>, 81 Cal. App.4th at p. 1313.) The Legislature could rationally distinguish domestic violence cases from other offenses "in order to assist in more realistically

/////

1    adjudging the unavoidable credibility contest between accuser and
     accused."  (Ibid.)

2

3    (Opinion at 5-9.)

4            1.  Due Process

5            A state's criminal law, such as an evidence code provision, does not violate the

6    Due Process Clause "unless it offends some principle of justice so rooted in the traditions and

7    conscience of our people as to be ranked as fundamental."  Montana v. Egelhoff, 518 U.S. 37, 47

8    (1996).  The United States Supreme Court "has never expressly held that it violates due process

9    to admit other crimes evidence for the purpose of showing conduct in conformity therewith, or

10   that it violates due process to admit other crimes evidence for other purposes without an

11   instruction limiting the jury's consideration of the evidence to such purposes."  Garceau v.

12   Woodford, 275 F.3d 769, 774 (9th Cir. 2001), overruled on other grounds by Woodford v.

13   Garceau, 538 U.S. 202 (2003).  In fact, the Supreme Court has expressly left open this question.

14   See Estelle, 502 U.S. at 75 n.5 ("Because we need not reach the issue, we express no opinion on

15   whether a state law would violate the Due Process Clause if it permitted the use of 'prior crimes'

16   evidence to show propensity to commit a charged crime").  Accordingly, the state appellate

17   court's decision with respect to this claim is not contrary to clearly established federal law.  See

18   also Mejia v. Garcia, 534 F.3d 1036, 1046 (9th Cir. 2008) (holding that state court had not acted

19   objectively unreasonably in determining that the propensity evidence introduced against the

20   defendant did not violate his right to due process); Alberni v. McDaniel, 458 F.3d 860, 863-67

21   (9th Cir. 2006), cert. denied, 549 U.S. 1287 (2007) (denying the petitioner's claim that the

22   introduction of propensity evidence violated his due process rights under the Fourteenth

23   Amendment because "the right [petitioner] asserts has not been clearly established by the

24   Supreme Court, as required by AEDPA"); United States v. LeMay, 260 F.3d 1018 (9th Cir.

25   2001) (Federal Rule of Evidence 414, permitting admission of evidence of similar crimes in child

26   molestation cases, under which the test for balancing probative value and prejudicial effect

1  remains applicable, does not violate the due process clause).  This precedent forecloses

2  petitioner's due process challenge to the admission of testimony regarding his prior bad acts.

3          Further, any error in admitting this testimony could not be said to have "a

4  substantial and injurious effect or influence in determining the jury's verdict."  Brecht, 507 U.S.

5  See also Penry v. Johnson, 532 U.S. 782, 793-96 (2001).  The record reflects that the state trial

6  judge struck an appropriate balance between petitioner's rights and the clear intent of the

7  California legislature that evidence of prior similar acts be admitted in domestic violence

8  prosecutions.  The trial court held a hearing on the prosecutor's pre-trial in limine motion to

9  introduce evidence of petitioner's uncharged acts of domestic violence pursuant to California

10  Evidence Code § 1109.  The trial court instructed the jury at the close of the evidence that if they

11  found petitioner had committed the prior acts of domestic violence they could, but were not

12  required to, infer that the defendant had a disposition to commit domestic violence offenses.  The

13  jury was also instructed that if they found that petitioner had such a disposition, they could, but

14  were not required to, infer that he was likely to have committed the charged offenses.  These

15  instructions did not compel the jury to draw an inference of propensity; they simply allowed it to

16  do so.  Finally, the jury was directed that it should not consider petitioner's prior conduct, or

17  evidence thereof, as proof that petitioner committed the crimes charged in the Information.  In

18  addition, the jury instructions given at petitioner's trial, viewed in their entirety, correctly

19  informed the jury that the prosecution had the burden of proving all elements of each charge

20  against petitioner beyond a reasonable doubt and that the instructions should be considered as a

21  whole.  (CT at 1388 and 1355,)  The jury is presumed to have followed all of these instructions.

22  Weeks v. Angelone, 528 U.S. 225, 234 (2000); Brown v. Ornoski, 503 F.3d 1006, 1018 (9th Cir.

23  2007).  Although the prior acts of domestic violence evidence was potentially powerful, "[the

24  fact] that prior acts evidence is inflammatory is not dispositive in and of itself."  LeMay  260

25  F.3d at 1030.  In any event, the prior acts evidence was not nearly as inflammatory as the

26  allegations brought against petitioner in this case.

1        The admission of petitioner's prior acts of domestic violence did not violate any

2   right clearly established by federal precedent or result in prejudice under the circumstances of

3   this case.  See Chavarria, 2003 WL 1563992, at *11.  Accordingly, petitioner is not entitled to

4   federal habeas relief with respect to his due process claim.

5        B.  Equal Protection

6        Petitioner has also failed to demonstrate that California Evidence Code § 1109

7   violates the federal Equal Protection Clause.  The Equal Protection Clause "embodies a general

8   rule that States must treat like cases alike but may treat unlike cases accordingly."  Vacco v.

9   Quill, 521 U.S. 793, 799 (1997) (citing Plyler v. Doe, 457 U.S. 202, 216 (1982) and Tigner v.

10  Texas, 310 U.S. 141, 147 (1940)).  The Fourteenth Amendment "guarantees equal laws, not

11  equal results."  McQueary v. Blodgett, 924 F.2d 829, 835 (9th Cir. 1991) (quoting Personnel

12  Adm'r v. Feeney, 442 U.S. 256, 273 (1979)).  "[L]egislation may impose special burdens upon

13  defined classes in order to achieve permissible ends."  Estelle v. Dorrough, 420 U.S. 534, 539

14  (1975).  However, the Equal Protection Clause "does require that, in defining a class subject to

15  legislation, the distinctions that are drawn have 'some relevance to the purpose for which the

16  classification is made.'"  Id.  A habeas petitioner has the burden of alleging facts sufficient to

17  establish "a prima facie case of uneven application."  McQueary, 924 F.2d at 835.  "[A] mere

18  demonstration of inequality is not enough . . . There must be an allegation of invidiousness or

19  illegitimacy in the statutory scheme before a cognizable claim arises."  Id.

20       In LeMay, the Ninth Circuit held that Federal Rule of Evidence 414, a provision

21  analogous to California Evidence Code § 1109, did not violate the Equal Protection Clause

22  because it did not discriminate against any group of individuals on the basis of a suspect or

23  quasi-suspect class and did not infringe on a fundamental right.  LeMay, 260 F.3d at 1030

24  (defendants have "no fundamental right to have a trial free from relevant propensity evidence that

25  is not unduly prejudicial").  Because Rule 414 did not burden a fundamental right and because

26  sex offenders are not a suspect class, the court found the rule was constitutional so long as it

1  bears a "reasonable relationship to a legitimate government interest." Id. at 1031.  The court

2  observed that Rule 414 allowed prosecutors to introduce relevant evidence in furtherance of the

3  legitimate government interest of prosecuting and convicting sex offenders.  Id.  On this basis the

4  court found the equal protection challenge to Rule 414 to be without merit.  Id.

5          Just as the class of sex offenders was found not to be a suspect class in LeMay,

6  the class of domestic batterers is not a suspect class here.  Further, California Evidence Code §

7  1109 does not infringe on a fundamental right because petitioner has no fundamental right to a

8  trial free from relevant propensity evidence that is not unduly prejudicial.  See LeMay, 260 F.3d

9  at 1030.  In addition, § 1109 bears a reasonable relationship to the legitimate government interest

10  in the effective prosecution of cases of domestic violence.  See id. at 1031.  See also Porter v.

11  McGrath, No. 06-16124, 2008 WL 636408, at *1 (9th Cir. Mar. 7, 2008)[25] (rejecting equal

12  protection challenge to analogous California statutory code permitting admission of defendant's

13  prior acts of sexual abuse where defendant is charged with current act of sexual abuse, citing

14  LeMay); Chavarria, 2003 WL 1563992, at *11.   Here, petitioner has not demonstrated that

15  California Evidence Code § 1109 violates the Equal Protection Clause.  Accordingly, he is not

16  entitled to federal habeas relief on this claim.

17          C.  Claim Ten – CALJIC No. 2.50.01

18          In petitioner's next claim, he argues that the trial court violated his constitutional

19  rights when it instructed the jury on how to evaluate evidence of other sexual offenses, pursuant

20  to CALJIC No. 2.50.01.  (Doc. 1-1, at 15-21.)  Petitioner claims that the instruction allowed the

21  jury to find him guilty of the charged offenses on proof less than beyond a reasonable doubt and

22  on the basis of "character, disposition or propensity."  (Id. at 17, 18.)  The California Court of

23  Appeal rejected these arguments, reasoning as follows:

24  /////

25  _____

26  [25]  Citation to this unpublished decision is appropriate pursuant to Ninth Circuit Rule 36-
3(b).

CALJIC No. 2.50.01 and Due Process

Defendant argues the court's use of the post-1999 version (specifically, the 2002 version) of CALJIC No. 2.50.01 was unconstitutional.  He contends the instruction "allowed the jury to find [him] guilty of the charged offenses based solely on evidence of the prior rape offense if they found by a standard of proof greater than a preponderance of the evidence (e.g./, [ sic ] beyond a reasonable doubt) that [he] committed the prior offense."  We disagree.

The instruction read to the jury states in relevant part: "Evidence has been introduced for the purpose of showing that the defendant engaged in a sexual offense other than that charged in this case.  [¶] . . . [¶]  If you find that the defendant committed a prior sexual offense, you may, but are not required to, infer that the defendant had a disposition to commit sexual offenses.  If you find that the defendant had this disposition, you may, but are not required to, infer that he was likely to commit and did commit the crime or crimes of which he is accused.  [¶]  However, if you find by a preponderance of the evidence that the defendant committed a prior sexual offense, that is not sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes.  If you determine an inference properly can be drawn from this evidence, this inference is simply one item for you to consider, along with all other evidence, in determining whether the defendant has been proved guilty beyond a reasonable doubt of the charged crime.  You must not consider this evidence for any other purpose." (CALJIC No. 2.50.01, italics added.)

This instruction, in pertinent part, was expressly approved in People v. Falsetta, supra, 21 Cal.4th at page 922.  That court stated: "In future cases, defendants may request an instruction based on revised CALJIC No. 2.50.01 (1999 rev.), supra, which contains language appropriate for cases involving the admission of disposition evidence."  (People v. Falsetta, supra, at p. 922.)  It further stated:  "[W]e think revised CALJIC No. 2.50.01 adequately sets forth the controlling principles under section 1108."  (People v. Falsetta, supra, at p. 924.)

It appears defendant is arguing that, although the instruction limits the jury as to what it can do with the prior sexual offense evidence if it finds by a preponderance of the evidence that defendant committed the prior act, it fails to also limit what the jury does with the evidence if it finds beyond a reasonable doubt that defendant committed the prior act.  In other words, the jury could base a conviction solely on its finding beyond a reasonable doubt that defendant committed the prior act.  We reject this attack on the instruction.  A jury that finds beyond a reasonable doubt that a defendant committed a prior act also finds it by a preponderance of the evidence.  Furthermore, there is no reason to believe this jury

1    was, or any other jury would be, misled in the manner defendant
     raises.

2

3    "[N]o juror could reasonably interpret the instructions to authorize
     conviction of a charged offense based solely on proof of an
     uncharged sexual offense.  It is not possible, for example, to find

4    each element of the charged crimes, as the jury was instructed to do
     before returning a guilty verdict, based solely on the [prior]

5    offense."  (People v. Reliford (2003) 29 Cal.4th 1007, 1015.)

6    (Opinion at 7-8.)

7           In Gibson v. Ortiz, 387 F.3d 812, 820 (9th Cir. 2004), overruled on other grounds

8    by Byrd v. Lewis, 566 F.3d 855, 866 (9th Cir. 2009), the court held that the 1996 version of

9    CALJIC No. 2.50.01 and CALJIC No. 2.50.1, when given together at a criminal trial, violate a

10   defendant's Fourteenth Amendment due process rights to be proven guilty beyond a reasonable

11   doubt because they allow a jury to: (1) find that a defendant had committed prior sexual offenses

12   by a preponderance of the evidence; (2) infer from those past offenses a predilection for

13   committing sexual offenses; and (3) further infer guilt of the charged offense based on those

14   predilections.  CALJIC No. 2.50.01 was amended in 1999 to clarify how jurors should evaluate a

15   defendant's guilt relating to the charged offense if they find that the defendant had committed a

16   prior sexual offense.  That revision added the following language:  "However, if you find by a

17   preponderance of the evidence that the defendant committed prior sexual offenses, that is not

18   sufficient by itself to prove beyond a reasonable doubt that he committed the charged crimes."

19   CALJIC No. 2.50.01 (7th ed. 1999).  The revised instruction also provided that "[t]he weight and

20   significance of the evidence, if any, are for you to decide."  Id.  In 2002, CALJIC No. 2.50.01

21   was revised once again.  The 2002 revision deleted the sentence "[t]he weight and significance of

22   the evidence, if any, are for you to decide," and inserted the following statement:  "If you

23   determine an inference properly can be drawn from this evidence, this inference is simply one

24   item for you to consider, along with all other evidence, in determining whether the defendant has

25   been proved guilty beyond a reasonable doubt of the charged crime."  CALJIC No. 2.50.01.  In

26   People v. Reliford, 29 Cal.4th 1007, 1016 (2003), the California Supreme Court upheld the

1   constitutionality of the 1999 version of CALJIC No. 2.50.01, but commented that the instruction

2   had been "improved" by the addition of the sentence noted above in the 2002 amendment.

3          Challenges to the constitutionality of the 1999 and 2002 versions of CALJIC No.

4   1.50.01 have been rejected by numerous federal courts in unpublished opinions.  See e.g. Abel v.

5   Sullivan, No. 08-55612, 2009 WL 1220761, *3 (9th Cir. May 6, 2009) (2002 version); Smith v.

6   Ryan, No. 05-16072, 2007 WL 387589, at *3 (9th Cir. Feb. 5, 2007) (1999 version); McGee v.

7   Knowles, No. 05-17301, 2007 WL 135679, *1 (9th Cir. Jan. 8, 2007)[26]; Gridley v. Hartley, No.

8   2:08-cv-2659 MCE KJN P, 2010 WL 2765662, *6 (E.D. Cal. July 13, 2010) (2002 version); Cata

9   v. Garcia, No. C 03-3096 PJH (PR), 2007 WL 2255224, *15-16 (N.D.Cal., Aug. 3, 2007) (1999

10   version); Perez v. Duncan, No. C 04-5014 SI (PR), 2005 WL 2290311 (N.D.Cal., Sept. 20, 2005)

11   (1999 version).  Based on the reasoning of those courts in the above-cited opinions, this court

12   concludes that the decision of the state court rejecting petitioner's contention that his

13   constitutional rights were violated by the giving of CALJIC No. 2.50.01 was not contrary to or an

14   unreasonable application of clearly established federal law.  Accordingly, petitioner is not

15   entitled to federal habeas relief with respect to this claim.

16          Claim Eleven – Refusal of Jury Instructions on Theory of Defense

17          In his next ground for relief, petitioner claims that the trial court "abused its

18   discretion" and violated his federal constitutional rights to "due process, equal protection, and [a]

19   fair trial" when it "refused to allow or admit any of [his] jury instructions on theory of defense

20   that was supported by the evidence and law."  (Doc.1-1, at 22.)  Below, the court will set forth

21   the factual background to this claim.

22          It appears from the state court record that on a weekend before the jury was to be

23   instructed, and after the parties and the court had already discussed which of the prosecution's

24   proposed jury instructions would be given, petitioner put together a packet of additional or

25

26      [26]   See fn. 25, above.

supplemental jury instructions that he wished the trial court to give.  On the following Monday,

the trial judge received petitioner's packet of additional jury instructions.  The trial judge made

the following comments regarding those proposed instructions:

> THE COURT: Okay.  What I would do is some of these have been
> addressed, some of your instructions we've talked about, and some
> of them either duplicate or do add to them.  I'll need – because of
> the amount you have in this folder, I'll use the time I have during
> the lunch hour to go over them, and when we come back at 1:30,
> I'll make a record of what I'm allowing and not allowing.
>
> THE DEFENDANT: And do we stipulate on the record each one
> of those that we are allowing and not allowing?
>
> THE COURT: I may not spend the time to go over each one of
> them individually.  They will all be marked as part of the record.
>
> THE DEFENDANT: All right.
>
> THE COURT: But I'll – I'll let you know which ones I'm allowing
> . . .

(RT at 2013-14.)

After the trial judge had reviewed petitioner's proposed jury instructions, the

following colloquy occurred:

> THE COURT:  . . . And on the instructions, I will give 2.28, as I
> indicated this morning, and I'm going to limit to –
>
> THE DEFENDANT:  Are we doing mine?
>
> THE COURT:  Pardon me?
>
> THE DEFENDANT:  We're doing mine?
>
> THE COURT:  No.  The standard CALJIC 2.28.  It will read as it
> reads in CALJIC, but I'm only referring specifically to the sheriff
> dispatch tapes that the prosecution did not provide.
>
> So that part will read in this case the People failed to timely
> disclose the following evidence:  Sheriff's dispatch tapes and
> related evidence.  The weight and significance of this failure to
> disclose are matters for your consideration.  However, you should
> consider whether this evidence pertains to a fact of importance,
> something trivial or subject matters already established by other
> credible evidence.

/////

1    That's out of the standard wording from the CALJIC instruction.

2    I did review all of your other proposed instructions, Mr. Jensen.
     Many were duplicative or added to in some method the instructions
3    that I'm already giving.  The ones that did not duplicate the
     instructions I'm already giving, we will make a set obviously, and
4    that remains a matter of record, but I am declining to give any of
     your additional instructions.

5
     And I'll ask the clerk to –
6
     THE DEFENDANT:  You're declining – you are declining on
7    putting in as far as the officers' notes?

8    THE COURT:  Yes.

9    THE DEFENDANT:  Why?

10   THE COURT:  I'm not going to elaborate on everything that I'm –

11   THE DEFENDANT:  I'm not asking for everything, your Honor.
     I'm asking for this one.
12
     THE COURT:  I'm not giving it.  Officers' notes are not required
13   to be maintained.  Among other things, there's no law that says the
     officer has to maintain his original notes.  It's standard in cases that
14   officers destroy their notes once they are satisfied that the report
     that's been prepared conforms with their notes.
15
     There is some law pertaining to notes that involve the questioning
16   of the accused.

17   THE DEFENDANT:  Okay.  As to the CALJIC 9.40, 9.94 for
     criminal threats, you're not going to add the term – the term
18   sustained fear means a period of time that extends beyond what is
     momentary, fleeting and transitory?  You're not going to add that?
19
     THE COURT:  I'm giving the CALJIC wording for that definition
20   of that crime.

21   THE DEFENDANT:  So there ain't going to be no forecites and no
     nothing that I want to put in?
22
     THE COURT:  Unless there is some of the set we settled earlier
23   that I understood you did want in, and that's in.

24   You brought me then these additional instructions that you went
     over during the weekend, and I'm not giving them.  Correct.
25
     I'll ask the clerk to –
26   /////

69

1        THE DEFENDANT:  These – I would like to state for the record,
2        your Honor, that these are the only ones that I asked to be put in,
and you're denying all of them.

3        THE COURT:  Well, when we went over the set that the D.A. had
4        provided, and we were off the record, there were a number of those
that you agreed you wanted in.

5        But yes, these are the ones you brought this morning, the only
additional ones since we settled instructions last week that you
6        have added, and I'm not giving any except your request concerning
the dispatch tapes and the D.A.'s failure to disclose those in
7        response to the discovery order.

8                                  \* \* \*

9        THE DEFENDANT:  And could you also make it clear that I did
not have the opportunity last week while we were going through
10      jury instructions that you and the D.A. put in, I did not put mine in
at that time.

11
        THE COURT: That's clear.  Yeah.  As I repeatedly just said, you
12      brought these today since you compiled them over the weekend.

13  (Id. at 2076-80.)

14        Subsequently, prior to jury deliberations, the trial judge allowed the parties to

15  express their objections on the record to the jury instructions that had been given.  The following

16  colloquy occurred at that time:

17        THE COURT:   All right.  For the record then what I'd like to do is
in this order.  We'll go with the instructions that I read to the jury
18      and hear either side as to which ones you objected to, if any and
otherwise it will be deemed to be with your approval as to the rest.
19
        Then I'll address any more issues concerning defendant's set of
20      instructions.

21        But Mr. Jensen, I'm not going to go through them individually and
state specifically as to each individual instruction anything for the
22      record why I didn't give them.  You're protected otherwise on the
record if I erred and should have given any of them.  They're all
23      here for the record, and that can be raised as an issue on appeal if
necessary.
24
        And then I want to separately address, it should be briefly, the
25      instructions that were in the D.A.'s packet that were either
withdrawn or refused by me without again going into detail except
26      maybe in one or two cases.

* * *

THE COURT: Okay.  Mr. Jensen, which ones then that I gave did
you object to?

(Id. at 2208-09.)  Petitioner then stated his objection to the giving of jury instructions that were,

according to him, "repetitious about the rape."  (Id. at 2209.)  He also complained that "it's

showing bias or prejudice towards me to just these [sic] jury instructions and you not allowing

any of my instructions to go along with it."  (Id.)  Petitioner also stated he wanted the trial judge

to give CALJIC No. 2.01.[27]  The trial judge responded that although that instruction was

"discussed at least twice," he had decided not to instruct the jury with it.  (Id. at 2210.)  The trial

judge then concluded by stating:

THE COURT:  Okay.  And for the record I didn't give 17.01 where
it tells the jury a verdict may be based on one of a number of
unlawful acts.  I concluded that since this was by the defendant's
account a very brief period of time, by the victim's account a
longer period of time, it was all one uninterrupted sequence of
events, and if the jury decides that the defendant committed, for
instance, a battery, they don't need to be unanimous as to which
particular battery occurred, whether it be in the car or in the
bedroom.  It was a continuing incident, and for that reason under
the cases concerning 17.01 I did not give that.

Okay.  For the defendant's set of instructions they'll be retained as
part of the record, and everything you have in here is in the file,
and it will merely be captioned and all offered by the defendant and
refused by the Court.

(Id. at 2210-11.)

In his application for federal habeas relief, petitioner claims that the trial judge

"showed bias and prejudice toward [petitioner] when it went over all of the courts and district

attorney's jury instructions individually and stated specifically as to each individual instruction

the reason they were either approved or denied, then denied all of [petitioner's] jury instructions

in whole with no reason given on almost all instructions."  (Doc. No. 1-1 at 22.)  In his traverse,

---

[27]  CALJIC No. 2.01 instructs on "Sufficiency of Circumstantial Evidence—Generally."

1    petitioner complains that "the trial court denied all of petitioner's jury instructions without giving

2    any cause for the denials." (Traverse at 24.)

3              Petitioner also objects to the trial court's instructions regarding the prosecution's

4    failure to turn over the dispatch tapes in response to petitioner's discovery request for this

5    material. (Doc 1-1 at 22.)[28]  With respect to this claim, the state court record reflects that the trial

6    court took judicial notice on the record of petitioner's numerous requests for discovery pertaining

7    to all telephone calls and radio communications, including computer printouts, among Deputies

8    Templeton, Koontz, Elliot, and Garcia; the communications of those deputies with dispatch; tape

9    recordings and other evidence of sheriff radio calls pertaining to the report of the alleged crime,

10   including surveillance and the arrest of petitioner; and the prosecution's responses to these

11   discovery requests, including its failure to turn over all of the requested material in discovery

12   despite court orders to do so. (RT at 2053-57.)  After taking judicial notice of these matters, the

13   trial court advised the jury that these were "pieces of information for the sides to argue and the

14   jury to consider as you deem appropriate." (Id. at 2057.)  Petitioner claims that this instruction

15   was not forceful enough and that, in any event, it was undermined by jury instructions which

16   informed the jury that (1) "you must apply the law that I state to you, to the facts, as you

17   determine them, and in this way arrive at your verdict;" (2) "you must accept and follow the law

18   as I state it to you, regardless of whether you agree with it," and (3) "if anything concerning the

19   law said by the attorneys in their arguments or at any other time during the trial conflicts with my

20   instructions on the law, you must follow my instructions." (Doc 1-1 at 27.)

21   /////

22   /////

23   /////

24   /////

25

26   [28] Petitioner's objection in this regard was also the subject of his claim 5, which has been addressed above.

Petitioner also complains that the trial court "made the jury accept and believe in CALJIC No. 2.28, and rejected petitioner's proposed "instruction to go with it." (Id.)[29] Petitioner argues that the instruction that was given was "inadequate in light of all the evidence provided to the court and the fact that the court found numerous violations in the People not providing the requested/ordered discovery." (Id. at 28.) Petitioner also complains that the trial court deleted the part of CALJIC No. 2.28, which states that "the People's concealment and or failure to timely disclose evidence was without lawful justification." (Id.) He argues:

> There was nothing in the court's instruction that the requested/ordered discovery was destroyed after [petitioner] and the court requested/ordered the People to fully disclose said evidence at least six times, and the court made it seem to the jury that the evidence was provided to [petitioner] when "the People failed to timely disclose the evidence" (this implies to the jury that the evidence was disclosed, and provides a greater impact to the

---

[29] The instruction which petitioner objected to as insufficient has been set forth above in connection with claim 5, and provided as follows:

> The prosecution and the defense are required to disclose to each other before trial the evidence each intends to present at trial so as to promote the ascertainment of the truth, save court time and avoid any surprise which may arise during the course of the trial.

> Concealment of evidence or delay in the disclosure of evidence may deny a party a sufficient opportunity to subpoena necessary witnesses or produce evidence which may exist to rebut the non-complying party's evidence.

> Disclosures of evidence are required to be made at least 30 days in advance of trial. Any new evidence discovered within 30 days of trial must be disclosed immediately.

> In this case the People failed to timely disclose the following evidence: Sheriff's dispatch tapes and related evidence.

> The weight and significance, if any, of this failure to disclose are matters for your consideration.

> However, you should consider whether this evidence pertains to a fact of importance, something trivial or subject matters already established by other credible evidence.

(RT at 2179-80.)

73

1

> jury when the court ordered the jury in instruction 1.00 "if anything
> concerning the law said by the attorney's in their arguments" or "at
> any other time during trial" conflicts with my instructions on the
> law, "you must follow my instructions.)"

2

3

4   (Id.)

5        Finally, petitioner states that "there are many other instructions that [he] could and

6   would appeal," but he is not in possession of the complete trial record and "cannot provide the

7   court with the specific instructions that [he] provided to the lower court." (Id.)  Petitioner

8   concludes,

9

> Therefore, for all of the reasons listed above with the court denying
> all of [petitioner's] jury instructions in whole without the court
> giving cause as to why the court denied them, especially when all
> of [petitioner's] requested instructions were in fact approved and
> accepted by the court and submitted in "the forecites" and
> "California Criminal Forms and Instructions 2d" publications for
> the theory of defense for defendants, the requested instructions by
> [petitioner] passed all the test's when the requested instructions
> were supported by the evidence, and the court did not tailor a
> sufficient instruction to conform to the theory of defense.

10

11

12

13

14

15   (Id. at 29.)

16        The last reasoned decision addressing these claims is once again the October 1,

17   2007 decision of the Sacramento County Superior Court on petitioner's application for a writ of

18   habeas corpus.  (Resp't's Lod. Doc. 6.)  The Superior Court denied relief on these claims with a

19   citation to In re Dixon.  (Id. at 2.)  Respondent again argues that the Superior Court's citation to

20   In re Dixon constitutes a procedural bar precluding this court from considering the merits of the

21   claims.  (Answer, at 53.)  As in the case of the claims addressed above, the court will assume

22   these claims are not procedurally barred and will address them on the merits, applying a de novo

23   standard of review.

24        A challenge to jury instructions does not generally state a federal constitutional

25   claim.  See Engle v. Isaac, 456 U.S. 107, 119 (1982); Dunckhurst v. Deeds, 859 F.2d 110, 114

26   (9th Cir. 1988).  Petitioner must demonstrate that the trial court's failure to give his requested

1   jury instructions rendered his trial fundamentally unfair, in violation of the Due Process Clause.

2   Cupp v. Naughten, 414 U.S. 141, 146 (1973).  Where the challenge is a failure to give an

3   instruction, the petitioner's burden is "especially heavy," because "[a]n omission, or an

4   incomplete instruction is less likely to be prejudicial than a misstatement of the law."  Henderson

5   v. Kibbe, 431 U.S. 145, 155 (1977).  See also Villafuerte v. Stewart, 111 F.3d 616, 624 (9th Cir.

6   1997).

7          The court notes first that there is no federal constitutional requirement that a state

8   trial judge give reasons for rejecting each individual jury instruction proposed by a party.  Nor is

9   there a federal constitutional requirement that a state trial court devote the same amount of time

10  to its analysis of each party's proposed jury instructions.  Accordingly, petitioner's claims that

11  the trial judge violated his federal constitutional rights when he discussed the specific jury

12  instruction proposed by the prosecution but denied petitioner's instructions "in whole with no

13  reason given on almost all instructions" lacks merit and will be rejected.  In any event, the record

14  indicates that petitioner participated in all of the jury instruction conferences and approved many

15  of the instructions actually given to the jury at his trial.  Certainly there is no evidence the process

16  utilized by the trial judge in determining the appropriate jury instructions to give was based on

17  any bias against petitioner.

18          The jury instructions proposed by petitioner which the trial court declined to give

19  are included in the state court record.  (CT 1277-1348.)  The trial judge reviewed these proposed

20  instructions and decided not to give them, for the reasons reflected in the trial transcript and set

21  forth above.  This court has also reviewed the instructions and petitioner's arguments in support

22  of his request that they be included in the final jury instructions at his trial.  (See Pet'r's Lod.

23  Doc. No. 16.)  This court concludes that the state court's decision not to give petitioner's

24  requested instructions did not violate petitioner's right to due process.  As stated by the trial

25  court, a number of petitioner's proposed instructions were repetitive of the instructions that were

26  in fact given at petitioner's trial.  Further, some of them are not supported by the evidence

introduced at trial, others were incorrect statements of the law, some of them are incomplete,

some are vague and confusing, and others are unnecessary or would not have added anything of

substance to the jury's deliberations.  Nor has petitioner demonstrated that the instructions as

given, including the instruction addressing the prosecution's discovery violations, violated his

right to due process.  In short, petitioner has failed to demonstrate that the trial court's failure to

give his proposed jury instructions, or the giving of any of the final jury instructions, rendered his

trial fundamentally unfair.  Accordingly, petitioner is not entitled to federal habeas relief on his

claims of jury instruction error.

Petitioner's argument that the trial court failed to give jury instructions on his

theory of the defense is also unavailing.  It is true that failure to give a jury instruction on the

defendant's theory of the case may be reversible error if the defense theory is legally cognizable

and there is evidence upon which the jury could rationally find for the defendant.  United States

v. Rodriguez, 45 F.3d 302, 306 (9th Cir. 1995); United States v. Yarbrough, 852 F.2d 1522, 1541

(9th Cir. 1988).[30]  However, petitioner has failed to explain how any of his proposed jury

instructions were relevant to his defense theory or how the failure to give any of those proposed

instructions prevented him from presenting that defense.  Petitioner has failed to sustain his

"heavy burden" with respect to this claim.  Henderson, 431 U.S. at 155; Walker v. Endell, 850

F.2d 470, 475-76 (9th Cir. 1987).  Accordingly, he is not entitled to federal habeas relief.

Claim Twelve – Violation of Right to Jury Trial

Citing the decisions in Cunningham v. California, 549 U.S. 270 (2007), Ring v.

Arizona, 536 U.S. 584 (2002) and Apprendi v. New Jersey, 530 U.S. 466 (2000), petitioner

---

[30]  In California, the trial court has a sua sponte obligation to give instructions with
respect to a defense when (1) defendant is relying on the defense or (2) there is substantial
evidence supportive of the defense and when the defense is not inconsistent with the defendant's
theory of the case.  People v. Barton, 12 Cal.4th 186 (1995).  To warrant a defense instruction,
"the accused must present 'evidence sufficient to deserve consideration by the jury, i.e., evidence
from which a jury composed of reasonable men could have concluded that the particular facts
underlying the instruction did exist.'"  People v. Strozier, 20 Cal. App.4th 55, 63 (1993).

76

claims that the trial court violated his Sixth Amendment right to a jury trial when it sentenced him "to three separate upper terms based solely on the judges [sic] discretion without a jury finding the aggravating factors to be true beyond a reasonable doubt."  (Doc. No. 1-1 at 80.)

The last reasoned decision addressing this Sixth Amendment claim is the October 1, 2007 decision of the Sacramento County Superior Court denying petitioner's application for a writ of habeas corpus.  (Resp't's Lod. Doc. 6.)  The Superior Court rejected this claim, reasoning as follows:

> [Petitioner's] twelfth claim alleges that he was sentenced in violation of <u>Cunningham v. California</u>, (2007) 66 L. Ed.2d 856, because the Court imposed the upper term for his offenses based on facts that should have been submitted to the jury.
>
> Factual findings that subject a defendant to the possibility of an upper term, with some exceptions, must be made by a jury rather than the trial judge.  (<u>Cunningham</u>, <u>supra</u>.)  If there is at least one aggravating factor that has been found true by the jury, the upper term may be imposed.  (<u>People v. Black</u> (2007) 41 Cal.4th 799, 816.)  The California Supreme Court has held that "imposition of the upper term does not infringe upon the defendant's constitutional right to jury trial so long as one legally sufficient aggravating circumstance has been found to exist by the jury, has been admitted by the defendant, or is justified based upon the defendant's record of prior convictions."  (<u>Idid.</u>)
>
> In the instant case, Petitioner was sentenced to the upper terms on the three felony counts on the basis of Petitioner's "prior significant record."  The probation report shows that petitioner had numerous prior convictions that were not used in sentencing, either as a prior strike or as a sentence enhancement.  As result, Petitioner was eligible for the upper term and there was no <u>Cunningham</u> error.

(<u>Id.</u> at 3.)

The state court record reflects that petitioner was originally sentenced on March 26, 2004 to fifteen years in state prison.  (CT at 49, 1850-51; RT at 2564-65.)  As part of that original sentence, petitioner received the upper term of three years on count 4 (making terrorist threats), a concurrent upper term of three years on count 2 (false imprisonment), the upper term of eight years on Count 1 (spousal rape with force), time served on Count 3 (misdemeanor

spousal battery), and a total of four years in enhancements for having served four prior prison terms.  (Id.)  The trial judge later recalled that sentence and, on April 22, 2004, re-sentenced petitioner to an aggregate fifteen years in state prison, with that sentence being specifically imposed as follows: the upper term of three years on Count 4, a stayed upper term of three years on Count 2; time served on Count 3, the upper term of eight years on Count 1, and a total of four years for the four prior prison terms.[31]  (CT at 51; RT at 2597-98.)  The sentencing judge imposed the upper terms on counts 2 and 4, finding that petitioner had "engaged in violent conduct which indicates a danger to society and because of his overall prior record."  (RT at 2597.)  The sentencing judge imposed the upper term on Count 1 "based upon [petitioner] being on parole at the time of the offense."  (Id. at 2597-98.)

Petitioner claims that his Sixth Amendment right to a jury trial was violated because he was "sentenced to the upper terms based on the sole discretion of Judge Morris, without a jury finding the aggravating factors true beyond a reasonable doubt." (Doc. No. 1-1 at 80.)  In his traverse, he raises a different objection, complaining that "the jury did not find petitioner guilty of any of the alleged prior convictions."  (Traverse at 26.)  Petitioner concludes that his sentence on Counts 1, 2, and 4 should be reduced to the middle terms.  (Id. at 27.)

In Apprendi the United States Supreme Court held that the Due Process Clause of the Fourteenth Amendment requires any fact other than a prior conviction that "increases the penalty for a crime beyond the prescribed statutory maximum" to be "submitted to a jury and proved beyond a reasonable doubt."  530 U.S. at 490.  In Cunningham, the Supreme Court held that California's Determinate Sentencing Law violates a defendant's right to a jury trial to the extent it permits a trial court to impose an upper term based on facts found by the court rather
/////

---

[31]  California Penal Code § 1170(d) provides, in pertinent part, that a trial court may sua sponte recall a defendant's sentence within 120 days and resentence the defendant "in the same manner as if he or she had not previously been sentenced, provided the new sentence, if any, is no greater than the initial sentence."

than by a jury.  549 U.S. at 291.[32]  In Blakely v. Washington, 542 U.S. 296, 303-04 (2004), the

Supreme Court decided that a defendant in a criminal case is entitled to have a jury determine

beyond a reasonable doubt any fact that increases the statutory maximum sentence, unless the

fact was admitted by the defendant or was based on a prior conviction.

      Under California law, only one valid aggravating factor need be found to

authorize an upper term sentence.  Butler v. Curry, 528 F.3d 624, 641 (9th Cir. 2008); Kessee v.

Mendoza-Powers, 574 F.3d 675, 676 n.1 (9th Cir. 2009); Moore v. Evans, No. 2:09-cv-2737-

JFM (HC), 2010 WL 4290080, at *9 (E.D. Cal. Oct. 22, 2010); Armstrong v. Small, No. CV 07-

1101 RGK (FMO), 2009 WL 863351, at *17 (C.D. Cal. Mar. 30, 2009); see also People v. Black,

41 Cal.4th 799 (2007); People v. Osband, 13 Cal. 4th 622, 728 (1996).  That is, only one

aggravating factor is necessary to set the upper term as the "statutory maximum" for Apprendi

and Blakely purposes as long as it is established in accordance with the constitutional

requirements set forth in Blakely.  Black, 41 Cal.4th at 812.  While the sentencing court may

make factual findings with respect to additional aggravating circumstances, these findings,

themselves, do not further raise the authorized sentence beyond the upper term.  Id.  Furthermore,

with respect to claims of Apprendi error, "the relevant question is not what the trial court would

have done, but what it legally could have done."  Butler, 528 F.3d at 648.  Therefore, whether a

sentencing judge might not have imposed an upper term sentence in the absence of additional

aggravating factors does not implicate the Sixth Amendment.  Butler, 528 F.3d at 649.  Rather, a

petitioner's upper term sentence is not unconstitutional if at least one of the aggravating factors

---

[32]  The Supreme Court has also determined that "the middle term prescribed in California's statutes, not the upper term, is the relevant statutory maximum."  Cunningham v. California, 549 U.S. 270, 288 (2007).  The California Legislature responded to this determination by amending California Penal Code § 1170(b) to vest sentencing courts with the discretion to impose the lower, middle or upper terms without making specific factual findings, thereby making the upper term the maximum term under California law.  See People v. Sandoval, 41 Cal. 4th 825, 844-52 (2007).  The Ninth Circuit has subsequently held that Cunningham "did not announce a new rule of constitutional law and may be applied retroactively on collateral review."  Butler v. Curry, 528 F.3d 624, 639 (9th Cir. 2008).

1   that the sentencing judge relied upon was established in a manner consistent with the Sixth

2   Amendment.

3          In Almendarez-Torres v. United States, 523 U.S. 224, 239-47 (1998), the

4   Supreme Court held that the fact of a prior conviction need not be determined by a jury before a

5   sentencing court may use that conviction as the basis for a sentencing enhancement.  Rather,

6   prior convictions may be found by the sentencing judge based on a preponderance of evidence.

7   Id. at 239-47.  The requirement announced in Cunningham and Apprendi that aggravating factors

8   used to increase a sentence beyond the statutory maximum must be found by the jury beyond a

9   reasonable doubt, specifically does not apply to the fact of a prior conviction.  Cunningham, 549

10  U.S. at 288; Blakely, 542 U.S. at 301; Apprendi, 530 U.S. at 488; see also United States v.

11  Medina-Villa, 567 F.3d 507, 520 (9th Cir. 2009) ("Almendarez-Torres remains good law").  The

12  task of determining the precise contours of the Almendarez-Torres exception "has been left to the

13  federal appellate courts."  Kessee v. Mendoza-Powers, 574 F.3d 675, 678 (9th Cir. 2009).  Here,

14  the Sacramento County Superior Court concluded that the trial court was entitled to rely on the

15  fact of petitioner's record of prior convictions.  This decision is consistent with Almendariz-

16  Torres and therefore may not be set aside.  Moreover, the four prior felony conviction and prison

17  term enhancement allegations in this case were submitted to the jury and found by them to be

18  true.  (CT at 1260-62.)  With respect to the upper terms imposed on Counts 2 and 4, the

19  sentencing judge relied, in part, on petitioner's prior record.  For all these reasons, the sentencing

20  judge could have legally imposed the upper terms solely on the existence of petitioner's prior

21  convictions and his upper term sentence is not unconstitutional.

22         The trial court also imposed the upper term on Count 1 based, in part, on the fact

23  that petitioner was on parole at the time of his crimes.  In Butler v. Curry, the Ninth Circuit held

24  that a defendant's probationary status at the time of the crime does not fall within the prior

25  conviction exception stated in Almendarez-Torres and must be "pleaded in an indictment and

26  proved to a jury beyond a reasonable doubt."  528 F.3d at 647.  The court in Butler conceded that

80

1  its decision conflicted with rulings by other circuit courts, which had held that a defendant's

2  probationary status at the time of the crime is a fact that comes within the Almendarez-Torres

3  prior conviction exception and so may be found by a sentencing judge by a preponderance of the

4  evidence. Id. at 647 (citing cases). Thereafter, the Ninth Circuit acknowledged the holding in

5  Butler, but concluded that a state court decision upholding a trial judge's imposition of an

6  increased sentenced based on its finding that the defendant was on probation at the time of the

7  offense was not contrary to clearly established federal law. Kessee, 574 F.3d at 678. The Ninth

8  Circuit noted that other circuits had disagreed with Butler's construction of the "prior

9  conviction" exception, and concluded that Butler did not represent clearly established federal law

10  for purposes of the AEDPA analysis. Id. at 677-78. The court held that "although a defendant's

11  probationary status does not fall within the 'prior conviction' exception, a state court's

12  interpretation to the contrary does not contravene AEDPA standards." Id. at 678. The court also

13  explained that "[f]or purposes of AEDPA review, . . . a state court's determination that is

14  consistent with many sister circuits' interpretations of Supreme Court precedent, even if

15  inconsistent with our own view, is unlikely to be "contrary to, or involve an unreasonable

16  application of, clearly established Federal law, as determined by the Supreme Court." Id. at 679.

17  See also Wilson v. Knowles, 638 F.3d 1213, 1215 (9th Cir. 2011) ("For example, it isn't clearly

18  established whether a judge may find the fact that a defendant was on probation at the time of an

19  earlier conviction.")

20        Being on parole is no different than being on probation at the time of the offense

21  of conviction for these purposes. Under the Ninth Circuit's decision in Kessee, which is binding

22  on this court, the Sacramento County Superior Court's rejection of petitioner's Sixth Amendment

23  claim with respect to the sentencing court's reliance on his parole status in imposing the upper

24  /////

25  /////

26  /////

81

1   term on Count 1is not contrary to or an unreasonable application of federal law and should not be

2   set aside.[33]

3           In any event, so-called Apprendi error is subject to harmless error analysis.

4   Washington v. Recueno, 548 U.S. 212 (2006); Butler, 528 F.3d at 648-49.  Petitioner is therefore

5   entitled to federal habeas relief with respect to this claim only upon a showing that any violation

6   of his constitutional rights had a "substantial and injurious effect or influence in determining the

7   jury's verdict."  Brecht, 507 U.S. at 623.   "Under that standard, [a reviewing court] must grant

8   relief if we are in 'grave doubt' as to whether a jury would have found the relevant aggravating

9   factors beyond a reasonable doubt."  Butler, 528 F.3d at 648 (citing O'Neal v. McAninch, 513

10  U.S. 432, 436 (1995).)  "Grave doubt exists when, 'in the judge's mind, the matter is so evenly

11  balanced that he feels himself in virtual equipoise as to the harmlessness of the error.'"  Butler,

12  528 F.3d at 648 (citing O'Neal, 513 U.S. at 435).  Here, as noted above, the jury did find the four

13  prior felony convictions and prison term allegations to be true.  (CT 1260-63.)  Moreover, there

14  is no doubt that a jury would have found petitioner was on parole at the time of his offense of

15  conviction.  Those findings are sufficient to make petitioner eligible for the upper term sentences

16  he received.  There is also no serious doubt that a jury would have concluded beyond a

17  reasonable doubt that petitioner's crime involved violent conduct which posed a danger to

18  society.  See Butler, 528 F.3d at 648 ("Any Apprendi error therefore will be harmless if it is not

19  prejudicial as to just one of the aggravating factors at issue.").  Accordingly, any error by the

20  sentencing judge in imposing the upper term on any count of conviction based on the factors

21  discussed above, was harmless.

22  /////

23

---

24      [33]  The court also notes that Butler was decided in 2008, four years after petitioner was
    sentenced in 2004.  Therefore, at the time petitioner was sentenced, it was even more apparent

25  that "clearly established federal law" did not require a sentencing court to base an upper term
    sentence due to the defendant's parole or probation status at the time of a crime on a jury finding

26  of that fact.

Claim Thirteen – Consecutive Sentence

In his thirteenth ground for relief, petitioner claims that the trial court violated his federal constitutional rights when it relied on California Penal Code § 667.6(c), instead of California Penal Code § 1170.1, to sentence him to "a full, separate, and consecutive term." (Doc. 1-1 at 31.)  Petitioner alleges that § 667.6(c) is "an enhancement that should have been alleged in the accusatory pleading."  (Traverse at 27.)

The last reasoned decision addressing this claim is the Sacramento County Superior Court's October 1, 2007 denial of petitioner's application for a writ of habeas corpus. The Superior Court ruled as follows:

> In his thirteenth claim, [petitioner] alleges that the trial court improperly sentenced him because it used Penal Code Section 667.6(c) to run his sentence on the spousal rape with force charge consecutive to his sentences on the other counts.  He argues that Section 667.6(c) is an enhancement that was required to be pled and proven beyond a reasonable doubt at trial.  This is incorrect. (People v. Reynolds (1984) 154 Cal. App.3d 796, 810-811.)  That section only affects the length of the consecutive sentence.  It does not change the fact that the consecutive sentence is imposed for the underlying crime which was clearly charged in the complaint and information.  "There is nothing else to charge or find other than that the defendant committed the crime of which he had notice." (Id., at p. 811.)  "Defendant was specifically charged with the crimes for which the consecutive terms were imposed.  No further pleading or proof is required."  (Ibid.)  The sentence was not improper.  This claim is denied.

(Resp't's Lod. Doc. 6 at consecutive p. 3.)

Claims of state sentencing error are not generally cognizable in a federal habeas corpus proceeding.  As discussed above, habeas corpus relief is unavailable for alleged errors in the interpretation or application of state sentencing laws by either a state trial court or appellate court.  Souch v. Schaivo, 289 F.3d 616, 623 (9th Cir. 2002) ("[N]either an alleged abuse of discretion by the trial court in choosing consecutive sentences, nor the trial court's alleged failure to list reasons for imposing consecutive sentences, can for the basis for federal habeas relief."); Cacoperdo v. Demosthenes, 37 F.3d 504, 507 (9th Cir. 1994) ("[t]he decision whether to impose

sentences concurrently or consecutively is a matter of state criminal procedure and is not within the purview of federal habeas corpus); Hendricks v. Zenon, 993 F.2d 664, 674 (9th Cir. 1993). So long as a state sentence "is not based on any proscribed federal grounds such as being cruel and unusual, racially or ethnically motivated, or enhanced by indigency, the penalties for violation of state statutes are matters of state concern." Makal v. State of Arizona, 544 F.2d 1030, 1035 (9th Cir. 1976). The Ninth Circuit has specifically refused to consider on habeas review claims of erroneous application of state sentencing law by state courts. See, e.g., Miller v. Vasquez, 868 F.2d 1116 (9th Cir. 1989) (holding that whether assault with a deadly weapon qualifies as a "serious felony" under California's sentence enhancement provisions is a question of state sentencing law and does not state a federal constitutional claim). Accordingly, petitioner is not entitled to federal habeas corpus relief on this claim of sentencing error.

Claim Fourteen – Error by Court Clerk

As noted, petitioner was originally sentenced on March 26, 2004. At that time, petitioner was advised that he would be on parole for three years following his release from state prison. (RT at 2566.) That sentence was later recalled and petitioner was re-sentenced on April 22, 2004. At the April 22, 2004 sentencing hearing, the only mention of parole was the sentencing judge's advice to petitioner that his restitution fine was stayed "until and unless the defendant's released on parole and has parole revoked." (Id. at 2602.) Petitioner was also not advised that he would be required to register as a sex offender pursuant to California Penal Code § 290.

Petitioner alleges that, subsequent to the April 22, 2004 re-sentencing hearing, the "Clerk of the Superior Court, Erlene Klein, illegally added to [petitioner's] court minutes things that were not stated on the record by the court during sentencing, included a requirement that he be subject to parole for five years." (Doc. 1-1 at 41.)[34]

---

[34] The minute order for the April 9, 2004 sentencing hearing contains the following notation: "appeal & parole rights given prev on 3/26/04." (Pet., Ex. G-2.)

1    Petitioner points out that California Penal Code § 1170(c) provides that the

2    sentencing court shall state the reasons for its sentence choice on the record, and shall also

3    inform the defendant that he or she may be placed on parole after release from prison. (Id.)

4    Petitioner notes that the computer printout reflects that his sentence includes a five year parole

5    term and the requirement that he register as a sex offender pursuant to California Penal Code §

6    290. (Id.; see also Pet., Ex. G-3.)  He argues, "this is not a part of petitioner's sentence and

7    petitioner cannot be subject to additional punishment that was not pronounced at sentencing nor

8    made a part of the record by the court." (Doc. 1-1 at 42.)  Petitioner concludes that he "cannot be

9    subject to five years parole, nor to register per section 290 when it is not a part of the record or

10   listed in the abstract of judgment." (Id.)[35]  Petitioner contends, in essence, that the Court Clerk

11   improperly increased his sentence to include a five-year period of parole and the requirement to

12   register as a sex offender, even though the sentencing judge did not include these requirements in

13   the sentence imposed on April 22, 2004.  He argues, "its not for the clerk of the court to take the

14   law into her own hands when she could have very easily asked the court to state more into the

15   record during the sentencing hearing." (Id.)

16   The last reasoned decision addressing this claim is the Sacramento County

17   Superior Court's October 1, 2007 order denying petitioner's application for a writ of habeas

18   corpus.  The Superior Court ruled as follows:

19   > In his fourteenth claim [petitioner] alleges that when he was
20   > sentenced, he was neither advised that he would be subject to five
     > years parole nor advised that he would have to comply with Penal
     > Code Section 290's registration requirements.  He alleges that the
21   > California Department of Corrections has him listed as having a
     > five year parole period and having to register pursuant to Penal
22   > Code Section 290.  His legal status summary sheet confirms this
     > allegation.  Petitioner was initially sentenced on March 26, 2004,
23   > and then re-sentenced on April 9, 2004, after the Court recalled the
     > sentence.

24   /////

25

26   [35]   Petitioner's abstract of judgment does not include a parole term or the requirement to register as a sex offender pursuant to California Penal Code § 290.  (Pet., Exs. G-4, G-5.)

85

1

2       First, the Court was not required to inform Petitioner of his duty to
        register pursuant to Penal Code section 290. (Pen. Code § 290(b).)
        Section 290 itself does not require the trial court to affirmatively
3       impose the registration requirement. Rather, that occurs by
        operation of law, when registration is mandatory, as it is here with
4       a conviction for violating Section 262(a)(1). Thus there was no
        error in this regard, and Petitioner is not entitled to an order that he
        is not required to comply with Penal Code Section 290.
5

6       Further, while Petitioner has complained that he was only advised
        that he was subject to a three year parole period, the Department of
7       Corrections is correct that he is subject to a five year parole period
        for the crimes for which he was convicted. One convicted of a
8       violation of an offense enumerated in Penal Code Section
        667.5(c)(3)-(6), (11), (16) and (18) is subject to a five-year parole
9       period. (Penal Code § 3000(b)(1).) Penal Code Section 262(a)(1)
        is an offense specified in Penal Code Section 667.5(c)(3). Thus,
10      one convicted of a Section 262(a)(1) charge is subject to a five-
        year parole period. Petitioner has neither alleged nor could he
11      show that he suffered any prejudice from the Court's statement that
        he would be subject to a three year parole period. This claim is
        denied.

12

13 (Resp't's Lod. Doc. 6 at 4 of 6.)

14          The decision of the Superior Court rejecting this claim, which is derived from its

15 analysis of state law, is binding on this court. Waddington, 555 U.S. at 192 n.5; Bradshaw, 546

16 U.S. at 76. "State courts are the ultimate expositors of state law," and a federal habeas court is

17 bound by the state's construction except when it appears that its interpretation is an obvious

18 subterfuge to evade the consideration of a federal issue. Mullaney v. Wilbur, 421 U.S. 684, 691

19 (1975). Petitioner has failed to demonstrate that the decision of the Superior Court rejecting his

20 contentions on this issue is a subterfuge to evade consideration of a federal issue. Accordingly,

21 he is not entitled to federal habeas relief on his claim fourteen.

22          Claims Fifteen, Sixteen, and Seventeen: Constitutionality of State Statutes

23          In his next three claims, petitioner challenges the constitutionality of three state

24 statutes. The last reasoned decision addressing these claims is the Sacramento County Superior

25 Court's October 1, 2007 denial of petitioner's application for a writ of habeas corpus. The

26 Superior Court rejected this claims, reasoning as follows:

1

> In his fifteenth, sixteenth and seventeenth claims, [petitioner]
> alleges that various provisions of the Penal Code, for example,
> sections 3000.07(A), and 3004(b) cannot be applied to him because
> they were enacted after he was sentenced in 2004.  Those sections,
> which were enacted by the November 2006 ballot initiative, deal
> with conditions of parole for those convicted of registerable sex
> offenses.
>
> These claims are not ripe.  Habeas corpus may not be used to
> challenge the validity of anticipated future action.  (In re Drake,
> (1951) 38 Cal.2d 195, 198.)  Petitioner is not currently on parole
> and the provisions are not currently being applied to him.  Nor is
> there any indication that these provisions will be applied to him
> when he is paroled.

(Resp't's Lod. Doc. 6, at 5 of 6.)  Respondent argues that petitioner's claims fifteen, sixteen and

seventeen are unexhausted because the denial of a claim on the ground that it is not ripe for

review is a denial on procedural grounds that can be cured by presenting the claim later, when it

is ripe for adjudication.  (Answer at 50-51.)

Generally, a state prisoner must exhaust all available state court remedies either

on direct appeal or through collateral proceedings before a federal court may consider granting

habeas corpus relief.  28 U.S.C. § 2254(b)(1).  A state prisoner satisfies the exhaustion

requirement by fairly presenting his claim to the appropriate state courts at all appellate stages

afforded under state law.  Baldwin v. Reese, 541 U.S. 27, 29 (2004); Casey v. Moore, 386 F.3d

896, 915-16 (9th Cir. 2004).  However, an application for a writ of habeas corpus "may be denied

on the merits, notwithstanding the failure of the applicant to exhaust the remedies available in the

courts of the State."  28 U.S.C. § 2254(b)(2).  See Cassett v. Stewart, 406 F.3d 614, 624 (9th Cir.

2005) (a federal court considering a habeas petition may deny an unexhausted claim on the merits

when it is perfectly clear that the claim is not "colorable").  Assuming arguendo that petitioner's

claims fifteen, sixteen, and seventeen are unexhausted, this court will deny relief with respect to

the claims on the merits pursuant to 28 U.S.C. § 2254(b)(2).[36]

---

[36] This court will also assume that petitioner's claims 15, 16 and 17 are cognizable in a
federal habeas petition as opposed to a civil rights action brought pursuant to 42 U.S.C. § 1983.

1           In ground fifteen, petitioner claims that California Penal Code § 3000.1(a)(4)

2    violates the federal constitutional prohibition against bills of attainder and ex post facto laws.

3    (Doc. 1-1 at 43.)  Section 3000.1(a)(4) provides that

4          [t]he parole period of any person found to be a sexually violent
      predator shall be tolled until that person is found to no longer be a

5          sexually violent predator, at which time the period of parole, or any
      remaining portion thereof, shall begin to run.

6

7    Petitioner has provided this court with no evidence that he has been found to be a sexually

8    violent predator under California law.  See Cal. Welf. & Inst. Code §§ 6600, et seq.

9    Accordingly, his challenge to California Penal Code § 3000.1(a)(4) is not ripe.  See Laird v.

10   Tatum, 408 U.S. 1, 14 (1972) (to meet the ripeness standard, the petitioner must show either a

11   specific present objective harm or the threat of specific future harm; Thomas v. Union Carbide

12   Agric. Prods. Co., 473 U.S. 568, 580-81 (1985) (a case that involves "contingent future events

13   that may not occur as anticipated, or indeed may not occur at all" is not ripe for decision).

14   Moreover, because he has not demonstrated that he is subject to the challenged statutory

15   provision, his claim lacks merit in any event and will be rejected on that basis as well.

16          In ground sixteen, petitioner claims that California Penal Code § 3000.07(a) also

17   violates the federal constitutional prohibition against bills of attainder and ex post facto laws.

18   (Doc. No. 1-1 at 46.)  In ground seventeen, petitioner claims that California Penal Code §

19   3004(b) violates the federal constitutional prohibition against bills of attainder and ex post facto

20   laws, and is "a punishment that cannot apply to parole."  (Id. at 47.)  In his traverse, petitioner

21   argues that "any laws changing the terms of parole that were voted in since petitioner's

22   sentencing are ex post facto law and cannot pertain to petitioner."  (Traverse at 28-29.)

23          California Penal Code §§  3000.07(a) and 3004(b) are part of the Sexual Predator

24   Punishment and Control Act (SPPCA), or "Jessica's Law."  The SPPCA was enacted by

25   California voters on November 7, 2006.  It prohibits registered sex offenders from residing

26   within 2,000 feet of any public or private school or park where children regularly gather

1   (California Penal Code § 3003.5), and requires them to be monitored by a global positioning

2   system (GPS) for parole (id. § 3000.07), and for life (id. § 3004).[37]  Petitioner has not

3   demonstrated that he will be subject to these provisions upon his release from state prison.  There

4   is no evidence before this court that a condition of petitioner's parole will contains the

5   requirement to submit to GPS monitoring or that such a condition will automatically be applied

6   to petitioner after he is released.  Accordingly, it appears that this claim is also not ripe for review

7   and, in any event, lacks merit in light of the lack of such a showing.  See Sacks v. Office of

8   Foreign Assets Control, 466 F.3d 764, 773 (9th Cir. 2006) (in determining the ripeness of a

9   pre-enforcement challenge to a law, the court must examine "whether the plaintiffs have

10  articulated a 'concrete plan' to violate the law in question, whether the prosecuting authorities

11  have communicated a specific warning or threat to initiate proceedings, and the history of past

12  prosecution or enforcement").

13          Petitioner has also failed to demonstrate that California Penal Code §§ 3000.07(a)

14  and 3004(b) violate the Ex Post Facto Clause, either on their face or as applied to him.  In

15  Weaver v. Graham, 450 U.S. 24, 28-29 (1981), the United States Supreme Court explained that

16  "two critical elements must be present for a criminal or penal law to be ex post facto: it must be

17  retrospective, that is, it must apply to events occurring before its enactment, and it must

18  disadvantage the offender affected by it."  The Ex Post Facto Clause is also violated if: (1) state

19  regulations have been applied retroactively to a defendant; and (2) the new regulations have

20  created a "sufficient risk" of increasing the punishment attached to the defendant's crimes.

21  Himes, 336 F.3d at 854.  See also Garner v. Jones, 529 U.S. 244, 259 (2000).

22  /////

23

24          [37]  California law has provided for sex offender registration since 1947.  Wright v.
    Superior Court, 15 Cal.4th 521, 526 (1997).  California voters broadened the scope and
25  consequences of sex offender registration in November 2006 by approving Jessica's Law.  (Voter
    Information Guide, Gen. Elec. (Nov. 7, 2006) text of Prop. 83, § 1, p. 127.)  However,
26  petitioner's conviction of forcible rape subjected him to the lifetime sex offender registration
    requirements of California Penal Code § 290.  (Doc. No. 18 at 67.)

1    The California Supreme Court recently held that the residency requirement of the

2  SPPCA has no retrospective effect on those persons who are paroled after the effective date of

3  the statute.  In re E.J., 47 Cal.4th 1258, 1276-78 (2010).  The court explained that conviction as a

4  sex offender, thereby triggering a lifetime registration requirement before passage of Jessica's

5  Law, did not alone show that the law was applied retroactively.  (Id. at 1276.)  See also Doe v.

6  Schwarzenegger, 476 F. Supp.2d 1178, 1182 (E.D. Cal. 2007) ("the SSPCA is silent on the issue

7  of retroactivity, and it is not 'very clear' from extrinsic sources that the intent of the voters was to

8  make it retroactive.").[38]  Although the California Supreme Court did not specifically discuss the

9  GPS monitoring requirements of Jessica's Law in the In re E.J. decision, its reasoning also

10  defeats petitioner's argument in support of his Ex Post Facto claim.  Here, although petitioner's

11  crimes were committed before the SPPCA was passed, any GPS monitoring of him will not

12  occur, if at all, until petitioner is released on parole.  Because petitioner will be paroled after the

13  effective date of the SPPCA, the application of the SPPCA to him does not appear to violate the

14  Ex Post Facto Clause.

15    In any event, petitioner has not cited any federal court decisions holding that any

16  portion of Jessica's Law violates the Ex Post Facto Clause of the federal constitution or that the

17  law constitutes an unlawful bill of attainder.  Accordingly, the decision of the state courts

18  rejecting these claims is not contrary to or an unreasonable application of well-established federal

19  law.  28 U.S.C. § 2254(d).

20    For the foregoing reasons, relief will be denied as to petitioner's claims fifteen,

21  sixteen, and seventeen.

22  /////

23  /////

24

25    [38]  One judge of this court has held that the SPPCA is not retroactive and does not apply
   "to individuals who were convicted and who were paroled, given probation, or released from
26  incarceration prior to its effective date."  Doe v. Schwarzenegger, 476 F. Supp.2d 1178, 1181
   (E.D. Cal. 2007).  Here, petitioner has not yet been released on parole.

1          Claim Eighteen – New Evidence of Actual Innocence

2                  In his next ground for relief, petitioner claims that "new evidence of

3    perjured/recanted testimony by prosecutions [sic] witness [Jill Johnson] exonerates [petitioner]

4    and shows a conspiracy between the victim and witness to get rid of [petitioner], in violation of

5    petitioner's rights pursuant to the "5th and 14th Amendments." (Doc. No. 1-1 at 50.) Petitioner

6    has filed with his application for habeas relief copies of affidavits signed by Jill Johnson and

7    Tracy Richie in support of this claim. (Doc. No. 1-2 at 117-118.) Therein, Jill Johnson declares

8    that her trial testimony was false "mainly as to what was supposed to be what I heard while Keith

9    and Terri were in the bedroom and in regards to Keith saying that he would kill his stepson,

10   Craigon Avara." (Id. at 117.) Tracy Richie declares that Jill Johnson told her that she was "so

11   very sorry for lying and saying the things she said in her statements and testimony given in trial

12   that convicted Keith Jensen." (Id. at 118.)

13                 As described above, on December 12, 16, and 17, 2008, the Sacramento County

14   Superior Court held an evidentiary hearing on petitioner's allegations of the use of perjured

15   testimony at his trial. (Resp't's Lod. Docs. 16-18.) At that time, Jill Johnson asserted her Fifth

16   Amendment privilege against self-incrimination and did not testify at the evidentiary hearing.

17   (Resp't's Lod. Doc. 19 at 28.)[39] However, petitioner presented the testimony of Johnson's friend

18   Tracy Richie, and petitioner's sister Karen Bartholomew. (Resp't's Lod. Doc. 17 at 5-6, 10-13.)

19   On March 18, 2009, the Superior Court issued a lengthy order which summarized all of the

20   evidence relevant to petitioner's claim of actual innocence and concluded that petitioner "failed

21   to make any convincing showing that Jill Johnson had committed perjury at trial." (Resp't's

22   Lod. Doc. 19.) The Superior Court also found that Johnson had not "affirmatively recanted any

23   of her testimony in court itself" because she invoked her Fifth Amendment privilege at the

24   _____

25         [39] Petitioner claims that the Superior Court and the prosecutor denied his request that Jill
     Johnson be granted immunity from prosecution for perjury prior to her testimony at the
26   evidentiary hearing, and that "the court and Ms. Johnson's attorney threatened Ms. Johnson with
     four years for perjury if she testified for petitioner." (Traverse at 29.)

evidentiary hearing.  (Id. at 40.)  With regard to Johnson's previous written recantations, the court found that "there is nothing in any of those statements that is a recantation of anything material" and that "Johnson's basic story remains the same."  (Id.)  The Superior Court further found that the evidentiary hearing testimony of petitioner's sister, Karen  Bartholomew,"added little to petitioner's claim."  (Id. at 42.)  The Superior Court ruled as follows:

> The court will now find as fact that Johnson did not lie during the trial.  Neither Richie's nor Bartholomew's testimony was believable, as both had only recently befriended Johnson and at least Bartholomew had motive to lie, in order to protect her brother, who is petitioner.  Regardless, as discussed above, Johnson's statements and testimony at trial had undermined what little Richie and Bartholomew had to add in this matter.  Nor do any of Johnson's post-trial statements contain any believability concerning Johnson's having lied at trial, including that petitioner did not threaten to kill the victim's son while they were all in the car.  Johnson admitted that the main aspects of her trial testimony were true, and readily adopted the suggestions to her during the defense investigator interview that she had merely embellished at trial, giving no credence to that part of the interview.  Johnson now appears to be motivated only by remorse not from having lied at trial, which she did not do, but from having testified to the truth such that petitioner received such a severe sentence.  Johnson appears to be having second thoughts about having helped in putting petitioner in prison for such a lengthy sentence, and is simply attempting to now obtain for him a lesser sentence.

> This court will not find that Johnson in fact lied during trial, as the court does not believe it.  However, even if this court were to make no factual finding about whether Johnson lied at trial or not, it is clear that from what little was said in the recantations, that were this matter to be retried, with all of Johnson's statements introduced to the jury including the recantations, pretrial statements, and trial testimony, that there is no reasonably [sic] probability that a different outcome would have been reached at trial.  Again, there is nothing material in her recantations other than Johnson's recent statement that petitioner did not threaten to kill the victim's son while they were all in the car, and even the latter is not believable.  Further, Johnson was not the victim, and did not testify as to what occurred in the bedroom while the bedroom door was closed.

> Further, the victim's testimony at trial was consistent with Johnson's testimony, and included other threats that petitioner made to the victim and the victim's fear that her son as well as herself would be harmed.  As the victim's testimony would be introduced at a retrial if the victim was no longer available, or as

1  inconsistent statements if the victim testified differently at retrial, it
   is clear that that testimony, coupled with the other evidence
2  summarized above, show that there is no prejudice even if this
   matter were retried.
3
4  Thus, the totality of the evidence, including all of Johnson's
   statements, would not lead to a different result.

5  As such, this Court finds that Claim 18 fails and it is DENIED.

6  (Id. at 44-46.)

7  Recantation of testimony alone is insufficient to set aside a conviction on the

8  ground that the Due Process Clause has been violated. Napue, 360 U.S. at 269; Hysler v.

9  Florida, 315 U.S. 411, 413 (1942); Maxwell v. Roe, 628 F.3d 486, 499 (9th Cir. 2010). Where it

10 is established that a State's witness testified falsely; that the false testimony was material; and

11 that the prosecution knew that the testimony was false, habeas relief is appropriate. United States

12 v. Agurs, 427 U.S. 97, 103 (1976) ("[T]he Court has consistently held that a conviction obtained

13 by the knowing use of perjured testimony is fundamentally unfair."); Giglio, 405 U.S. at 153-54;

14 see also Maxwell, 628 F.3d at 499-500; Ortiz v. Stewart, 149 F.3d 923, 936 (9th Cir. 1998) ("If a

15 prosecutor knowingly uses perjured testimony or knowingly fails to disclose that testimony is

16 false, the conviction must be set aside if there is any reasonable likelihood that the false

17 testimony could have affected the jury verdict."). In seeking relief on this basis due to recanted

18 testimony, a petitioner must assert that there was misconduct on the part of the State. Giglio, 405

19 U.S. at 153-54; Ortiz v. Stewart, 149 F.3d at 936. In this respect, "[t]he essence of the due

20 process violation is misconduct by the government, not merely perjury by a witness." Morales v.

21 Woodford, 388 F.3d 1159, 1179 (9th Cir. 2004). However, even in cases where the prosecutor

22 neither knew nor should have known that the testimony relied upon was false, a petitioner may

23 nonetheless establish a due process violation by demonstrating that false evidence brought about

24 his conviction. Maxwell, 628 F.3d at 499, 506-08 (citing Killian v. Poole, 282 F.3d 1204, 1208

25 (9th Cir. 2002) and Hall v. Director of Corrections, 343 F.3d 976, 978 (9th Cir. 2003)).

26 /////

1        Cases involving claims of recanted trial testimony often are presented as seeking

2 habeas relief due to newly discovered evidence.  However, the existence of newly discovered

3 evidence relevant to the guilt of a state prisoner, standing alone, is not a ground for federal

4 habeas relief.  Townsend v. Sain, 372 U.S. 293, 317 (1963), overruled on other grounds by

5 Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992).  Therefore, in most cases, the recantation of trial

6 testimony, in and of itself, has been found not to merit habeas relief.   See Armstead v. Maggio,

7 720 F.2d 894, 896-97 (5th Cir.1983) (affidavit of another person confessing to the crime);

8 Anderson v. Maggio, 555 F.2d 447, 451 (5th Cir. 1977) (recantation of trial testimony and

9 confession to the crime);  see generally Pelegrina v. United States, 601 F.2d 18, 19 n.2 (1st Cir.

10 1979) (citing cases).  However, some courts have found a credible recantation by a material

11 witness alone to provide a basis for habeas relief.  See Sanders v. Sullivan, 863 F.2d 218, 222-26

12 (2d Cir. 1988); Burks v. Egeler, 512 F.2d 221, 226 (6th Cir. 1975).

13        The Ninth Circuit has not addressed this issue squarely.  See Hankinson v. Board

14 of Prison Terms, 768 F. Supp. 720, 724 (C.D. Cal. 1991).  However, it is clear that at a threshold

15 a petitioner must demonstrate that the newly discovered evidence would probably have resulted

16 in his acquittal.  Spivey v. Rocha, 194 F.3d 971, 979 (9th Cir. 1999); Swan v. Peterson, 6 F.3d

17 1373, 1384 (9th Cir. 1993); Quigg v. Crist, 616 F.2d 1107, 1112 (9th Cir. 1980); see also Gordon

18 v. Duran, 895 F.2d 610, 614-15 (9th Cir. 1990).  Finally, it must be noted that "[t]he recanting of

19 prior testimony by a witness is ordinarily met with extreme skepticism."  United States v. Nixon,

20 881 F.2d 1305, 1311 (5th Cir. 1989).  See also Carriger v. Stewart, 132 F.3d 463, 483 (9th Cir.

21 1997) (Kozinski, J., dissenting) ("There is no form of proof so unreliable as recanting

22 testimony").

23        Viewing petitioner's claim as one based on the alleged introduction of false

24 testimony, petitioner has not alleged in this claim that the prosecutor engaged in misconduct by

25 knowingly presenting false testimony.  For this reason, pursuant to United States Supreme Court

26 authority as set forth above, petitioner has failed to state a cognizable constitutional claim that his

1   conviction was obtained in violation of his right to due process in that respect.  Moreover, as the

2   Superior Court found in denying relief on this claim, witness Johnston in her post-trial

3   declaration did not recant any material aspect of her trial testimony.  Under such circumstances

4   petitioner has clearly failed to establish that his conviction was brought about by the introduction

5   of false evidence.  See Maxwell, 628 F.3d at 499, 506-08.

6          Viewing petitioner's claim as one based upon alleged newly discovered evidence

7   in the form of the recantation of trial testimony, it is no more meritorious.  The Superior Court

8   conducted a thorough evidentiary hearing and determined that Jill Johnson had not presented

9   false testimony at trial and that, even if her recantation was placed before the jury, the result of

10   the trial would have been the same.  There is no evidence before this court establishing that

11   petitioner's conviction was obtained as a result of a due process violation.  Petitioner has shown

12   neither that prosecuting officials knew of any perjured testimony used to secure his conviction,

13   nor that any new evidence regarding a later recantation by Jill Johnson is credible or would

14   probably have produced an acquittal if known at the time of his trial.  Accordingly, petitioner is

15   not entitled to federal habeas relief with respect to this claim.

16      Claim Nineteen – Errors by State Courts

17          In claim nineteen, petitioner argues that the California Court of Appeal violated

18   his constitutional rights when it ruled that he had failed to "state a prima facie case" with respect

19   to a number of the claims raised in his habeas petition filed in that court on March 28, 2007.

20   (Doc. No. 1-1 at 57; see Resp't's Lod. Doc. 5.)  Petitioner also appears to be claiming that the

21   Sacramento County Superior Court erroneously rejected the claims contained in his habeas

22   petition filed in that court on June 25, 2007.  (Doc. No. 1-1 at 58; see Resp't's Lod. Doc. 6.)

23   Petitioner argues at length that he stated a prima facie case with respect to all of his claims

24   contained in both petitions and that all of those claims were meritorious and should have resulted

25   in the granting of relief by the state courts.  (Doc. No. 1-1 at 59-75.)

26   /////

95

Petitioner's claim that the California Court of Appeal or the Sacramento County Superior Court improperly denied his habeas petitions is not cognizable because alleged errors in state post-conviction review proceedings are not cognizable in federal habeas proceedings. Gerlaugh v. Stewart, 129 F.3d 1027, 1045 (9th Cir. 1997); Villafuerte, 111 F.3d at 632 n.7 (the claim that petitioner "was denied due process in his state habeas corpus proceedings" was not cognizable on federal habeas review); Franzen v. Brinkman, 877 F.2d 26 (9th Cir. 1989); see also Nichols v. Scott, 69 F.3d 1255, 1275 (5th Cir. 1995) (an attack on the petitioner's state post-conviction proceedings "is an attack on a proceeding collateral to the detention and not the detention itself"); Williams v. Missouri, 640 F.2d 140, 143-44 (8th Cir. 1981) ("Errors or defects in the state post-conviction proceeding do not . . . render a prisoner's detention unlawful or raise constitutional questions cognizable in habeas corpus proceedings"); Bojorquez v. Grounds, No. CV 11-4324-JAK(MAN), 2011 WL 2882490, *3 (C.D. Cal. June 22, 2011) ("Regardless of Petitioner's reference to due process in Ground One, his complaints about how the state trial and appellate courts handled his state habeas petitions do not present any basis for federal habeas relief"). Accordingly, petitioner is not entitled to federal habeas relief on his claim nineteen.

Claim One – Ineffective Assistance of Appellate Counsel

Petitioner claims that his appellate counsel rendered ineffective assistance when he failed to send petitioner the state court record in a timely manner; failed to file any further challenges to petitioner's conviction after the conclusion of the direct appeal, as he had promised; and failed to raise on appeal all of the claims contained in the instant federal petition. (Pet. at 21-24.) The last reasoned decision addressing this ineffective assistance of appellate counsel claim is the opinion of the Sacramento County Superior Court which stated as follows:

> A petitioner seeking relief by way of habeas corpus has the burden of stating a prima facie case entitling him to relief. (In re Bower (1985) 38 Cal.3d 865, 872.) A petition for writ of habeas corpus should attach as exhibits all reasonably available documentary evidence or affidavits supporting the claim. (People v. Duvall (1995) 9 Cal.4th 464, 474.) To show constitutionally inadequate assistance of counsel, a defendant must show that counsel's

representation fell below an objective standard and that counsel's failure was prejudicial to defendant.  (In re Alvernaz (1992) 2 Cal.4th 924, 937.)  It is not a court's duty to second-guess trial counsel and great deference is given to trial counsel's tactical decisions.  (In re Avena (1996) 12 Cal.4th 694, 722.)  Actual prejudice must be shown, meaning that there is a reasonable probability that, but for the attorney's error(s), the result would have been different.  (Strickland v. Washington (1984) 466 U.S. 668, 694.)

In Petitioner's first claim for relief, he alleges that his appellate counsel was ineffective for failing to petition the California Supreme Court for review and for failing to return the appellate record to him.  He appears to allege that the failure to get the record prevented him presenting a timely petition for writ of habeas corpus.  Without addressing whether counsel's performance was deficient, Petitioner has failed to show prejudice.  That is, Petitioner has been able to present his petition for writ of habeas corpus to this Court.  Therefore, this claim is denied.

(Resp't's Lod. Doc. 6, at "page 2 of 6.")

The Sixth Amendment guarantees a criminal defendant the effective assistance of counsel.  The United States Supreme Court set forth the test for demonstrating ineffective assistance of counsel in Strickland v. Washington, 466 U.S. 668 (1984).  To support a claim of ineffective assistance of counsel, a petitioner must first show that, considering all the circumstances, counsel's performance fell below an objective standard of reasonableness.  466 U.S. at 687-88.  After a petitioner identifies the acts or omissions that are alleged not to have been the result of reasonable professional judgment, the court must determine whether, in light of all the circumstances, the identified acts or omissions were outside the wide range of professionally competent assistance.  Id. at 690; Wiggins v. Smith, 539 U.S. 510, 521 (2003).  Second, a petitioner must establish that he was prejudiced by counsel's deficient performance.  Strickland, 466 U.S. at 693-94.  Prejudice is found where "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."  Id. at 694.  A reasonable probability is "a probability sufficient to undermine confidence in the outcome."  Id.  See also Williams, 529 U.S. at 391-92; Laboa v. Calderon, 224 F.3d 972, 981 (9th Cir. 2000).  A reviewing court "need not determine whether counsel's performance was

97

deficient before examining the prejudice suffered by the defendant as a result of the alleged

deficiencies . . . .  If it is easier to dispose of an ineffectiveness claim on the ground of lack of

sufficient prejudice . . . that course should be followed."  Pizzuto v. Arave, 280 F.3d 949, 955

(9th Cir. 2002) (quoting Strickland, 466 U.S. at 697).  In assessing an ineffective assistance of

counsel claim "[t]here is a strong presumption that counsel's performance falls within the 'wide

range of professional assistance.'"  Kimmelman v. Morrison, 477 U.S. 365, 381 (1986) (quoting

Strickland, 466 U.S. at 689).  There is in addition a strong presumption that counsel "exercised

acceptable professional judgment in all significant decisions made."  Hughes v. Borg, 898 F.2d

695, 702 (9th Cir. 1990) (citing Strickland, 466 U.S. at 689).  See also Harrington, 131 S. Ct. at

787-88 ("When 2254(d) applies, the question is not whether counsel's actions were reasonable.

The question is whether there is any reasonable argument that counsel satisfied Strickland's

deferential standard").

The Strickland standards apply to appellate counsel as well as trial counsel.  Smith

v. Murray, 477 U.S. 527, 535-36 (1986); Miller v. Keeney, 882 F.2d 1428, 1433 (9th Cir. 1989).

However, an indigent defendant "does not have a constitutional right to compel appointed

counsel to press nonfrivolous points requested by the client, if counsel, as a matter of

professional judgment, decides not to present those points."  Jones v. Barnes, 463 U.S. 745, 751

(1983).  Counsel "must be allowed to decide what issues are to be pressed."  Id.  Otherwise, the

ability of counsel to present the client's case in accord with counsel's professional evaluation

would be "seriously undermined."  Id.  See also Smith v. Stewart, 140 F.3d 1263, 1274 n.4 (9th

Cir. 1998) (counsel not required to file "kitchen-sink briefs" because it "is not necessary, and is

not even particularly good appellate advocacy.")  There is, of course, no obligation to raise

meritless arguments on a client's behalf.  See Strickland, 466 U.S. at 687-88 (requiring a

showing of deficient performance as well as prejudice).  Thus, counsel is not deficient for failing

to raise a weak issue.  See Miller, 882 F.2d at 1434.  In order to demonstrate prejudice in this

context, petitioner must show that, but for appellate counsel's errors, he probably would have

1    prevailed on appeal.  Id. at 1434 n.9.

2           As set forth above in connection with claim two, petitioner has demonstrated that

3    his appellate counsel failed to raise a meritorious Faretta error claim on appeal.  Accordingly,

4    petitioner's claim that his appellate counsel rendered ineffective assistance in failing to raise that

5    error on appeal will be granted.

6           Petitioner has failed, however, to demonstrate prejudice with respect to any other

7    aspect of his ineffective assistance of counsel claim.  Above, this court has found no merit in any

8    of petitioner's claims, other than his Faretta claim.  Petitioner and/or his appellate counsel raised

9    all of these claims in state court, where they were found to lack merit as well.  Of course,

10   petitioner's appellate counsel had no obligation to raise meritless issues on appeal.  Strickland,

11   466 U.S. at 687-88.  Appellate counsel's decision to raise issues that he believed, in his

12   professional judgment, had more merit than the claims suggested by petitioner was "within the

13   range of competence demanded of attorneys in criminal cases."  McMann v. Richardson, 397

14   U.S. 759, 771 (1970).

15          Nor has petitioner demonstrated prejudice with respect to his appellate counsel's

16   alleged failure to return the state court record to him in a timely manner.  As stated by the

17   Sacramento County Superior Court, petitioner was able to raise all of his claims numerous times

18   in state court, notwithstanding counsel's alleged failure to return the record to him in a manner

19   petitioner found to be timely.  Accordingly, other than as noted above with respect to the Faretta-

20   error claim, petitioner is not entitled to federal habeas relief on his ineffective assistance of

21   appellate counsel claim.

22          Claims Raised in Traverse

23          In his traverse, petitioner claims for the first time that the AEDPA is an

24   unconstitutional amendment to the United States Constitution.  (Traverse at 1-5.)  He also alleges

25   various errors by the state courts and state court employees in connection with his collateral

26   challenges to his conviction presented in state court.  (Id. at 6-11.)  This court will not consider

1  these new claims, raised long after the federal habeas petition was filed.  <u>Cacoperdo</u>, 37 F.3d at

2  507 (a traverse is not the proper pleading to raise additional grounds for relief); <u>see also</u>

3  <u>Greenwood v. Fed. Aviation Admin.</u>, 28 F.3d 971, 977 (9th Cir. 1994) ("we review only issues

4  which are argued specifically and distinctly in a party's opening brief").  Even if these new

5  claims had been properly raised, petitioner has not demonstrated entitlement to federal habeas

6  relief.  Petitioner has failed to support his claim that the AEDPA is unconstitutional and, as noted

7  above, claimed violations of state law are not cognizable in federal habeas corpus proceedings.

8  CONCLUSION

9        Accordingly, for all of the foregoing reasons, IT IS HEREBY ORDERED that

10  petitioner's application for a writ of habeas corpus is conditionally granted only with respect to

11  his claims of <u>Faretta</u> error and that his appellate counsel rendered ineffective assistance in failing

12  to raise that <u>Faretta</u> error on appeal.  The petition is denied in all other respects.

13        Therefore, the writ is conditionally granted and petitioner's judgment of

14  conviction shall be vacated only if respondent fails to either dismiss the enhancement allegations

15  which were added by amendment after the <u>Faretta</u> advisement and resentence petitioner, or

16  initiate proceedings to retry petitioner within ninety (90) days.  However, if either party appeals

17  the judgment in this case, no criminal proceedings need be commenced until ninety (90) days

18  after the issuance of the mandate following a final appellate decision or the denial of a petition

19  for writ of certiorari, whichever occurs later.

20  DATED: March 30, 2012.

21

22

23  DALE A. DROZD
    UNITED STATES MAGISTRATE JUDGE

24  DAD:8
    jensen512.hc

25

26